1  LYNN & FORTUNE, LLP
   Robert H. Lynn (SBN 054016)
2     Rebecca J. Fortune (SBN 229921)
   2171 India Street, Suite C
3  San Diego, California 92101
   Phone: (619) 233 - 9464
4  Fax:   (619) 702 - 6911

5

   Attorneys for Plaintiffs SDMS, INC.,
6  THOMAS P. ANDERSON and KEN PECUS

FILED

08 MAY -7 PH 4: 41

**ORIGINAL**

DEPUTY

7

8  # UNITED STATES DISTRICT COURT

9  ## SOUTHERN DISTRICT OF CALIFORNIA

10  **'08 CV   833 JM AJB**

11  SDMS, INC., THOMAS P. ANDERSON, and
   KEN PECUS,
12   

            Plaintiffs,
13

14        vs.

 ROCKY MOUNTAIN CHOCOLATE FACTORY
15  INC.,

16        Defendant.

17

18

19

20

Case No.:

COMPLAINT FOR INJUNCTIVE RELIEF,
DECLARATORY RELIEF AND DAMAGES:

1.  Rescission and/or Damages - Failure of
    Consideration (Cal. Civ. Code §1689);
2.  Negligence;
3.  Unconscionable Contract (Cal. Civ. Code
    §1670.5);
4.  Violations of Section 17000 of the
    California Business & Professions Code;
5.  Violations of Section 17200 of the
    California Business & Professions Code.

21       COMES NOW Plaintiffs, SDMS, INC., THOMAS P. ANDERSON and KEN PECUS, by and

22  through their counsel, and assert the following claims for relief against Defendants, ROCKY

23  MOUNTAIN CHOCOLATE FACTORY, INC., a Colorado corporation.

24                  **PARTIES**

25       1.    Plaintiffs, SDMS, INC., a California sub-chapter "S" corporation ("SDMS"), THOMAS

26  P. ANDERSON, an individual ("ANDERSON") and KEN PECUS, an individual ("PECUS")

27  (hereinafter, unless specifically identified otherwise, Plaintiffs collectively referred to as "SDMS") are,

28

1    and at all times herein mentioned were, residents of San Diego County, California and are the previous

2    owners of a Rocky Mountain Chocolate Factory franchised retail location at 234 5th Avenue, Space B,

3    San Diego, California 92101 ("the Gaslamp Franchise").

4          2.        Upon information and belief and thereon alleged, Defendant ROCKY MOUNTAIN

5    CHOCOLATE FACTORY, INC. ("RMCF") is a Colorado corporation with a principal place of

6    business located in Durango, Colorado. As such and, upon information and belief, RMCF is a citizen of

7    the State of Colorado. And, at all times mentioned herein, has been registered to do business in the State

8    of California as a franchisor of retail chocolate store locations.

9                                    **JURISDICTION AND VENUE**

10         3.        This Court has original subject matter jurisdiction over this action under 28 U.S.C. §

11   1332(a)(1), in that this is a civil action where the matter in controversy exceeds the sum or value of

12   $75,000, exclusive of interest and costs, and, is between citizens of different States.

13

14         4.        Venue is proper in the Southern District of California because the contracts forming the

15   subject matter of this Complaint were entered into in San Diego County, California and the location of

16   Plaintiffs' business premises at issue under those contracts is located in San Diego County.

17                                        **JURY DEMAND**

18         5.        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands the

19   right to a trial by jury.

20                                   **GENERAL ALLEGATIONS**

21   **Case Background**

22   **SDMS**

23         6.        At all times throughout ANDERSON's life, his family has been employed in the

24   chocolate/candy making and retail industry. In this regard, both of ANDERSON's paternal

25   grandparents, his father, his mother and his aunt worked at the Schrafft Chocolate Factory in Boston,

26   Massachusetts. Since 1974, ANDERSON's mother has been employed at "Russo's Fine Chocolates"

27   located in Saugas, Massachusetts. Throughout his life, ANDERSON would visit is mother at Russo's

28

Fine Chocolates where she would teach him various candy and chocolate making techniques and recipes.

7.    At all times relevant to the allegations alleged herein, PECUS has been employed as a licensed California real estate sales person.  In or about 2005, PECUS became the co-owner of Ascent Real Estate, Inc., a California corporation.

8.    In or about the spring of 2003, ANDERSON decided that he would like to enter the chocolate/candy making and retail business for himself and he began researching the business opportunities near his home in San Diego, California.

9.    Upon information and belief and thereon alleged, in or about June 2003, ANDERSON contacted Counter-defendant, RMCF with regards to becoming a licensed Rocky Mountain Chocolate Factory franchisee.

**RMCF – "Franchisor"**

10.    RMCF is the franchisor of a retail chocolate store concept that was founded and operated upon the premise that the franchisee could fund, own and operate a retail gourmet chocolate store selling chocolates and other premium confectionary products.  The emphasis required by, and advertised at the insistence of the franchisor, was based upon the sale of a gourmet and/or premium product, utilizing all natural ingredients.  The RMCF franchise is promoted as the "perfect family business," with the vast number of its franchises owned and operated by small businesses comprised almost entirely of immediate family members.

11.    Upon information and belief and thereon alleged, at the time of filing this complaint, RMCF has sold in excess of three hundred (300) franchise locations within the United States, seventy (70) within the State of California alone, to franchisees who paid a minimum initial franchise fee of

$19,500. Accordingly, RMCF has built a business system on more than $5,850,000.00 in capital invested by individual franchise owners and not themselves.

12.    Each RMCF franchisee signed a standardized form franchise agreement prepared by RMCF. As part of the standard "Franchise Agreement," executed by all RMCF franchisees, franchisees are required: (1) to pay to RMCF a royalty (averaging between 5-10%), based on the gross sales of the individual's franchised retail location and; (2) to purchase products directly from Defendant, RMCF to meet certain display and inventory requirements for their individual RMCF retail franchise location. Upon information and belief and thereon alleged, in fiscal year 2007, RMCF franchisees paid in excess of $5,500,000 to RMCF in royalty fees and in excess of $15,000,000 in products produced by RMCF at its wholly-owned Durango, Colorado manufacturing facility.

13.    Upon information and belief and thereon alleged, in addition to its franchising activities, RMCF engages in the sale of its products to customers outside its franchising system.  Such outside customers include wholesale distribution centers such as Costco Wholesale Corporation, discount retail outlets such as Target, internet-based retail outlets such as "Proflowers.com," "Amazon.com," "Shop.com," and catalog retailers such as "Wine Country Gift Baskets" (collectively, RMCF's "Direct Customers").

14.    Upon information and belief and thereon alleged, RMCF does not set a minimum sales price requirement with regards to its Direct Customers prior to their purchase of product from RMCF. As a result, RMCF's Direct Customers are free to set any sales price they so choose, even if it undercuts the franchisee by more than forty percent (40%).

15.    Upon information and belief and thereon alleged, during Bryan Merryman's service on the RMCF Board of Directors and as RMCF's Chief Operating Officer, RMCF has been actively marketing its products outside the franchising system, realizing an increase in revenues from such sales

in excess of fifty percent (50%) in each of the last three years. During the same time frame, franchise sales have increased at the much more modest rate of approximately two percent (2%) per year with actual pounds

of product purchased by the franchising system in negative numbers. Further, upon information and belief and thereon alleged, RMCF sells certain products to its Direct Customers that are either not available to or, are sold at a lesser per-unit cost, than it sells the same (or equivalent) product within the franchising system.

16.     Prior to the sale of each of its franchises within the State of California, RMCF issued pre-sale disclosures mandated by the Federal Trade Commission's ("FTC") Franchise Disclosure Rule, 16 C.F.R. Part 436 and applicable state law, including the California Franchise Investment Law ("CFIL", Cal. Corp. Code § 31000, et seq. RMCF's pre-sale disclosures were reduced to writing and are embodied in a "Uniform Offering Circular" ("UFOC") presented to each franchisee prior to their purchase of an RMCF franchise. RMCF did not disclose to any of its franchisees, prior to their investment in the franchise, that it intended to make a concerted effort to expand its sale of products to Direct Customers and that such sales were growing at a rate in significant excess of that of its franchising sales revenue. A true and correct copy of the RMCF June 2003 UFOC is attached hereto as Exhibit "1" and is incorporated by reference herein.

17.     RMCF reports that one of its principal competitive strengths is in its knowledge and experience in applying criteria for selection of new retail store locations. RMCF admits that careful selection of a site is critical to the success of a Rocky Mountain Chocolate Factory store. Final site selection occurs only after RMCF's senior management has approved the site. Further, RMCF admits that a franchised location's economic viability depends, in part, upon obtaining a suitable location "at reasonable occupancy costs".

18.    Upon information and belief and thereon alleged, if a franchisee is opening a new RMCF retail location, it is solely responsible for all costs involved in the build-out of their store location. RMCF's June 2003 UFOC discloses the estimated cost of build-out to be $302,500 for a full-sized RMCF retail store.  While RMCF's UFOC does disclose the gross income of the top 75% of all RMCF stores, it does not disclose any anticipated operating costs or expenses related to the operation of a RMCF franchised retail location.  Further, the RMCF UFOC states specifically, "We do not have access to or knowledge of the expenses or costs incurred by each of the 175 franchised Stores."  Upon information and belief and thereon alleged, RMCF's "Operations Manual," provided to the RMCF franchisee only *after* executing the Franchise Agreement, contains pro forma cost and expense information related to the operation of an RMCF franchised retail location.

19.    Upon information and belief and thereon alleged, the RMCF standard Franchise Agreement, signed by all franchisees, requires that each franchisee provide RMCF with a "Quarterly financial statement, prepared in accordance with generally accepted accounting principals ("GAAP") and consisting of a profit and loss statement and balance sheet" for each of their RMCF franchised retail locations.

20.    In addition to those provisions cited above, RMCF's standard Franchise Agreement contains the following terms:

a.    Paragraph 2.2 – " … The Franchisee is required to devote a minimum of fifty percent (50%) of all retail display space to ROCKY MOUNTAIN CHOCOLATE FACTORY brand assorted bulk chocolates and boxed and packaged candies.  The franchisee's [RMCF] Store must feature [RMCF] brand candy manufactured by the Franchisor …"



b.   Paragraph 5.1 – "The Franchisee shall obtain the Franchisor's prior written approval before executing any lease or purchase agreement for the Franchise Location.

c.   Paragraph 10.1(e) – "The Franchisee shall offer only authorized products and services ..."

d.   Paragraph 11.1 – "The Franchisee agrees to pay to the Franchisor a monthly royalty ("Royalty") equal to 5% of its Gross Retail Sales generated from or through its [RMCF] Store ... The Franchisee also agrees to pay a quarterly Royalty based on Adjusted Gross Retail Sales during each calendar quarter ... the Franchisee shall owe the Franchisor a quarterly Royalty equal to 10% of its Adjusted Gross Retail Sales..."

e.   Paragraph 12.3 – "The Franchisee shall pay to the Franchisor, in addition to Royalties, a fee of 1% of the total amount of the Franchisee's Gross Retail Sales ("Marketing and Promotion Fee") ..."

f.   Paragraph 13.4 – "The Franchises shall be required to purchase all of its Factory Candy for its RMCF Store from the Franchisor or its designee."

g.   Paragraph 18.1(a) – "Termination by Franchisor – Ten Days Notice. Abandonment. If the Franchisee ceases to operate the [RMCF] Store or otherwise abandons the [RMCF] Store for a period of five consecutive days ..."

h.   Paragraph 18.2(e) – "Termination by Franchisor – Thirty Days Notice. Breach of Related Agreement. The Franchisee defaults under any term of the lease ..."

i.   Paragraph 18.3(a) – "Failure to Pay. ... Additionally, the event this Agreement is terminated by the Franchisor prior to its expiration ... the Franchisee acknowledges and

agrees that in addition to all other available remedies, the Franchisor shall have the right to recover lost future Royalties during any period in which the Franchisee fails to pay through and including the remainder of the then-current term of this Agreement."

j.      Paragraph 18.4 – "Right to Purchase.  Upon termination, the Franchisor shall have the option to purchase .... at fair market value ..."

k.      Paragraph 20.2 – Post-Termination Covenant Not to Compete.  Upon termination of Franchise Agreement for any reason, Franchisee agrees not to compete within a ten-mile radius of their existing Franchise Location or within a ten-mile radius of any other RMCF franchise location.

A true and correct copy of the RMCF standard Franchise Agreement, as it is attached to the June 2003 RMCF UFOC, is attached hereto as Exhibit "2" and is incorporated by reference herein.

21.     Upon information and belief and thereon alleged, not only does RMCF require that all franchisees purchase products from RMCF, it also requires that such products be delivered to the franchisee by RMCF at an additional freight charge above and beyond the cost of the product to the franchisee.  Upon information and belief and thereon alleged, under certain circumstances and with regards to certain products, the RMCF franchisee can purchase, repackage and sell RMCF products at a lesser total per-unit cost if such items are initially purchased, by the franchisee, from one of RMCF's Direct Customers, such as Costco, than it can if purchasing from RMCF.

22.     Upon information and belief and thereon alleged, RMCF's standard Franchise Agreement does not permit the franchisee to terminate the RMCF Franchise Agreement under any circumstances.

23.     Upon information and belief and thereon alleged, an RMCF franchisee has a higher profit margin (income after deducting costs and expenses) when selling "store made products" versus products

purchased in their final form from RMCF.  Upon information and belief and thereon alleged, RMCF is

aware of this fact.  In or about 2002 or 2003, RMCF changed its royalty fee calculation so that all non-

RMCF factory products would incur a total royalty of ten percent (10%), up from the five percent (5%)

charged since RMCF's inception.  Upon information and belief and thereon alleged, RMCF, via its

many representatives, disclosed this change to be of benefit to the RMCF franchisee.

**The Gaslamp Franchise**

24.    Upon information and belief and thereon alleged, in or about September 2003, a RMCF's

Franchise Sales Representative, Kraig Carlson, personally visited 234 5th Avenue, Space B, San Diego,

California 92101 ("the Gaslamp Franchise"), the location proposed by Plaintiffs for their Rocky

Mountain Chocolate Factory franchise location.  The proposed Gaslamp location included a total lease

space of 1,983 square feet.  Mr. Carlson, on behalf of RMCF, not only physically inspected the Gaslamp

Franchise, he also reviewed the proposed lease agreement.  Upon RMCF's approval of both the location

and lease agreement, Plaintiffs executed a lease agreement ("Lease Agreement") with S.D. Bridgeworks,

LLC on October 9, 2003.  A true and correct copy of the Lease Agreement is attached as Exhibit "3"

hereto and is incorporated by reference herein.  Under terms of the Lease Agreement, Plaintiffs'

monthly lease payment was $4,957.50 for the months 1 through 12; $6,444.75 for months 13 through

24; $7,932.00  for months 25 through 36 and; $8,427.75 for months 37 through 40.  The lease agreement

also included a requirement for Plaintiffs to pay to the landlord: (a) a sum equal to six percent (6%) of

their monthly Gross Retail Sales and, (b) 8.55% of monthly operating expenses.

25.    Upon information and belief and thereon alleged, Counter-claimants spent in excess of

$300,000.00 for costs and expenses required to open the Gaslamp Franchise.

26.    Upon information and belief and thereon alleged, Counter-claimants opened the Gaslamp

Franchise for business in February 2004.

27.    Upon information and belief and thereon alleged, at all times from the date of opening through and until approximately June 2006, the Gaslamp Franchise was operated in strict compliance with the RMCF Franchise and Operations Manual.

28.    Upon information and belief and thereon alleged, despite Plaintiffs' best efforts and absolute compliance with the RMCF business model, the Gaslamp Franchise never produced sufficient income to meet SDMS' operating expenses.

29.    Upon information and belief and thereon alleged, since first opening the Gaslamp Franchise in February 2004, Plaintiffs were required to contributed approximately $100,000.00 of personal financing to meet the store's financial obligations.

30.    In or about May 2006, due the Gaslamp Franchise's poor performance, SDMS began looking for ways to increase their revenue.  In this regard, Plaintiffs requested RMCF's approval to sell additional items in their store (individual chocolate pieces commonly referred to as "ganasch" developed and hand-made by ANDERSON) to help generate enough revenue to meet their monthly financial obligations.  After initially providing positive feedback, RMCF refused to give its approval and demanded that SDMS immediately dispose of any product then existing in the Gaslamp Franchise.

31.    Upon RMCF's refusal ANDERSON wrote RMCF a letter expressing SDMS' desire to disassociate from RMCF and continue operating a business in their current location under a different name.

32.    Between February 2004 and November 2006, SDMS suffered a total operating loss in the approximate amount of $234,168.00 relating to their Gaslamp RMCF franchise location.

33.    Between February 2004 and November 2006, SDMS paid approximately $51,000.00 in royalty and marketing fees to RMCF relating to their Gaslamp RMCF franchise location.

34.    Between February 2004 and November 2006, SDMS purchased approximately $246,450.00 worth of product from RMCF for their Gaslamp RMCF franchise location.

35.    Between February 2004 and November 2006, SDMS paid approximately $166,000.00 in commercial lease payments to S.D. Bridgeworks.

**RMCF's Termination of the Gaslamp Franchise**

36.    Without further communication with Plaintiffs, RMCF filed an action against SDMS, INC., THOMAS P. ANDERSON and KENNETH PECUS in the state court of Colorado seeking only injunctive and declaratory relief.  The action was later removed to the United States District Court for the District of Colorado based upon diversity of citizenship.  However, the case was held in abeyance while the parties attempted to resolve their dispute without the need for litigation.  During the course of litigation, Plaintiffs were led to believe there would be an opportunity for settlement that would allow them continued possession and control of their Gaslamp location if certain adjustments were made with regards to the type of items offered for sale.   From Plaintiffs' prospective, at no time did these adjustments involve exclusion of chocolates or other confectionary items from the products to be sold. After a substantial amount of settlement discussions through the months of June 2006 – September 2006, it became clear that RMCF would not agree to any settlement that allowed SDMS' continued possession and control in addition to a continued ability to sell chocolates and other confectionary items. For these reasons, settlement discussions were terminated and, on October 20, 2006, RMCF filed an Amended Complaint alleging the following causes of action against SDMS, ANDERSON and PECUS: (1) Trademark Infringement under the United States' Lanham Act based upon SDMS' alleged use of the RMCF marks without consent from October 10, 2006 through the time of filing on October 20, 2006; (2) Unfair Competition under the United States' Lanham Act based upon SDMS' alleged use of RMCF marks without consent and continued sale of unauthorized products; (3) Breach of Contract (common

law) based upon Plaintiffs alleged: (a) sale of unauthorized product beginning in or about August 2006, (b) failure to pay royalties beginning in or about May 2006, (c) failure to abide by RMCF's post-termination provisions including, but not limited to selling all assets associated with the Gaslamp Franchise to RMCF at the offered price of $60,000; (4) Violation of Colorado Trade Secrets Act based upon SDMS' alleged use of RMCF trade secret material without consent from October 10, 2006 through October 20, 2006; and (5) Declaratory Judgment seeking enforcement of Plaintiffs' Franchise Agreement, including the post-termination provisions including, but not limited to, the forced sale of assets and enforcement of the 2-year, 10-mile covenant not to compete. ("Colorado Complaint" - USDC Case No. 06cv01212, hereinafter referred to as the "Colorado Action").

37.    On November 7, 2006, in response to RMCF's Colorado Complaint, Plaintiffs filed an Answer and the following Counter-Claims for damages in the Colorado District Court: (1) Rescission – Material Misrepresentation in Registration Application based upon RMCF's alleged misstatement of material fact with regards to three specific issues contained within its Uniform Offering Circular (attached hereto as Exhibit "#"); (2) Damages - Material Misrepresentation in Registration Application based upon RMCF's alleged misstatement of material fact with regards to three specific issues contained within its Uniform Offering Circular; (3) Damages – Improper Termination of Franchise based upon RMCF's alleged retaliatory termination of Plaintiffs' Franchise Agreement in or about October 2006; (4) Rescission – Fraud in the Inducement based upon RMCF's alleged misstatement of material fact with regards to three specific issues contained within its Uniform Offering Circular; (5) Rescission – Unconscionable Contract under Colorado Revised Statutes section 4-2-302 based upon the unconscionable construction and application of the Rocky Mountain Chocolate Factory Franchise Agreement; (6) Damages – Fraud based upon RMCF's alleged misstatement of material fact with regards to three specific issues contained within its Uniform Offering Circular; (7) Damages – Breach of

Contract based upon RMCF's alleged failure to provide operational assistance as required by the Franchise Agreement; and (8) Breach of Covenant of Good Faith and Fair Dealing. (Hereinafter "Colorado Counter-Claims").

38.    Also filed by Plaintiffs on November 7, 2006 was a motion to transfer venue from the District of Colorado to the Southern District of California based upon: (a) Plaintiffs' residence in San Diego County, (b) RMCF's registration as a California franchisor, (c) RMCF's sale of franchises in San Diego County, (d) SDMS' operations in San Diego County, and (e) California Business and Professions Code section 20040.4 which states, "A provision in a franchise agreement restricting venue to a forum outside this state is void with respect to any claim arising under or relating to a franchise agreement involving a franchise business operating within this state."

39.    On November 17 and, continuing on November 29, oral argument was held with regards to Plaintiffs' motion to transfer venue wherein the presiding District Court Judge, the Honorable Wiley Y. Daniel, failed to apply the aforementioned California law and venue was maintained in the District of Colorado.

40.    Upon information and belief and thereon alleged, had Plaintiffs' been permitted to transfer venue to the Southern District of California, they would have been permitted to allege counter-claims available only under California law.  However, because venue was maintained in the District of Colorado, Colorado substantive law applied and Plaintiffs were prohibited from bringing their intended California claims.  Because the State of Colorado does not possess any laws comparable to the California Franchise Investment Law, Plaintiffs were able to maintain their two causes of action for misrepresentation brought thereunder.

41.    On or about August 24, 2007, RMCF filed a Motion for Summary Judgment in the Colorado Action seeking summary judgment with regards to each of Plaintiffs' seven Colorado Counter-

1    Claims. After oral argument conducted on November 15, 2007 and, via Order issued on November 30,

2    2007, summary judgment was granted in RMCF's favor with regards to: (a) one of the three allegations

3    of fraud (one allegation was voluntarily withdrawn by Plaintiffs and one remains), (b) Plaintiffs' Third

4    Colorado Counter-Claim for Improper Termination based upon a finding that SDMS' failed to make

5    royalty payments and sold unauthorized products, each prohibited by the Franchise Agreement, (c)

6    Plaintiffs' Fifth Colorado Counter-Claim for Unconscionable Contract based upon the Court's finding

7    that Colorado Revised Statute section 4-2-302 did not apply to franchise agreements, therefore, the

8    Court never reached a decision based upon the merits of Plaintiffs' claim thereunder, and (d) Plaintiff's

9    Eighth Colorado Counter-Claim for Breach of Covenant of Good Faith and Fair Dealing based upon the

10   Court's finding that RMCF's differential treatment of SDMS did not violate in individual term of the

11   Franchise Agreement. (Plaintiffs' voluntarily withdrew its seventh Colorado Counter-Claim for Breach

12   of Contract).

13        42.    Upon information and belief and thereon alleged, as of the date of this complaint,

14   discovery has been completed and the Colorado Action is prepared for trial, currently scheduled for

15   November 3, 2008. The only remaining issues and/or claims to be tried are: (a) RMCF's claim for

16   Breach of Contract based upon SDMS' sale of unauthorized products and failure to pay royalties

17   (RMCF voluntarily withdrew its intellectual property and declaratory relief claims) and (b) SDMS'

18   allegation of fraud with regards to misrepresentations contained within RMCF's UFOC related to

19   RMCF's knowledge of its franchisees' "actual financial performance".

20        43.    Upon information and belief and thereon alleged, this Complaint is properly filed in the

21   Southern District of California and Rule 13(a) of the Federal Rules of Civil Procedure relating to

22   compulsory counter-claims does not apply as the allegations maintained herein do not relate to the same

23   transaction or occurrence as did RMCF Colorado Complaint in that the Colorado Action was

specifically limited to SDMS' alleged breach of the Franchise Agreement and unauthorized use of the RMCF marks in or about the summer and fall of 2006.  As such, the law and facts required to prove the claims maintained hereunder were not applicable nor relevant to, nor properly discoverable, in the Colorado Action.

## FIRST CAUSE OF ACTION

### Failure of Consideration (California Civil Code §1689)

44.    Plaintiffs refer to, and incorporate by reference herein, each and every allegation contained in all proceeding and subsequent paragraphs as if fully set forth herein.

45.    In consideration of, and exchange for, their payment of Initial Franchisee Fees in the amount of $19,500, SDMS was to receive the beneficial use of the service mark "Rocky Mountain Chocolate Factory" which was advertised and disclosed by RMCF to indicate gourmet chocolates and premium confections.

46.    As a result of RMCF's sale of products on a discount basis to Direct Customers such as Costco and Target, the value of the service mark "Rocky Mountain Chocolate Factory" has been substantially diminished. As a consequence of their actions, the consideration provided by RMCF to the contract (its franchise agreement) has failed.

47.    As a result of the failure of RMCF's consideration, Plaintiffs are entitled to the remedy of rescission (and restitution) or, in the alternative, SDMS is entitled to recover damages in an amount to be established at trial, but no less than $700,000.00, representing the Initial Franchise Fee, construction costs, opening expenses, operating losses, royalty and marketing fees and the profit on any product purchased by Plaintiff from RMCF from February 2004 – May 2006.

## SECOND CAUSE OF ACTION

### Negligence

48.    Plaintiffs refer to, and incorporate by reference herein, each and every allegation contained in all proceeding and subsequent paragraphs as if fully set forth herein.

49.    RMCF reports that one of its principal competitive strengths is in its knowledge and experience in applying criteria for selection of new retail store locations.  RMCF admits that careful

1    selection of a site is critical to the success of a Rocky Mountain Chocolate Factory store. Final site

2    selection occurs only after RMCF's senior management has approved the site. Further, RMCF admits

3    that a franchised location's economic viability depends, in part, upon obtaining a suitable location "at

4    reasonable occupancy costs".

5        50.     Upon information and belief and thereon alleged, as a result of holding itself out as

6    having special expertise in choosing an "economically viable" location for each of its franchise

7    locations, RMCF possessed an increased standard of care when advising the Plaintiffs with regards to

8    the suitability of the Gaslamp location as an RMCF franchise.

9        51.     Upon information and belief and thereon alleged, RMCF had a duty to exercise its good

10   judgment and to take actions in a manner that put the interests of SDMS ahead of its own.

11       52.     RMCF has breached its duty to Plaintiffs by committing all acts mentioned in this

12   complaint but specifically in advising the suitability of the Gasplamp location for an RMCF franchised

13   retail location.

14       53.     As a direct and proximate result of RMCF's breach, Plaintiffs have been damaged in an

15   amount to be established at trial, but no less than $700,000.00, representing the lease payments, Initial

16   Franchise Fees, construction costs, opening expenses, operating losses, royalty and marketing fees and

17   the profit on any product purchased by Plaintiff from RMCF from February 2004 – May 2006. with

18   regards to the Gaslamp Franchise.

### THIRD CAUSE OF ACTION

### Unconscionable Contract (California Civil Code §1670.5)

21       54.     Plaintiffs refer to, and incorporate by reference herein, each and every allegation

22   contained in all proceeding and subsequent paragraphs as if fully set forth herein.

23       55.     Strict application of the RMCF Franchise Agreement and Operations Manual results in

24   the following:

25       a.     As stated in their Offering Circular, the costs associated with establishing a new

26              RMCF franchise average between $128,000 and $430,000. Yet, under the terms of the

27              standard RMCF franchise agreement, in the event of a franchisee's default or termination,

regardless of the time in business, RMCF may exercise its option to repurchase the franchise at "fair market value". Upon information and belief and thereon alleged, a significant number of RMCF franchisees have defaulted and/or been terminated as a result of poor business performance. Because "fair market value" takes into consideration business performance, the associated value at the forced sale to RMCF is often much less than is the costs for a new franchise. As a result, RMCF is able to purchase for themselves or, offer for sale to a third party, an existing franchise location at a much discounted rate. In this case, while Plaintiff's spent in excess of $300,000.00 opening the Gaslamp Franchise in February 2004, RMCF offered the sum of $60,000.00 only two years later.

b.    Under paragraphs 2.2 and 10.1(e) of the RMCF Franchise Agreement and certain other provisions of the RMCF Operations Manual, Plaintiffs are required to devote a minimum of 50% of all display space to the sale of RMCF "Factory Candy". All other space must offer for sale only those other items specifically approved of by RMCF, yet RMCF maintains absolute authority to withhold approval. In the event that the sale of the aforementioned items do not produce an adequate income stream to meet the franchisee's financial obligations, there is no remedy available to the franchisee and RMCF may force a sale of the franchise, as was the case herein.

c.    Paragraph 12.3 of the RMCF Franchise Agreement requires the franchisee to contribute 1% of its monthly gross sales for the purposes of marketing and promotion. However, there is no requirement under paragraph 12.3 that such funds, or any portion thereof, are devoted to marketing and promotion within the franchisee's region or business area. Upon information and belief and thereon alleged, RMCF collects this fee for its own personal gain without any intent to benefit the franchisee.

d.    Paragraphs 18.2(e), 18.3, 18.4 and 18.5 permit RMCF to terminate the franchise agreement and enforce its rights of re-purchase in the event that the franchisee breaches a "related agreement" including the lease agreement. This right is true regardless of the reason for the franchisee's breach, including but not limited to, the franchisee's inability

to pay rent as result of events described in paragraph (b.) above. The franchisee (Plaintiffs) have no reciprocal right of termination.

    e.    Paragraphs 20.1 and 20.2 prohibit any franchise from owning or operating any business where more than 10% of the gross retail sales are generated from the manufacture or sale of chocolate or "other non-chocolate confectionary items" for two years within a ten-mile radius of their existing franchise location or within ten miles of any other RMCF franchise. These provisions apply regardless of the franchisee's prior work history, experience or education within the chocolate or candy making profession.

56.    Plaintiffs seek a judgment from this Court that the RMCF Franchise Agreement and all related documents are rescinded by reason of being unconscionable under California Civil Code §1670.5. In the alternative, Plaintiffs seek a judgment from this court invalidating the certain provisions as outlined above and permitting the enforcement of all other contract provisions.

**FOURTH CAUSE OF ACTION**

**Violation of Cal. Bus. & Prof. Code §1700, et seq.**

57.    Plaintiffs refer to, and incorporate by reference herein, each and every allegation contained in all proceeding and subsequent paragraphs as if fully set forth herein.

58.    Plaintiffs and defendant were engaged in the sale of articles or products including services as defined under California Business & Professions Code Sections 17023 and 17024.

59.    RMCF committed unfair, deceptive or illegal acts or practices as defined under California Business & Professions Code Section 1700, et seq. and which are actionable under California Business & Professions Code Section 17070.

60.    The unfair, deceptive or illegal acts or practices committed by RMCF were a series of acts and violations that, in addition to being separately actionable, are part of an actionable pattern or violations and misconduct which included, but were not limited to:

    a.    Offering its product for sale to discount retailers such as Costco, Target and "Shop.com" (as defined more particularly at paragraph 13 above), thereby diminishing the value of its trade name;

   b. Offering its products for sale to its Direct Customers at a lesser cost per unit than is offered to its franchise system;

   c. Offering products for sale to its Direct Customers that are unavailable to the franchise system;

   d. Failing to disclose any of the actions contained at sub-sections a. – c. herein to Plaintiff in advance of their execution of the franchise agreement.

61. The misconduct of the defendant should be preliminarily and permanently enjoined and all Uniform Offering Circulars submitted by RMCF to the California Department of Corporations and thereon distributed to each of its existing franchisees as well as all RMCF standard franchise agreements executed by each of the 70+ California franchisees should be declared null and void pursuant to California Business & Professions Code Section 17051.

## FIFTH CAUSE OF ACTION

### Violation of Cal. Bus. & Prof. Code §17200, et seq.

62. Plaintiffs refer to, and incorporate by reference herein, each and every allegation contained in all proceeding and subsequent paragraphs as if fully set forth herein.

63. Plaintiffs and defendant are "persons" as defined under California Business & Professions Code Section 17201. RMCF committed unlawful, unfair or fraudulent business acts or practices as defined under California Business & Professions Code Sections 17200, 17203 and other applicable statutory provisions of the California Business & Professions Code.

64. RMCF owed SDMS a duty to not engage in illegal, fraudulent or unfair trade practices prohibited under Section 17200, et seq. of the California Business & Professions Code.

65. The above actions of RMCF constituted illegal trade practices in violation of Section 17200 of the California Business & Professions Code including but not limited to violations of the CFIL, the FTC Act, 15 United State Code Section 45, and the FTC Disclosure Rule, Title 16 Code Federal Regulations Part 436. Said violations include oral and written misrepresentations as set for in the preceding paragraphs.

66. The above actions of RMCF also constituted fraudulent trade practices in violations of Sections 17200 and 17500 of the California Business & Professions Code. RMCF had the capacity to

deceive Plaintiffs and others because RMCF had superior and exclusive knowledge of their business and SDMS and members of the general public had no method of learning the falsity of those misrepresentations as outlined in preceding paragraphs.

67.    The unfair, deceptive or illegal acts or practices committed by RMCF were a series of acts and violations that, in addition to being separately actionable, are part of an actionable pattern or violations and misconduct which included, but were not limited to:

    a.  Unfairly cannibalizing its franchise system by:

        i.  Offering its product for sale to discount retailers such as Costco, Target and "Shop.com" (as defined more particularly at paragraph 13 above), thereby diminishing the value of its trade name;

        ii.  Offering its products for sale to its Direct Customers at a lesser cost per unit than is offered to its franchise system;

        iii.  Offering products for sale to its Direct Customers that are unavailable to the franchise system;

    b.  Failing to disclose any of the actions contained at sub-section a. i. – iii. herein to Plaintiffs in advance of their execution of the franchise agreement;

    c.  Using the method of unfairly cannibalizing its franchise system in a long term scheme, conspiracy, plan and/or pattern of misconduct to cause a forfeiture or breach of the franchise agreement thereby driving down the value of the individual RMCF franchisees' "goodwill" and "going concern" value of their business;

    d.  "Gouging" the RMCF franchisees on the costs and freight of products purchase directly from RMCF;

    e.  Interfering, disparaging, defaming and otherwise trying to prevent the communication and organization of failing RMCF franchisees;

    f.  Utilizing artful drafting of franchise contracts of adhesion to carry out and/or facilitate the long term scheme, conspiracy and pattern of activity or misconduct described herein;

g.  Unfairly attempting to utilize the law of the State of Colorado in the RMCF standard Franchise Agreement and the post-term non-competition covenants unenforceable under California Business & Professions Code Sections 16600 and 20040.5.

h.  Upon information and belief and thereon alleged, unfairly using independently owned and operated RMCF franchisees to diminish RMCF's expenses for its employees and manufacturing practices;

i.  Upon information and belief and thereon alleged, conspiring with its Direct Customers to sell products at less than cost to the RMCF franchisee;

j.  Misrepresenting and deliberately withholding of information and financial data about the profitability of the RMCF franchised retail store;

k.  Using in-terrorem tactics, threats, intimidation and other deceitful and unfair practices to force franchisees to remain in financial destructive relationships including, but not limited to, threatening franchisees with a lawsuit seeking a forced sale of their franchised location and/or lost future royalties for the remaining term of their franchise agreement;

l.  Undermining the RMCF business model in which each RMCF franchisee had made a firm specific investment by selling products to discount retailers;

m.  Charging and collecting royalty payments from the RMCF franchisees while actively working to cannibalize the franchise system by developing a market place of Direct Customers, destroying and/or drastically reducing the RMCF franchisees' "good will" and the "going concern value" of their independently owned franchised business;

n.  Charging and collecting "marketing fees" over a period of more than four years and unfairly utilizing those funds for advertising RMCF's own, factory brand products sold to Direct Customers and not to the franchise system.

\\\

\\\



68.    As a result of the above-referenced misconduct, RMCF was unjustly enriched not just by the unfair collection of royalties and marketing fees totaling more than $19,000,000.00 during the pendancy of the scheme, conspiracy and pattern of conduct, but by the increase in their own revenues in an amount of up to and possibly exceeding $3,500,000.00 for calendar year 2007 alone, all of which defendants should be ordered to disgorge.

69.    In addition, penalties should be assessed against RMCF for each violation as committed multiple times against each of the 70+ RMCF franchisees within the State of California under California Business and Professions Code Section 17206.

70.    Plaintiff is entitled to declaratory and injunctive relief declaring the franchise agreements with RMCF to be null and void as a result of the alleged misconduct of RMCF and ordering that Plaintiff be entitled to operate a business as a chocolate and/or candy store without any further payments of royalties or marketing fees and without any interference with their business operations by RMCF.

71.    Plaintiff seeks declaratory and injunctive relief declaring that all of the RMCF standard Franchise Agreements executed by RMCF franchisees are null and void under California law including but not limited to California Business & Professions Code Sections 17051 and 17046-17048 and as unconscionable contracts of adhesion and preliminarily and permanently enjoining RMCF from issuing replacement documents for those unlawful agreements.

72.    The illegal, fraudulent and unfair business practices of RMCF presents a continuing threat to Plaintiffs and to members of the public in that RMCF persist in these practices and will do so unless and until a permanent injunction is issued by this Court. Such permanent injunctive relief should also include ancillary equitable relief of rescission of contract, restitution, and ancillary damages to Plaintiffs.

73.    As a direct result of the above illegal, fraudulent and unfair business practices, RMCF has been unjustly enriched and has otherwise received revenues from Plaintiffs and others as a result of their violations of section 17200 of the California Business & Professions Code which should be held in trust and disgorged, including the monies and other items paid by Plaintiffs including franchising fees, royalties, and inventories, which monies should be returned to Plaintiffs and others similarly situated by

1  restitution, disgorgement or other equitable remedies.

2      74.     Plaintiffs are entitled to attorneys fees due to the common fund doctrine and under the

3  private attorney general doctrine including under Section 1021.5 of the California Code of Civil

4  Procedure.

5                              **PRAYER FOR RELIEF**

6      WHEREFORE, Plaintiffs respectfully request that the Court enter Judgment against the

7  defendant and order:

8      a.    For an award of general and special monetary damages against RMCF in an amount

9            equal to Plaintiffs' direct, indirect and consequential damages;

10     b.    For an award of punitive or exemplary damages assessed against defendants according to

11           proof where appropriate and per the allegations cited above;

12     c.    For an award of pre-judgment interest;

13     d.    For cost of suit;

14     e.    For preliminary and permanent injunction enjoining defendant RMCF from illegal,

15           fraudulent and unfair trade practices and related equitable;

16     f.    For defendant RMCF to make restitution to Plaintiffs of all royalties, marketing fees, and

17           its profit on the shipment and sale of product to Plaintiff obtained during the period of

18           time in which RMCF was engaged in its violation of California Business and Professions

19           Code Section 17200 et seq.;

20     g.    For the disgorgement by RMCF of its revenues obtained by and through its violations of

21           California Business and Professions Code Section 17200 et seq.;

22     h.    For the imposition of penalties for each and every violation of the California Business

23           and Professions Code Section 17200 and 17500, et seq.;

24  \\\

25  \\\

26  \\\

27  \\\

28  \\\

1    i.       For an award to Plaintiff of reasonable attorneys' fees; and

2    j.      For such other and further relief as may be fair and just.

Dated this 7th day of May, 2008.

Lynn & Fortune, LLP

Rebecca J. Fortune
Attorney for Plaintiffs, SDMS, Inc.,
Thomas P. Anderson and Ken Pecus..

**EXHIBIT 1**

COPY



EXHIBIT "1"

S00829



A15001 / 1                           A15001

## ROCKY MOUNTAIN CHOCOLATE FACTORY, INC.

### FRANCHISE OFFERING CIRCULAR

\* \* \* \* \*

### INFORMATION FOR PROSPECTIVE FRANCHISEES
### REQUIRED BY THE FEDERAL TRADE COMMISSION

FRANCHISOR:

**ROCKY MOUNTAIN CHOCOLATE FACTORY, INC.**
(a Colorado corporation)
265 Turner Drive
Durango, Colorado 81303
Telephone: (970) 259-0554
www.rmcf.com

To protect you, we've required your franchisor to give you this information. We haven't checked it, and don't know if it's correct. It should help you make up your mind. Study it carefully. While it includes some information about your contract, don't rely on it alone to understand your contract. Read all of your contract carefully. Buying a franchise is a complicated investment. Take your time to decide. If possible, show your contract and this information to an advisor, like a lawyer or an accountant. If you find anything you think may be wrong or anything important that's been left out, you should let us know about it. It may be against the law.

There may be laws on franchising in your state. Ask your state agencies about them.

**FEDERAL TRADE COMMISSION**
**WASHINGTON, D.C. 20580**

**THE DATE OF ISSUANCE OF THIS OFFERING CIRCULAR IS:**

**June 16, 2003**

(CA 6/1/03)

S00830

# FRANCHISE OFFERING CIRCULAR
## FOR PROSPECTIVE FRANCHISEES REQUIRED BY
## THE STATE OF CALIFORNIA



**ROCKY MOUNTAIN CHOCOLATE FACTORY, INC.**
(a Colorado corporation)
265 Turner Drive
Durango, Colorado 81303
Telephone: (970) 259-0554
www.rmcf.com

Rocky Mountain Chocolate Factory, Inc., a Colorado corporation, is offering franchises for the retail sale of gourmet chocolate and other premium confectionery products. The initial franchise fee ranges from $19,500 to $49,000. The estimated initial investment for a franchise ranges from $88,500 to $430,500.

Risk Factors:

1.  THE FRANCHISE AGREEMENT PERMITS THE FRANCHISEE TO SUE US ONLY IN COLORADO. OUT OF STATE LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT. IT MAY ALSO COST YOU MORE TO SUE US IN COLORADO THAN IN YOUR HOME STATE.

2.  THE FRANCHISE AGREEMENT STATES THAT COLORADO LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTION AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.

3.  THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

Information comparing franchisors is available. Call the state administrators listed in Exhibit A or your public library for sources of information.

Registration of this franchise by a state does not mean that the state recommends it or has verified the information in this Offering Circular. If you learn that anything in this Offering Circular is untrue, contact the Federal Trade Commission and the state authority listed in Exhibit A.

Effective date: June 16, 2003

(CA 6/1/03)

S00831

**TABLE OF CONTENTS**

<u>ITEM</u>                                                                                   <u>PAGE</u>

1    THE FRANCHISOR, ITS PREDECESSORS AND AFFILIATES ........................................ 1

2    BUSINESS EXPERIENCE ........................................................................................ 2

3    LITIGATION ........................................................................................................... 4

4    BANKRUPTCY ........................................................................................................ 4

5    INITIAL FRANCHISE FEE ....................................................................................... 4

6    OTHER FEES .......................................................................................................... 5

7    INITIAL INVESTMENT ............................................................................................ 7

8    RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES .................................. 11

9    FRANCHISEE'S OBLIGATIONS ............................................................................... 13

10   FINANCING ........................................................................................................... 14

11   FRANCHISOR'S OBLIGATIONS .............................................................................. 14

12   TERRITORY ........................................................................................................... 19

13   TRADEMARKS ....................................................................................................... 20

14   PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION ................................. 21

15   OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE
     FRANCHISE BUSINESS ........................................................................................... 21

16   RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL .......................................... 22

17   RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION ..................... 23

18   PUBLIC FIGURES ................................................................................................... 25

19   EARNINGS CLAIMS ............................................................................................... 25

20   LIST OF OUTLETS .................................................................................................. 28

21   FINANCIAL STATEMENTS ...................................................................................... 32

22   CONTRACTS .......................................................................................................... 32

23   RECEIPT ................................................................................................ Last Page

CALIFORNIA ADDENDUM TO OFFERING CIRCULAR
ITEM 3 ADDENDUM

(CA 6/1/03)                                                                                   S00832

## EXHIBITS

Exhibit A     List of State Agencies/Agents for Service of Process

Exhibit B     Franchise Agreement

Exhibit C     List of Franchisees

Exhibit D     Franchisees Who Have Left the System

Exhibit E     Financial Statements

Exhibit F     Operations Manual Table of Contents

Exhibit G     Sublease and Assignment Agreements

Exhibit H     Addendum to Franchise Agreement – Satellite Stores

Exhibit I     Addendum to Franchise Agreement – Temporary Stores

Exhibit J     Addenda to Franchise Agreement – Renewal and Transfer

Exhibit K     Closing Acknowledgment

Exhibit L     Receipt of Offering Circular

(CA 6/1/03)

S00833

## ITEM 1

## THE FRANCHISOR, ITS PREDECESSORS AND AFFILIATES

### The Franchisor.

The name of the franchisor is Rocky Mountain Chocolate Factory, Inc. For ease of reference, Rocky Mountain Chocolate Factory, Inc. means "we" or "RMCF" in this Offering Circular. We refer to the person who buys the franchise as "you" throughout this Offering Circular. If you are a corporation, partnership or limited liability company ("Business Entity"), certain provisions of the Franchise Agreement also apply to your owners as noted in the Franchise Agreement.

Our principal offices are located at 265 Turner Drive, Durango, Colorado 81303. We presently do business under the name "Rocky Mountain Chocolate Factory, Inc." We were formed in November, 1982, as a Colorado corporation. We have no predecessors or affiliates. Our agents for service of process are listed on Exhibit A.

### The Franchise.

We offer franchises for the establishment and operation of retail stores ("ROCKY MOUNTAIN CHOCOLATE FACTORY Stores" or "Stores") which sell gourmet chocolates and other premium confectionery products, featuring ROCKY MOUNTAIN CHOCOLATE FACTORY brand candy that you purchase from our factory in Durango, Colorado ("Factory Candy"), confectionery items that you make in the Store, such as caramel apples ("Store Candy"), and non-confectionery items ("Items"), including gifts and small toys. We license the Stores to use the service mark "ROCKY MOUNTAIN CHOCOLATE FACTORY" and related trademarks ("Marks") and our marketing plan and proprietary business methods ("System").

You must sign our Franchise Agreement ("Franchise Agreement"), (Exhibit B to this Offering Circular). The Franchise Agreement grants you the right to use our Marks and System to operate your own Store at a business premises which we must first approve ("Franchised Location"). If they qualify, existing franchisees may operate "Satellite Stores" and "Temporary Stores" by signing the applicable addendums to the Franchise Agreement, Exhibits H and I to this Offering Circular. Depending on the type of retail environment you choose for your Franchised Location and the type of Store you wish to operate, we offer eight different Store plans, ranging from a full-sized Store option to a variety of "Kiosk Stores," all of which we refer to in this Offering Circular as "Stores" or "ROCKY MOUNTAIN CHOCOLATE FACTORY Stores." See Item 7.

### Regulations Affecting Franchise.

There are no regulations specific to the operation of a Store in your state, although you must comply with all local, state and federal health and sanitation laws relating to food handling and the sale of food. You must comply with employment, worker's compensation, insurance, corporate, taxing, licensing and similar laws and regulations of a more general nature applicable to most businesses.

### Market Competition.

As a ROCKY MOUNTAIN CHOCOLATE FACTORY franchisee, you may face competition from firms such as Godiva Chocolatier, See's Candy, Fannie May and Fannie Farmer, or local, independent candy stores and other specialty food stores.

(CA 6/1/03)

**Our Prior Business Experience.**

We have 22 years of experience in the operation of our business and as of the date of this Offering Circular, we operate 8 company-owned Stores. We began offering franchises in 1982.

We offered franchises for retail stores which featured moving characters, lights, music and imitation candy-making machines and which sold bulk candy under the mark FUZZIWIG'S CANDY FACTORY from June 1996 through May 1998. Other than the FUZZIWIG'S CANDY FACTORY franchises, we have not offered franchises in any other line of business.

## ITEM 2

## BUSINESS EXPERIENCE

**President, Chairman of Board and Director: Franklin E. Crail.**

Franklin E. Crail co-founded the first ROCKY MOUNTAIN CHOCOLATE FACTORY retail store in May 1981. Since our incorporation in November 1982, he has served as our President and a Director, and from September 1984 to January 2000, as Treasurer. He was elected Chairman of the Board in March 1986.

**Chief Financial Officer, Chief Operating Officer, Treasurer and Director: Bryan J. Merryman.**

Bryan J. Merryman joined us in December 1997 as our Chief Financial Officer. Mr. Merryman became Chief Operating Officer in April 1999 and was appointed to the board of directors in March 1999. He was elected Treasurer in January 2000. From March 1997 through November 1997, Mr. Merryman served as a principal of Knightsbridge, Inc., an investment bank in San Francisco, California. From December 1996 through February 1997, Mr. Merryman was a self-employed financial consultant in Reno, Nevada. From July 1995 through November 1996, Mr. Merryman served as the Chief Financial Officer for Super Shops, Inc., an auto parts retailer located in Reno, Nevada. From January 1984 through July 1995, Mr. Merryman served as Senior Manager at Deloitte and Touche, an accounting firm in Reno, Nevada.

**Senior Vice President/Sales and Marketing: Edward L. Dudley.**

Edward L. Dudley joined us in January 1997 as Vice President of Product Sales Development. In 1998, he was promoted to Vice President of Sales and Marketing and in 2000, he was promoted to Senior Vice President of Sales and Marketing. From October 1995 through January 1997 he served as the Director of Distribution Services for Allegiance Healthcare, a healthcare supplier located in McGraw Park, Illinois.

**Vice President/Franchise Operations: Gregory L. Pope.**

Gregory L. Pope became Vice President of Franchise Operations in June 2001. Since joining RMCF in October 1990, he has served in various positions including Store manager, new Store opener and franchise field consultant. In March 1996, he became our Director of Franchise Development and Support, a position he held until he was promoted to his present position.

(CA 6/1/03)                                   2

S00835

**Chief Information Officer: William K. Jobson.**

William K. Jobson joined RMCF in July 1998 as Director of Information Technology. In June 2001, he was promoted to Chief Information Officer, a position created to enhance RMCF's strategic focus on information and information technology. From July 1995 to July 1998, Mr. Jobson worked for ADAC Laboratories in Durango, Colorado, a leading provider of diagnostic imaging and information systems solutions in the healthcare industry, as Manager of Technical Services and before that, Regional Manager.

**Vice President/Creative Services: Jay B. Haws.**

Jay B. Haws joined us in August 1991 as Vice President of Marketing. In 1998, we changed the name of our Marketing Department to Creative Services. Mr. Haws was closely associated with us from 1981 to 1991 through franchise ownership and marketing support services performed by Jay Haws Design and Image Group, Inc., a marketing communications firm located in northern California in which he served as Vice President from 1983 to 1989.

**Secretary: Virginia Perez.**

Virginia Perez has served as our corporate secretary since June 1996.

**Director: Fred M. Trainor.**

Fred M. Trainor became a director in August 1992. He has served as Chief Executive Officer and President of Avcor Health Care Products, Inc., located in Fort Worth, Texas, since December 1984.

**Director: Lee N. Mortenson.**

Lee N. Mortenson became a director in November 1987. Mr. Mortenson has been engaged in consulting, investments, troubled companies, and due diligence activities since July 2000, and has served as a Managing Director in Kensington Partners, LLC, a private investment firm located in Hickory, North Carolina, since June 2001. Mr. Mortenson has been President and CEO of Newell Resources, LLC, located in Hickory, North Carolina, since 2002 providing management consulting and investment services. He served as President, Chief Executive Officer and a director of Sunstates Corporation (formerly known as Acton Corporation), located in Raleigh, North Carolina, from May 1988 to December 1990 and he was President, Chief Operating Officer and a director of Sunstates Corporation from December 1990 to February 2000. Mr. Mortenson also served as President, Chief Operating Officer and a director of Telco Capital Corporation, a manufacturing and real estate business located in Chicago, Illinois, from January 1984 to February 2000. Mr. Mortenson was a director of Alba-Waldensian, Inc., which is principally engaged in the manufacturing of apparel and medical products from 1984 to July 1999, and served as its President and Chief Executive Officer and as a director from February 1997 to July 1999.

**Director: Gerald A. Kien.**

Gerald A. Kien became a director in August 1995. He is presently retired. From 1993 to 1995, he served as Chairman of the Board and Chief Executive Officer of Remote Sensing Technologies, Inc., a subsidiary of Envirotest Systems, Inc., a company engaged in the development of instrumentation for vehicle emissions testing located in Tucson, Arizona. From 1989 to 1993, Mr. Kien served as Chairman of the Board of Directors, President and Chief Executive Officer of Sun Electric Corporation, a

S00836

manufacturer of automotive test equipment located in Crystal Lake, Illinois. Mr. Kien has served as a Director and as Chairman of the Executive Committee of Sun Electric Corporation since 1980.

**Director: Clyde W. Engle.**

Clyde W. Engle became a director in January 2000. To the best of our knowledge, he has served as President of Coronet Insurance Company, Crown Casualty Company and National Assurance Indemnity Company, all insurance companies, since 1986 and as Chairman of the Board of Sunstates Corporation (formerly known as Acton Corporation), located in Raleigh, North Carolina since December 1985, as Chairman of the Board and Chief Executive Officer of GSC Enterprises, Inc., located in Chicago, Illinois since 1976, and President of RDIS Corporation, located in Chicago, Illinois since 1982, Chairman of the Board, Chief Executive Officer and President of Hickory Furniture Company located in Chicago, Illinois, since 1990, and as Chairman of the Board of Telco Capital Corporation, located in Chicago, Illinois, since 1977.

## ITEM 3

## LITIGATION

See Item 3 Addendum immediately following this Offering Circular for litigation information. Other than those 6 actions on the Item 3 Addendum attached, no litigation is required to be disclosed in this Offering Circular to the best of our knowledge.

## ITEM 4

## BANKRUPTCY

No person previously identified in Items 1 or 2 of this Offering Circular has been involved as a debtor in proceedings under the U.S. Bankruptcy Code required to be disclosed in this Item.

## ITEM 5

## INITIAL FRANCHISE FEE

You must pay between $24,500 and $49,000 as an initial franchise fee, $5,000 of which you must pay when you sign the Franchise Agreement. You must pay the remainder at the earlier of the date you sign the lease for a Franchised Location, or 120 days after you sign the Franchise Agreement. We discount the initial franchise fee by $5,000 if you purchase an additional franchise. We do not give refunds of these amounts, once paid, under any circumstances. See Item 7.

We offer no financing for the initial franchise fee. See Item 10.

The initial franchise fee includes between $5,000 and $29,500 for opening Factory Candy inventory and cooking supplies that you must purchase from us within 30 days after your Store opens. These costs are nonrefundable in all circumstances. See Item 7.

We reserve the right to hire a professional to negotiate the lease for you and you must reimburse us for the professional's fees. We did not use a professional to negotiate any leases during our fiscal year 2003, but we estimate these fees would be approximately $3,000 per lease negotiated. You may also hire a lease professional at your cost and discretion to negotiate your lease subject to our required provisions.

Except as set forth above, all franchisees currently acquiring a franchise pay the same initial franchise fee.

## ITEM 6

## OTHER FEES

| Name of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Product Purchase Costs[3] | As stated in our published price lists | Net 30 days from invoice | We may change our price lists |
| Royalty[1,4] | 5% of Gross Retail Sales each month, with a quarterly adjustment to exclude payments on purchases of Factory Candy, Store Candy ingredients and other items purchased from the Franchisor. | Payable monthly by the 15th day of the next month. Any amounts due following the quarterly adjustment are payable by the 15th day of the next month. | "Gross Retail Sales" is defined below. Following the end of each quarter, we calculate the number of pounds of Factory Candy and other items you purchased during the previous quarter times a fixed amount depending on the item purchased and subtract that from Gross Retail Sales, resulting in an Adjusted Gross Retail Sales figure. You owe us 10% of Adjusted Gross Retail Sales each quarter. We then compare total monthly Royalty paid to the amount due on Adjusted Gross Retail Sales and you are billed or credited the difference, if any. |
| Interest[1] | 18% per annum | On demand, but only if you are delinquent in your payments to us. | Begins to accrue the day after payments are due |
| Marketing and Promotion Fee[1,4] | 1% of Gross Retail Sales | Payable monthly by the 15th day of the next month | "Gross Retail Sales" is all revenue from the Store, but does not include taxes, refunded sales, settlements, fundraising sales, corporate sales, non-inventory sales or shipping expenses charged to a customer |
| Inspection and Audit Fee[1] | Costs of audit or inspection | On demand | Payable only if you understate your Gross Retail Sales by more than 5% |
| Transfer Fee[1] | $2,500 | Before effectiveness of transfer | Payable when you transfer the Franchise Agreement, an interest in the Store or the franchise |

| Name of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Successor Franchise Fee[1] | $100 | When you sign the then current Franchise Agreement | |
| Training Program Expenses[2] | Costs associated with attending mandatory training session | As incurred | We may require additional training occasionally |
| Payments for Items Supplied by Us[1,4] | Then current published price | As incurred | We may charge you for all items you buy through us |
| Costs and Attorneys' Fees[1] | Varies under circumstances | As incurred | Payable only if you do not comply with the Franchise Agreement |
| Design Fee for the Interior and Layout of Relocated or Remodeled Stores[1] | $2,500 | As incurred | Payable only if you relocate or remodel your Store during the term of your Franchise Agreement |
| Indemnification Under Franchise Agreement[1] | Varies under circumstances | As incurred | You must reimburse us if we are held liable for claims resulting from your Store |
| Insurance Premiums[1] | Varies under circumstances | As incurred | If you do not pay your premiums, we can pay them for you and you must reimburse us |
| Administrative Fee[1] | Varies up to 15% of the amount collected by us | As incurred | If you do not pay your landlord or any other third party, we can collect the money from you and pay the person owed and you must reimburse us. |

[1]    Fees which we impose which you pay to us.  All of these fees are nonrefundable.

[2]    Expenses associated with travel, meals and lodging while you attend initial training sessions. You pay all of these expenses to third parties.

[3]    You may purchase products from us or a supplier we designate or approve.  These fees are nonrefundable.

[4]    We reserve the right to require you to transfer funds to us electronically.

## ITEM 7

### INITIAL INVESTMENT
### FOR FULL-SIZED STORES
### LOCATED IN VARIOUS RETAIL ENVIRONMENTS

| Full-Sized Store Expenditures | Full-Sized Store High | Full-Sized Store Low | When Due | Method of Payment | Whether Refundable | To Whom Payment Must Be Made |
|---|---|---|---|---|---|---|
| Initial Franchise Fee (See Note 1) | $49,000 | $23,000 | $5,000 at signing of Franchise Agreement, the rest in 120 days or on signing your lease, whichever is earlier | Cash or Check | No | Us |
| Real Estate and Improvements (See Note 2) | 200,000 | 74,000 | Before opening | As incurred | No | Landlord, Contractor, Architect or Engineer |
| Furniture and Fixtures (See Note 3) | 75,000 | 9,000 | Before opening | As incurred | No | Suppliers |
| Equipment (See Note 3) | 49,000 | 10,000 | Before opening | As incurred | No | Suppliers |
| ns | 8,000 | 2,500 | Before opening | As incurred | No | Suppliers |
| Opening Inventory and Cooking Supplies Purchased from Us (See Note 4) | See Note 1 | See Note 1 | 30 days after shipping | Lump sum | No | Us |
| Opening Inventory and Cooking Supplies Purchased from Other Suppliers (See Note 4) | 8,000 | 2,000 | 10-30 days after shipping | As incurred | No | Suppliers |
| Security Deposits, Utility Deposits, Business Licenses (See Note 5) | 10,000 | 1,000 | Before opening | As incurred | Deposits are refundable; business licenses are not | Suppliers |
| Pre-Opening Training, Travel and Living Expenses (See Note 6) | 5,000 | 1,500 | Before opening | As incurred | No | Suppliers |
| Additional Funds - 3 months (See Note 7) | 26,500 | 5,500 | As incurred | As incurred | No | Suppliers |

| Full-Sized Store Expenditures | Full-Sized Store High | Full-Sized Store Low | When Due | Method of Payment | Whether Refundable | To Whom Payment Must Be Made |
|---|---|---|---|---|---|---|
| TOTAL ESTIMATED INITIAL INVESTMENT FOR STORES (See Note 8) | $430,500 | $128,500 | | | | |

### Explanatory Notes for Full-Sized Stores

Note 1:  Initial Franchise Fee. The opening candy inventory and cooking supplies you must buy from us are included in this amount.

Note 2:  Real Estate and Improvements.  Real estate costs vary from location to location, so we cannot estimate your real estate expenditures.  First, you must purchase or lease retail space that meets our standards and specifications. If your landlord at your Franchised Location requires us to sign the lease for your Franchised Location, we may hire a professional to negotiate the lease for us and you must reimburse us for the professional's fees or you may hire your own professional subject to including certain provisions in the lease. We include an estimated amount for these fees in the high number. See Item 5. Space requirements for Stores may range from approximately 300 to 650 retail square feet, resulting in cost variances to you.  Your costs to improve the Franchised Location will depend in part on whether your space is completely constructed, or is the remodel of an existing space. It will also depend on the size of the space and the type of retail environment in which the Store is located. We assist you in determining which of our four different full-sized Store configurations will suit your Franchised Location. You must hire an architect to design your Store layout according to our specifications and submit a plan to us for our prior approval. Architect fees depend on the condition of the space, its location and local permitting requirements. If your Store opens in a strip center or any building other than a major mall, the landlord will sometimes pay a portion of your tenant improvements.  If your Store is in a major mall or Triple A location, the landlord will usually not pay for any of your tenant improvements, resulting in higher construction costs to you. The condition of previously occupied sites varies greatly and the amount of usable space also varies greatly.

Note 3:  Furniture, Fixtures and Equipment.  This item includes the estimated costs to equip your Store with storage cabinets, display cabinets, cooking equipment, storage fixtures, signs, refrigeration equipment, and an integrated Store information system that includes one or two cash registers, scales and modems. Most full-sized Stores require two cash registers.

Note 4:  Opening Inventory and Cooking Supplies. Because Stores may range in size from 300 square feet to 650 retail square feet, we do not have a minimum opening inventory requirement. You must maintain a minimum inventory of no less than 1,000 pounds of Factory Candy throughout the term of your Franchise Agreement. In addition, you need cooking supplies consisting of chocolate, sugar, glucose, nuts, butter, evaporated milk, fresh and preserved fruit, flavorings and other items.

Note 5:  Security Deposits, Utility Deposits, Business Licenses.  Security deposits range from $0 to two months' rent; utility deposits range from $0 to approximately $1,500 and business licenses range from approximately $50 to $550, depending on your location.

**Note 6:** <u>Pre-Opening Training, Travel and Living Expenses</u>. Your travel and living expenses when you attend our initial training program vary depending on the length of your instruction, the distance you must travel and the standard of living you desire while you attend the program.

**Note 7:** <u>Additional Funds</u>. This estimates your pre-operational expenses, which are not listed above, as well as additional funds necessary for the first three months of your business operations. These figures are estimates and we cannot guarantee that you will not have additional expenses when you start the business. Your costs depend on factors such as: how much you follow our methods and procedures; your management skill, experience and business acumen; local economic conditions; the local market for our products; the prevailing wage rate; competition; and the sales level you reach during this initial period. This item includes a variety of expenses and working capital items during your start-up phase, such as legal and accounting fees; training expenses; insurance premiums; advertising, promotional and grand opening expenses and materials; rent; employee salaries; and other miscellaneous costs. This item does not include your salary or living expenses.

**Note 8:** <u>Total Estimated Investment</u>. We relied on our 22 years experience in the industry and on information voluntarily reported by franchisees when we prepared these figures, but we have not made any independent verification of the information reported by franchisees. You should review these figures carefully with a business advisor before you make any decision to purchase a franchise. We offer no direct financing of the initial franchise fee. See Item 10 of this Offering Circular.

**INITIAL INVESTMENT**
**FOR KIOSKS OF VARIOUS SIZES**
**LOCATED IN VARIOUS RETAIL ENVIRONMENTS**

| Kiosk Expenditures | Kiosk High | Kiosk Low | When Due | Method of Payment | Whether Refundable | To Whom Payment Must Be Made |
|---|---|---|---|---|---|---|
| Initial Franchise Fee (See Note 1) | $49,000 | $19,500 | $5,000 at signing of Franchise Agreement, the rest in 120 days or on signing your lease, whichever is earlier | Cash or Check | No | Us |
| Real Estate and Improvements (See Note 2) | 43,000 | 15,000 | Before opening | As incurred | No | Landlord, Contractor, Architect or Engineer |
| Furniture and Fixtures (See Note 3) | 50,000 | 15,000 | Before opening | As incurred | No | Suppliers |
| Equipment (See Note 3) | 35,000 | 25,000 | Before opening | As incurred | No | Suppliers |
| Signs | 5,000 | 2,500 | Before opening | As incurred | No | Suppliers |
| Opening Inventory and Cooking Supplies Purchased from Us (See Note 4) | See Note 1 | See Note 1 | 30 days after shipping | Lump sum | No | Us |

| Kiosk Expenditures | Kiosk High | Kiosk Low | When Due | Method of Payment | Whether Refundable | To Whom Payment Must Be Made |
|---|---|---|---|---|---|---|
| Opening Inventory and Cooking Supplies Purchased from Other Suppliers (See Note 4) | 2,500 | 1,000 | 10-30 days after shipping | As incurred | No | Suppliers |
| Security Deposits, Utility Deposits, Business Licenses (See Note 5) | 5,000 | 1,000 | Before opening | As incurred | Deposits are refundable; business licenses are not | Suppliers |
| Pre-Opening Training, Travel and Living Expenses (See Note 6) | 5,000 | 1,500 | Before opening | As incurred | No | Suppliers |
| Additional Funds - 3 months (See Note 7) | 8,000 | 8,000 | As incurred | As incurred | No | Suppliers |
| TOTAL ESTIMATED INITIAL INVESTMENT FOR KIOSKS (See Note 8) | $183,000 | $88,500 | | | | |

## Explanatory Notes for Kiosk Chart

Note 1: **Initial Franchise Fee**. The opening candy inventory and cooking supplies you must buy from us are included in this amount.

Note 2: **Real Estate and Improvements**. Real estate costs vary from location to location, so we cannot estimate your real estate expenditures. First, you must purchase or lease retail space that meets our standards and specifications. If your landlord at your Franchised Location requires us to sign the lease for your Franchised Location, we may hire a professional to negotiate the lease for us and you must reimburse us for the professional's fees or you may hire your own professional subject to including certain provisions in the lease. We include an estimated amount for these fees in the high number. See Item 5. Space requirements for Kiosk Stores may range from approximately 100 to 260 retail square feet, resulting in cost variances to you. Your costs to improve the Franchised Location will depend in large part on the size of your Kiosk Store and its configuration, including whether your space includes cooking facilities or sells only products that require no preparation. It will also depend on the size of the space and the type of retail environment in which the Kiosk Store is located. We assist you in determining which of our four different Kiosk Store configurations will suit your Franchised Location. You must hire an architect to design your Kiosk Store layout according to our specifications and submit a plan to us for our prior approval. Architect fees will depend on the condition of the space, its location and local permitting requirements. If your Kiosk Store opens in a strip center or any building other than a major mall, the landlord will sometimes pay a portion of your tenant improvements. If your Kiosk Store is in a major mall or Triple A location, the landlord will usually not pay for any of your tenant improvements, resulting

in higher construction costs to you. The condition of previously occupied sites varies greatly and the amount of usable space also varies greatly.

Note 3:  **Furniture, Fixtures and Equipment**.  This item includes the estimated costs to equip your Kiosk Store with storage cabinets, display cabinets, storage fixtures, signs, refrigeration equipment, and an integrated Store information system that includes one or two cash registers, scales and modems. Most Kiosk Stores require two cash registers. Most Kiosk Stores also require some cooking equipment, which is included in the high number.

Note 4:  **Opening Inventory and Cooking Supplies**. Because Kiosk Stores may range in size from 100 square feet to 260 retail square feet, we do not have a minimum opening inventory requirement. You must maintain a minimum inventory of no less than 1,000 pounds of Factory Candy throughout the term of your Franchise Agreement. In addition, if your Kiosk Store is equipped to cook, you need cooking supplies consisting of chocolate, sugar, glucose, nuts, butter, evaporated milk, fresh and preserved fruit, flavorings and other items, included in the high number.

Note 5: **Security Deposits, Utility Deposits, Business Licenses**.  See Note 5 for full-sized Stores above.

Note 6:  **Pre-Opening Training, Travel and Living Expenses**.  See Note 6 for full-sized Stores above.

Note 7:  **Additional Funds**. See Note 7 for full-sized Stores above.

Note 8:  **Total Estimated Investment**. See Note 8 for full-sized Stores above.

## ITEM 8

## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

You must establish and operate your Store in compliance with your Franchise Agreement and the operations manual we loan to you, in the form of several manuals, technical bulletins, cookbooks and other written materials ("**Operations Manual**"), which we may modify occasionally, in our sole discretion.  All equipment, services, supplies, materials, uniforms and inventory items that you use or offer for sale through your Store must meet the minimum standards and specifications in our Operations Manual.

You must sell only Factory Candy, Store Candy and Items that we designate.  If you want to sell other products, you must first receive our written consent, which we may withhold in our sole discretion. You may not sell any products resembling Factory Candy we manufacture unless you first receive our written consent.  In addition, your Store must devote at least 50% of its retail display space to ROCKY MOUNTAIN CHOCOLATE FACTORY bulk chocolates and packaged Factory Candy. The only Store Candy you may sell that we do not supply are those made at your Store that you prepare from recipes found in our Operations Manual through the process of molding, cooking and dipping foods such as cookies, crackers, pretzels, fresh and dried fruit, dog bones and plain chocolates, but you may sell them only if you prepare them according to our recipes and specifications. We will provide you with these recipes and specifications. You may not purchase or manufacture any product such as assorted chocolates or boxed chocolates unless we consent in writing.

(CA 6/1/03)                                        11                                           S00844

You must purchase all of the Factory Candy, ingredients for Store Candy and other Items that you sell at or through your Store from us or a source we designate. If you propose to offer, conduct or utilize any products, services, materials, forms, items or supplies for sale or use in your Store which we have not previously approved as meeting our specifications, you must first notify us in writing requesting our approval. We may, in our sole discretion, and for any reason, withhold our approval. For us to make a determination, you must submit specifications, information, or samples of the proposed products and services. We will advise you within 60 days whether the products or services meet our specifications.

You must purchase all products and services that you require to operate your Store from manufacturers or suppliers we designate. We are the designated supplier of ROCKY MOUNTAIN CHOCOLATE FACTORY branded Factory Candy. First-time franchisees must use one of our designated fixture contractors for the build-out of their Stores and we reserve the right to require experienced franchisees to use a designated contractor as well. If there is no designated supplier for a particular item, you must purchase all products and services from other suppliers who meet all of our specifications and standards. We formulate and modify our specifications and standards based on quality, composition, finish, appearance and service. Suppliers must adequately demonstrate their capacity to supply your needs, in the quantities, at the times and with the reliability requisite to an efficient operation. We may change our standards and specifications, or suppliers who have our authorization, at any time if we give you 30 days written notice in advance.

Our criteria for supplier approval are available to you upon request. We base our approval on quality, vendor reputation, pricing and our opinion about the compatibility of the product with our company image and product line. We may require that samples from a proposed new supplier be delivered to us for testing before we approve the supplier. You must reimburse us for the cost of conducting the test.

We derive revenue from the sale of Factory Candy, Store Candy ingredients, packaging materials, other Items and certain services to you. In the fiscal year ended February 28, 2003, our revenue from purchases from franchisees was $11,854,800 or 61% of our total revenues of $19,461,472. See our financial statements in Item 21. We estimate that the costs of your purchases from designated or approved sources, or according to our standards and specifications will range from 80% to 84% of the total cost of establishing your Store and approximately 38% of the total cost of operating your Store after that time. We are not affiliated with any approved or designated suppliers.

Except as described above, we do not derive income based on any required purchases or leases, except that in an effort to make sources or supplies available to you and to monitor and maintain consistency throughout the system, we may negotiate with approved vendors from whom you can purchase items which meet our specifications. We may collect a fee from approved vendors on the items franchisees purchase from our approved vendors. These vendors may sell you various Items, raw materials for the preparation of Store Candy, such as fudge, brittles and caramel, packaging items such as bags and tins, and other items. We estimate that any purchases by you for which we collect a fee will constitute less than 3% of your total cost of establishing your Store and less than 3% of your total cost of operating your Store.

Except as described above, we do not negotiate purchase arrangements with suppliers for the benefit of franchisees, although we reserve the right to do so in the future. We have no purchasing or distribution cooperatives. We do not give you any material benefits based on your use of designated or approved sources or suppliers.

## ITEM 9

### FRANCHISEE'S OBLIGATIONS

THIS TABLE LISTS YOUR PRINCIPAL OBLIGATIONS UNDER THE FRANCHISE AGREEMENT. IT WILL HELP YOU FIND MORE DETAILED INFORMATION ABOUT YOUR OBLIGATIONS IN THE FRANCHISE AGREEMENT AND IN OTHER ITEMS OF THIS OFFERING CIRCULAR.

| | Obligation | Section in Franchise Agreement | Item in Offering Circular |
|---|---|---|---|
| (a) | Site selection and acquisition/lease | Sections 3.1 and 5.1 | Items 7, 8 and 11 |
| (b) | Pre-opening purchases/leases | Sections 5.1, 5.3 and 5.4 | Items 5, 7 and 8 |
| (c) | Site development and other pre-opening requirements | Sections 5.2 and 5.5 | Items 7, 8 and 11 |
| (d) | Initial and ongoing training | Article 6 | Items 6, 7 and 11 |
| (e) | Opening | Section 5.6 | Item 11 |
| (f) | Fees | Articles 11 and 12 | Items 5 and 6 |
| (g) | Compliance with standards and policies/ Operations Manual | Article 8 and Sections 13.1 and 13.2 | Items 8, 11, 14, 15 and 16 |
| (h) | Trademarks and proprietary information | Article 14 and Section 20.3 | Items 13 and 14 |
| (i) | Restrictions on products/services offered | Sections 10.1(d) and 13.4 | Items 8 and 16 |
| (j) | Warranty and customer service requirements | None | None |
| (k) | Territorial development and sales quotas | None | None |
| (l) | On-going product/service purchases | Sections 13.5, 13.6 and 13.7 | Items 8 and 16 |
| (m) | Maintenance, appearance and remodeling requirements | Sections 10.1(a), (b) and (g) | Item 8 |
| (n) | Insurance | Article 21 | Item 7 |
| (o) | Advertising | Article 12 | Items 6 and 11 |
| (p) | Indemnification | Section 19.3 | None |
| (q) | Owner's participation/management/ staffing | Sections 10.1(c) and (h) | Item 15 |
| (r) | Records and reports | Article 15 | Item 6 |
| (s) | Inspections/audits | Sections 13.3 and 15.5 | Item 6 |
| (t) | Transfer | Article 16 | Item 17 |
| (u) | Renewal | Sections 17.2, 17.3 and 17.4 | Item 17 |
| (v) | Post-termination obligations | Section 18.4 | Item 17 |
| (w) | Non-competition covenants | Article 20 | Item 17 |

(CA 6/1/03)                          13

S00846

| Obligation | Section in Franchise Agreement | Item in Offering Circular |
|---|---|---|
| (x)  Dispute Resolution | Article 22 | Item 17 |

## ITEM 10

## FINANCING

If a landlord refuses to allow you to sign a lease and instead requires us to sign or guaranty the lease for your Franchised Location, we may sign it, in our discretion. If we become liable under the lease for your Franchised Location, we will either sublease the Franchised Location to you or assign it to you on the same terms and conditions contained in the landlord's lease agreement. Our Sublease Agreement and Assignment and Assumption of Lease are Exhibit G to this Offering Circular. We do not receive any payments when we sign or guaranty a lease for your Franchised Location.

During fiscal year 2004, we may offer some limited financing for build-out expenses to a few of our highly experienced franchisees. Except as stated above, neither we nor any agent or affiliate currently offer, directly or indirectly, any financing to you, nor do we guarantee any lease or other obligations for you. We cannot estimate whether you can obtain financing for any part or all of your investment and, if so, the terms of the financing, which depend on your creditworthiness and other characteristics. We do not have any past or present practice or intention to sell, assign or discount to any third party, any note, contract or other instrument signed by you.

## ITEM 11

## ' FRANCHISOR'S OBLIGATIONS

Except as listed below, we need not provide any assistance to you.

Pre-Opening Assistance.

Before you open your Store, we (or our designee) will:

1.      Provide you with written guidelines for the Franchised Location, but you must have an approved location as of the date you sign the Franchise Agreement. We base our approval of a proposed Franchised Location on information you submit and information we gather in a form sufficient to assess the location. (Section 7.1(b), Franchise Agreement.)

2.      Provide you with advice regarding the required conversion, design and decoration of the ROCKY MOUNTAIN CHOCOLATE FACTORY Store premises, plus specifications concerning signs, decor and equipment. (Section 7.1(c), Franchise Agreement.)

3.      Provide you with advice regarding the selection of suppliers of equipment, supplies and materials used and Factory Candy, Store Candy and Items offered for sale through your ROCKY MOUNTAIN CHOCOLATE FACTORY Store. Depending on the size and configuration of your Store, we will determine your initial purchase of Factory Candy inventory. We provide you with a list of approved suppliers, if any, of equipment, supplies, materials, ingredients for Store Candy and Items, and,

(CA 6/1/03)                                      14

S00847

if available, a description of any national or central purchase and supply agreements that approved suppliers offer for the benefit of ROCKY MOUNTAIN CHOCOLATE FACTORY franchisees. (Section 7.1(d), Franchise Agreement.)

4.    Train you in Durango, Colorado or at another location we designate. (Section 7.1(a), Franchise Agreement.)

5.    Loan you one copy of an Operations Manual, covering the operating and marketing techniques of the Store and all updates and revisions. (Section 8.1, Franchise Agreement.)

6.    Provide up to five days of opening assistance, beginning approximately two days before you open a new ROCKY MOUNTAIN CHOCOLATE FACTORY Store, or we provide up to two days of opening assistance if you purchase a Store that was already operating. (Section 7.1(f), Franchise Agreement.)

**Continuing Assistance**.

During the operation of your Store, we will:

1.    If you request, provide consultation by telephone regarding the continued operation and management of your ROCKY MOUNTAIN CHOCOLATE FACTORY Store and advice regarding retail services, product quality control, inventory issues, customer relations and similar advice. (Section 9.1(a), Franchise Agreement.)

2.    Give you access to advertising and promotional materials as we may develop, the cost of which we may pass on to you at our option. (Section 9.1(b), Franchise Agreement.)

3.    Provide you with on-going updates of information and programs regarding the candy industry, the ROCKY MOUNTAIN CHOCOLATE FACTORY concept and related Licensed Methods, including information about special or new products we develop and make available to our franchisees. (Section 9.1(c), Franchise Agreement.)

4.    Train replacement or additional General Managers during the term of the Franchise Agreement. We may charge a tuition or fee, commensurate with our other current published prices, for training and payable in advance. You must pay all travel and living expenses for your personnel during the training program. The availability of the training programs depends on space considerations and prior commitments to new ROCKY MOUNTAIN CHOCOLATE FACTORY franchisees. (Section 9.1(d), Franchise Agreement.)

5.    Make our employees or designated agents available to you for advice and assistance regarding the on-going operation of the Store. If you request additional assistance and we agree to provide it, we may charge you for all travel, lodging, living expenses, telephone charges and other identifiable expenses associated with the assistance, plus a fee based on the salary of each employee and the time spent by each employee on your behalf. (Section 9.2, Franchise Agreement.)

**Marketing and Promotion**.

You must pay a Marketing and Promotion Fee of 1% of your monthly Gross Retail Sales. You must pay the Marketing and Promotion Fee with the payment of the monthly Royalty, within 15 days after the end of each calendar month, based on the amount of Gross Retail Sales in the previous month. We deposit the Marketing and Promotion Fee in a bank, commercial account or savings account

(CA 6/1/03)                                        15

S00848

("**Marketing Fund**").  We contribute 1% of the monthly Gross Retail Sales of our Stores to the Marketing Fund. If you request it in writing, we send you an annual unaudited financial statement for the Marketing Fund that indicates how we spent the Marketing Fund.  Because we do not have the Fund audited, audited financial statements are not available to franchisees.

We administer the Marketing Fund in our sole discretion.  We use the Marketing Fund to create, produce and place point of purchase advertising, in-store signs and in-store promotions.  In the future, we may use the Marketing Fund for commercial advertising, agency costs and commissions, to create and produce video, audio, and written advertisements, to administer multi-regional advertising programs, including direct mail and other media advertising and to employ advertising agencies and in-house staff assistance, to support public relations, market research and other advertising and marketing activities.  We do not solicit franchisees with the Fund's money.

We may reimburse ourselves from the Marketing Fund for administrative costs, salaries and overhead expenses related to the administration of the Marketing Fund and its marketing programs, including conducting market research, preparing material, collecting and accounting for Marketing Fund contributions.  In any fiscal year we may spend an amount greater or less than the aggregate contribution of all ROCKY MOUNTAIN CHOCOLATE FACTORY Stores to the Marketing Fund in that year.  The Marketing Fund may borrow from us or other lenders to cover deficits or cause the Marketing Fund to invest any surplus for future use.  Any amounts that remain in the Marketing Fund at the end of each year accrue and we apply them toward the next year's expenses.  We do not guarantee that advertising expenditures from the Marketing Fund benefit you or any other franchisee directly or on a pro rata basis.  We assume no other direct or indirect liability or obligation to you for collecting amounts due to any advertising account or for maintaining, directing or administering any advertising account.

We have used in-house personnel and outside ad agencies in the past to create point-of-purchase advertising and promotions.

You may create your own advertising and promotional materials; however, all of your materials must be in media, of a type and in a format as we approve, must be conducted in a dignified manner and must conform to the standards and requirements we specify. This also applies to all advertising on the Internet. You may not use any advertising or promotional plans or materials, including advertising on the Internet, until you receive our written approval. We approve or disapprove of your proposed advertising within 14 days of the date we receive it.

In fiscal year 2003, we spent 70% of the Fund's proceeds on national marketing, 26% on new products and packaging development and 17% on local store marketing materials. These percentages total 113% because RMCF contributed 13% more than the franchisees contributed to the Fund during fiscal year 2003.

<u>Local Advertising</u>.

We may require you to spend up to 1% of Gross Retail Sales each month on local advertising in addition to the 1% Marketing and Promotion Fee. If we require it, you must give us an accounting of the amounts you spent on local advertising within 30 days following the end of each calendar quarter. If we require you to spend money on local advertising, all company-owned Stores would spend money for local advertising on an equal percentage basis with all franchised Stores. You may purchase local advertising separately through local marketing and media sources within a geographical area. Local advertising is your responsibility. We must approve all final advertising and promotional materials before publication.

S00849

**Regional Advertising.**

We reserve the right to designate geographic areas to establish regional advertising associations ("Associations"). If your Store is within the territory of an existing Association when your Store opens, you must become a member of the Association. If we establish an Association during the term of the Franchise Agreement, you must become a member within 30 days after we establish the Association. If you fail to participate in the Association or pay any Association dues, you breach the Franchise Agreement. We must approve all final advertising and promotion materials before publication. At the request of the Association, you would contribute up to 50% of your 1% Marketing and Promotion Fee described in this Item 11, as would all other franchises in the Association. These funds would be available for specific programs selected by the majority of the Association members and which we have approved in advance. If we form an Association, you will be bound by the decisions of the majority of the members of the Association with respect to expenditures, assessments and dues, to the extent we approve them. Each Association could require its members to make additional minimum contributions to the Association monthly up to the full amount of your Marketing and Promotion Fee. We would approve all advertising materials before they were used by an Association or furnished to its members. The Association would be required to prepare unaudited annual financial statements and send them to you if you request them. An Association would be comprised of franchisees. We can form, change and dissolve Associations. Each Association would operate under written documents which franchisees could view. Either we or the Association could create the Association's advertising, but advertising created by the Association would be required to have our written approval before use. We also reserve the right to establish advertising cooperatives in particular regions to enable the cooperative to self-administer a regional advertising program. If we establish a cooperative, you must participate in it.

See Items 6, 8 and 9 of this Offering Circular for more discussion of advertising.

**Operations Manual.**

Exhibit F to this Offering Circular are the tables of contents of our Operations Manual. The total number of pages in our Operations Manual as of the date of this Offering Circular is 250.

**Site Selection Assistance.**

You must select and acquire the premises for your Store. You must not, without our prior written approval, enter into any contract for the purchase or lease of any premises you intend to use as a Franchised Location for your Store. At our option, we may sign the lease or other acquisition document in our name or jointly with you. If this happens, we may sublease or assign the premises to you on the same terms on which we acquired the right to use the premises. Our Sublease Agreement and Assignment and Assumption of Lease are Exhibit H to this Offering Circular. We consider the following factors when we approve or disapprove your proposed Franchised Location: the coordination of the proposed Franchised Location's address with protected territories previously granted to other franchisees operating under the ROCKY MOUNTAIN CHOCOLATE FACTORY Mark, if any, mall character, quality and location and the nature and location of other competition and potential customers. Approval of a location does not infer or guarantee the success or profitability of a Franchised Location in any manner. There is no contractual limit on the time it takes us to approve or disapprove your proposed site. We typically take 30 days to approve or disapprove of your proposed Franchised Location.

**Schedule For Opening.**

We estimate that the typical length of time between the date you sign the Franchise Agreement and the date your Store opens will be between 90 and 180 days. The factors which may affect this time

(CA 6/1/03)                                    17

S00850

period are your ability to locate a site, secure financing, and obtain a lease, the extent to which you must upgrade or remodel an existing location, the delivery schedule for equipment, inventory and supplies, and completing your training. You must open your Store within 180 days after you sign the Franchise Agreement.

<u>Integrated Store Information System</u>.

You must use an integrated store information system ("System") in your Store that you must purchase from AIM Software Systems Incorporated ("AIM"), located at 656 Santa Rosa, Suite 2A, San Luis Obispo, California 93401, (805) 546-2900. As of the date of this Offering Circular, the System consists of an electronic PC based register (either an NCR 7460 cash register or a Dell 510D PC), FTP Store Communication software, PC/Anywhere, a thermal receipt printer, a scale, and a 56K (minimum) modem. At your option, the System may include credit card authorization software, a credit card scanner, a laser bar code scanner, a bar code printer and a Hewlett Packard Deskjet printer. You must dedicate one phone line to the System. You must contract with an Internet service provider ("ISP") to facilitate communication between your System and our data collection server. The System will be delivered to you already configured with proprietary software owned by AIM. AIM will provide all support, updates and maintenance for your System. As of the date of this Offering Circular, AIM charges an annual support fee of between $1,105 and $1,972, depending on the System options you have selected. You must purchase a support agreement with AIM. Most Stores require two cash registers. We may require you to upgrade or update your System. No contractual limitation exists on the frequency or cost of this obligation.

The System provides you with detailed information about your inventory, sales, purchasing, receiving, time and attendance, depending on options selected. The System also permits us to receive information electronically regarding your Store's sales. There is no contractual limit on our right to receive information through the System.

In conjunction with the operation of your System, you must use an IBM-compatible personal computer installed with Windows 98 operating system or higher. You will find it is more convenient to send and receive electronic mail messages and depending on options you select, track information generated by the System on a personal computer.

<u>Additional Training Information</u>.

After you sign the Franchise Agreement and before you open your Store, you must complete the initial training program to our satisfaction. We do not charge you for this training for up to three individuals, although you must pay travel, living expenses and wages for you and all employees who attend the training session. The initial training program consists of a total of 7 days of instruction and all training is currently conducted in Durango, Colorado. The training material consists of written, video and audiotaped instruction. The initial training program includes hands-on training in a mock retail store in our training center.

As often as annually, we may require you and/or your General Manager to attend, at your expense, a national, regional or local meeting, seminar or conference that we present for the purpose of discussing a topic such as advertising programs, new operations methods, training, management, sales, or sales promotion, to the extent that we offer any meetings, seminars or conferences.

As of our most recent fiscal year end, we gave the following initial training to franchisees.

S00851

| Subject[1] | Hours of Classroom Training[2] | Instructor |
|---|---|---|
| Introduction to Rocky Mountain Chocolate Factory | 1.5 | VP or Director of Franchise Support |
| Customer Service Techniques | 1 | Director of Franchise Support |
| Factory Candy Identification | 1.5 - 2.0 | Director of Franchise Support |
| Chocolate Dipping Technique | 2-3 | Director of Franchise Support |
| Cash Register and Scale Operation | 2 | Director of Franchise Support |
| Cooking | 20 | Director of Franchise Support |
| Design and Construction | 0.5 | Design & Construction |
| Employees (responsibilities, opening and closing dates) | 1 | Director of Franchise Support |
| Employees (hiring, training, scheduling) | 1.5 | Director of Franchise Support |
| Daily Bookkeeping, Month-end Inventory and Other Bookkeeping Methods to Increase Gross Margins | 2 | Director of Franchise Support |
| Our Accounting Policies | 1 | Various Finance Personnel |
| Our Factory Candy Manufacturers and Shipping | 3 (in factory) | Various Factory Department Heads |
| Our Ordering and Shipping Procedures | 1 | Customer Service |
| Authorized and Recommended Outside Suppliers | 1 | Director of Franchise Support |
| Merchandising and Marketing Techniques | 6.5 | Merchandising Manager |
| Our Philosophy, Franchisor/Franchisee Responsibilities | 1 | Various members of Management |
| Integrated Store Information System | 3 | Various IT Personnel |

[1]     For each subject, we hold training classes approximately 6 to 12 times per year. You must attend training after you sign the Franchise Agreement and before you open your Store.

[2]     If you wish, you may work in a company-owned Store at your expense to gain experience interacting directly with actual customers. If you live near a company-owned Store, you may spend up to three days in that Store; otherwise you may travel to one of our company-owned Stores at your expense for one day. In addition, many experienced franchisees allow new franchisees to work in their Stores at no charge after the new franchisee has completed the initial training program.

## ITEM 12

## TERRITORY

You will operate your Store at a specific location that is referred to as the "**Franchised Location**" in the Franchise Agreement. You may not relocate your Franchised Location without our prior written approval. If you have operated your Store for at least 12 months and you desire to change its Franchised

S00852

Location, you may send us a written request explaining your reasons and proposing an alternative location. If we approve an alternative location in writing, you must pay us a Design Fee of $2,500 (see Item 6), sign our then current form of Franchise Agreement, you may not change the owners or your percentage ownership interests from that of the prior location and you must complete the move and open your new Franchised Location within 12 months from the date the Store at the prior Franchised Location closes.

We must approve a Franchised Location before you sign a Franchise Agreement. The designation of your Franchised Location does not grant you the exclusive right to any particular market or customers. You may advertise your Store anywhere, as long as you receive our prior approval of all advertising. Other ROCKY MOUNTAIN CHOCOLATE FACTORY franchisees have the same rights to advertise. See Item 11 for more discussion of advertising.

We may establish other related franchises or company-owned Stores that sell or lease similar products or services under a different name or trademark. We retain the rights, among others: (1) to use, and to license others to use, the Marks and Licensed Methods for the operation of Stores, including Kiosk Stores, Satellite Stores and Temporary Stores, at any location other than at the Franchised Location; (2) to use the Marks and Licensed Methods to identify services and products, promotional and marketing efforts or related items, and to identify products and services similar to those which you will sell, but made available through alternative channels of distribution other than through traditional Stores, at any location other than at the Franchised Location, including, but not limited to, through Satellite Stores, Temporary Stores, Kiosk Stores, by way of mail order, (including electronic mail order), the Internet, catalog, television, retail store display or through the wholesale sale of its products to unrelated retail outlets or to candy distributors or outlets located in stadiums, arenas, airports, turnpike rest stops or supermarkets; and (3) to use and license the use of other proprietary marks or methods in connection with the sale of products and services similar to those which you will sell or in connection with the operation of retail stores selling gourmet chocolates or other premium confectionery products, at any location other than at the Franchised Location, which stores are the same as, or similar to, or different from a traditional Store, a Kiosk Store or a Satellite Store or a Temporary Store, on any terms and conditions as we deem advisable, and without granting you any rights in them.

Your continuation of the right to operate the Store during the term of the Franchise Agreement does not depend on achievement of any certain sales volume, market penetration or similar contingency. Although in some instances, we grant a franchisee a right of first refusal on a neighboring or extended territory, you have no option, right of first refusal or similar contractual right to acquire additional Stores within a territory or in areas contiguous to your Store(s).

## ITEM 13

## TRADEMARKS

We grant you the right to use the Marks, including the trademark and service mark ROCKY MOUNTAIN CHOCOLATE FACTORY, ROCKY MOUNTAIN CHOCOLATE FACTORY and design and other trademarks, service marks and commercial symbols which we may authorize. We have registered the following principal trademarks on the Principal Register of the United States Patent and Trademark Office:

S00853

| Mark | Registration No. | Date of Registration |
|------|------------------|----------------------|
| Rocky Mountain Chocolate Factory | Reg. No. 1,552,146 | August 15, 1989 |
| Rocky Mountain Chocolate Factory and design | Reg. No. 1,718,498 | September 22, 1992 |

We have filed all required affidavits and renewals for these Marks. You must follow our rules when you use the Marks. You may not use the phrase, an abbreviation or two or more of the words "ROCKY MOUNTAIN CHOCOLATE FACTORY" in the legal name of your Business Entity.

You must modify or discontinue your use of a Mark if we require you to modify or discontinue it, at your own expense. We do not allow you to use or register any domain names or use the Internet to market or promote your Store, Factory Candy, Store Candy or other Items sold in or through your Store without our prior written consent. See Items 11 and 16.

There are no presently effective determinations of the United States Patent and Trademark Office, the trademark trial and appeal board, the trademark administrator of any state or any court, any pending infringement, opposition or cancellation proceedings or material litigation involving the principal Marks.

No agreements limit our right to use or license the use of the Marks.

We are not contractually obligated by the Franchise Agreement to protect you against claims of infringement or unfair competition related to your use of the Marks, but it is our policy to do so when, in the opinion of our legal counsel, your right to use the Marks requires protection. In this case, we will pay all costs, including attorneys' fees and court costs, associated with any litigation required to defend or protect your authorized use of the Marks. You must cooperate with us in any litigation.

We do not know of any infringing uses that could materially affect your use of the Marks.


## ITEM 14

## PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

No patents or copyrights are material to the franchise.

We consider our Operations Manual and related materials to be proprietary and confidential and we consider them to be our property to be used by you only as described in the Franchise Agreement. You must maintain the confidentiality of our information and adopt reasonable procedures to prevent unauthorized disclosure of these secrets and information.


## ITEM 15

## OBLIGATION TO PARTICIPATE IN THE ACTUAL
## OPERATION OF THE FRANCHISE BUSINESS

You (or your managing shareholder or partner) are not required to participate personally in the direct operation of your Store although we strongly urge you to do so. If you (or your managing partner

(CA 6/1/03)                           21

or shareholder) do not participate in the day-to-day operation of the Store, you must designate a manager ("**General Manager**") to be responsible for the direct on-premises supervision of the Store at all times during its hours of operation. If you are a Business Entity, we do not require that your General Manager own an equity interest in you. You or, if applicable, the General Manager, must successfully complete our mandatory initial training program. You and your managers must enter into a confidentiality and noncompetition agreement with us (Exhibit VI to Franchise Agreement). We make no recommendations and have no requirements regarding employment or other written agreements between you and your employees.

We may require each of your officers, directors, principal shareholders, partners and/or members to sign an agreement (Exhibit III to Franchise Agreement) personally guaranteeing and agreeing to perform all of your obligations under the Franchise Agreement.

## ITEM 16

### RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must offer for sale through your Store only the Factory Candy, Store Candy and Items that we approve in writing. The authorized vendor list, which is part of our Operations Manual, describes the full line of products identified with the ROCKY MOUNTAIN CHOCOLATE FACTORY System. We may change the types of authorized products and services, and do not limit our right to do so, although we provide you with written notice 30 days before any change becomes effective.

You must devote a minimum of 50% of all retail display space to Factory Candy, or in other words, RMCF-manufactured bulk chocolates and packaged candies. The other edible items we permit you to serve, make and sell through your Store are store-made candies that you prepare from recipes and specifications in the Operations Manual, through the process of molding, cooking and dipping various foods, such as cookies, crackers, pretzels, fresh and dried fruits, dog bones, plain chocolate and other items we approve in writing, in our sole discretion. We refer to these other edible items as "Store Candy" throughout this Offering Circular. All Factory Candy, Store Candy and Items must be sold in containers or bags that we approve.

You must obtain our consent in writing before you operate food carts, participate in food festivals or offer any other type of off-site food services using our Marks and Licensed Methods. See Exhibits H (Satellite Store) and I (Temporary Store) to this Offering Circular.

You must not offer any other type of product or service, or operate or engage in any other type of business or profession, from or through your Franchised Location, including, filling "wholesale orders," which we define in the Franchise Agreement as those orders or sales where the principal purpose of the purchase is for resale, not for consumption, or any sale other than over-the-counter sales at a price other than the price charged to the general public. We permit volume discounted sales made at the Franchised Location to a single purchaser, not for resale, and discounted sales made at the Franchised Location to charitable organizations for fund-raising purposes. You may not offer any Store Candy, Factory Candy or Items for sale on the Internet.

S00855

## ITEM 17

### RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

This table lists certain important provisions of the Franchise Agreement.  You should read these provisions in the Franchise Agreement attached to this Offering Circular.

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| a. | Term of the franchise | Section 17.1 | 10 years |
| b. | Renewal or extension of the term | Section 17.2 | One 10-year term. |
| c. | Requirements for you to renew or extend | Section 17.3 | Pay fee, sign new agreement with addendum attached as Exhibit J. |
| d. | Termination by you | None | N/A |
| e. | Termination by us without cause | None | N/A |
| f. | Termination by us with cause | Sections 18.1 and 18.2 | We can terminate only if you commit any one of several listed violations. |
| g. | "Cause" defined-defaults which can be cured | Sections 18.1 and 18.2 | 15 days for failure to comply with any provision of Franchise Agreement or Operations Manual. |
| h. | "Cause" defined-defaults which cannot be cured | Section 18.1 | Assignment for benefit of creditors, inability to pay debts, bankruptcy,* reorganization, liquidation, dissolution, receivership, certain unreversed judgments, abandonment, material understatement of income, unlawful or deceptive practices, failure to pay fees, etc. to us after 10 days notice. |
| i. | Your obligations on termination/nonrenewal | Section 18.5 | Pay outstanding amounts, de-identify Store, transfer telephone number, no use of our trade secrets or proprietary materials, covenant not to compete, sign general release (see also r). |
| j. | Assignment of contract by us | Section 16.6 | No restriction on our right to assign. |
| k. | "Transfer" by you – definition | Section 16.1 | Includes transfer of at least 25% of stock or assets of Store. |
| l. | Our approval of transfer by you | Section 16.3 | We have the right to approve all transfers, our consent not to be unreasonably withheld. |
| m. | Conditions for our approval of transfer | Section 16.2 | You must have complied with Franchise Agreement and Operations Manual, transferee must qualify, you must pay all amounts due in full, you must pay transfer fee, transferee must sign the then current contract and you must sign a release. |

S00856

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| n. | Our right of first refusal to acquire your business | Section 16.4 | We may match any offer. |
| o. | Our option to purchase your business | Section 18.4 | We may offer to buy your Store or just your Store assets. |
| p. | Your death or disability | Section 16.7 | Transfer must occur within 120 days. |
| q. | Non-competition covenants during the term of the franchise | Section 20.1 | No involvement in competing business. |
| r. | Non-competition covenants after the franchise is terminated or expires | Section 20.2 | No involvement in competing business. |
| s. | Modification of the agreement | Section 22.3 | No modifications generally but Operations Manual may change. |
| t. | Integration/merger clause | Section 22.4 | Only terms of Franchise Agreement are binding (subject to state law). |
| u. | Dispute resolution by arbitration or mediation | None | N/A |
| v. | Choice of forum | Section 22.1 | Litigation in LaPlata County, Colorado (subject to state law). |
| w. | Choice of law | Section 22.1 | Colorado law applies (subject to state law). |

\*    This provision may not be enforceable under federal bankruptcy law. (11 U.S.C.A. Sec. 101 *et seq.*)

These states have statutes which may supersede the Franchise Agreement in your relationship with us, including the areas of termination and renewal of your franchise: ARKANSAS [Stat. Sections 4-72-201 to 4-72-210], CALIFORNIA [Bus. & Prof. Code Sections 20000-20043], CONNECTICUT [Gen. Stat. Ch. 739, Sections 42-133e to 42-133h], DELAWARE [Title 6, Ch. 25, Code Sections 2551-2556], HAWAII [Title 26, Rev. Stat. Section 482E-6], ILLINOIS [ILCS, Ch.815, Sections 705/1-705/44], INDIANA [Code Section 23-2-2.7-1 to 7], IOWA [Title XX, Code Sections 523H.1-523H.17], MARYLAND [MD. CODE ANN., BUS. REG. Sections 14-201 to 14-233 (1998 Repl. Vol. & Supp. 2001)], MICHIGAN [1979 Comp. Laws, Section 445.1527], MINNESOTA [1996 Stat. Section 80C.14], MISSISSIPPI [Code Sections 75-24-51 to 75-24-63], MISSOURI [Rev. Stat. Sections 407.400-407.410, 407.413, 407.420], NEBRASKA [Rev. Stat. Sections 87-401 to 87-410], NEW JERSEY [Rev. Stat. Sections 56:10-1 to 56:10-12], SOUTH DAKOTA [Codif. L. Section 37-5A-51], VIRGINIA [Code Sections 13.1-557-574], WASHINGTON [Rev. Code Sections 19.100.180, 19.100.190], WISCONSIN [Stat. Sections 135.01 - 135.07], DISTRICT OF COLUMBIA [Code Sections 29-1201 to 29-1208], PUERTO RICO [Ann. Laws, Title 10, Ch. 14, Sections 278-278d], VIRGIN ISLANDS [Code Ann., Title 12A, Ch. 2, Subch. III, Sections 130-139]. These and other states may have court decisions which may supersede the Franchise Agreement in your relationship with the Franchisor, including the areas of termination and renewal of your franchise.

SEE ATTACHED ADDENDUM IMMEDIATELY FOLLOWING ITEM 22 OF THIS OFFERING CIRCULAR FOR INFORMATION REGARDING CALIFORNIA LAW.

S00857

## ITEM 18

### PUBLIC FIGURES

We do not use any public figure to promote our franchise.

## ITEM 19

### EARNINGS CLAIMS

CAUTION: WHILE THE ATTACHED FIGURES REPRESENT ACTUAL GROSS SALES OF FRANCHISED STORES DURING OUR MOST RECENT FISCAL YEAR ENDED FEBRUARY 28, 2003, THE FOLLOWING DATA SHOULD NOT BE CONSIDERED AS THE ACTUAL, POTENTIAL OR PROBABLE GROSS SALES THAT WILL BE REALIZED BY YOU OR ANY OTHER FRANCHISEES. WE DO NOT REPRESENT THAT YOU CAN EXPECT TO ATTAIN THESE GROSS SALES LEVELS OR ANY INCOME OR PROFIT THAT COULD RESULT FROM SUCH GROSS SALES. YOUR FINANCIAL RESULTS ARE LIKELY TO DIFFER FROM THE FIGURES PRESENTED. YOU SHOULD CAREFULLY REVIEW THE ATTACHED EXPLANATORY NOTES.

THE EARNINGS FIGURES DO NOT REFLECT THE COSTS OF SALES OR OPERATING EXPENSES THAT MUST BE DEDUCTED FROM THE GROSS REVENUE OR GROSS SALES FIGURES TO OBTAIN YOUR NET INCOME OR PROFIT. THE BEST SOURCE OF COST AND EXPENSE DATA WILL EVENTUALLY BE FROM FRANCHISEES AND FORMER FRANCHISEES.

THIS FINANCIAL INFORMATION IS PREPARED WITHOUT AN AUDIT. PROSPECTIVE FRANCHISEES OR SELLERS OF FRANCHISES SHOULD BE ADVISED THAT NO CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED THESE FIGURES OR EXPRESSED HIS/HER OPINION WITH REGARD TO THE CONTENT OR FORM.

FISCAL YEAR 2003 ACTUAL GROSS SALES FOR TOP 75% OF FRANCHISED STORES
OPEN FOR AT LEAST TWELVE MONTHS

| Store | Sales | Year Opened | Store | Sales | Year Opened | Store | Sales | Year Opened |
|---|---|---|---|---|---|---|---|---|
| 1 | $1,477,109 | 1996 | 43 | $427,985 | 1997 | 85 | $299,472 | 1996 |
| 2 | $678,286 | 1999 | 44 | $411,312 | 2000 | 86 | $298,477 | 1995 |
| 3 | $667,375 | 1998 | 45 | $406,207 | 2001 | 87 | $294,710 | 2001 |
| 4 | $656,053 | 1985 | 46 | $402,044 | 2000 | 88 | $292,353 | 1997 |
| 5 | $620,540 | 1995 | 47 | $401,664 | 2000 | 89 | $291,446 | 2002 |
| 6 | $617,454 | 1999 | 48 | $401,591 | 1998 | 90 | $290,229 | 1999 |
| 7 | $613,192 | 2001 | 49 | $399,988 | 2001 | 91 | $285,106 | 1983 |
| 8 | $608,525 | 2002 | 50 | $399,426 | 1990 | 92 | $283,086 | 1993 |
| 9 | $593,951 | 1997 | 51 | $398,825 | 1992 | 93 | $283,029 | 2001 |
| 10 | $583,302 | 1986 | 52 | $398,301 | 2002 | 94 | $282,662 | 1998 |
| 11 | $583,012 | 1995 | 53 | $395,847 | 1992 | 95 | $280,614 | 2001 |
| 12 | $569,641 | 1994 | 54 | $393,244 | 1997 | 96 | $278,685 | 1997 |
| 13 | $563,212 | 1999 | 55 | $390,506 | 1994 | 97 | $278,012 | 1992 |
| 14 | $550,626 | 2002 | 56 | $388,455 | 1993 | 98 | $274,476 | 1995 |
| 15 | $545,772 | 1997 | 57 | $388,392 | 1993 | 99 | $272,257 | 2000 |
| 16 | $543,504 | 1992 | 58 | $382,861 | 1999 | 100 | $270,427 | 1982 |
| 17 | $537,239 | 2001 | 59 | $382,674 | 1992 | 101 | $270,369 | 1987 |
| 18 | $530,449 | 1995 | 60 | $382,244 | 2000 | 102 | $269,465 | 1982 |
| 19 | $527,800 | 1999 | 61 | $377,977 | 2000 | 103 | $268,439 | 1994 |
| 20 | $518,170 | 1996 | 62 | $376,828 | 1996 | 104 | $267,953 | 1999 |
| 21 | $516,524 | 2000 | 63 | $376,633 | 2000 | 105 | $266,812 | 1999 |
| 22 | $506,553 | 1992 | 64 | $370,142 | 1983 | 106 | $266,270 | 1998 |
| 23 | $500,441 | 1999 | 65 | $368,731 | 2000 | 107 | $264,899 | 1995 |
| 24 | $489,554 | 2002 | 66 | $368,529 | 2000 | 108 | $261,678 | 2000 |
| 25 | $489,046 | 1984 | 67 | $364,587 | 1995 | 109 | $258,120 | 2001 |
| 26 | $487,121 | 2002 | 68 | $364,231 | 1994 | 110 | $257,460 | 2000 |
| 27 | $483,759 | 1991 | 69 | $360,049 | 1999 | 111 | $254,126 | 1999 |
| 28 | $483,444 | 1993 | 70 | $358,692 | 2001 | 112 | $252,798 | 1997 |
| 29 | $480,458 | 1984 | 71 | $357,753 | 1995 | 113 | $251,450 | 2000 |
| 30 | $469,595 | 2001 | 72 | $349,728 | 2001 | 114 | $245,676 | 1984 |
| 31 | $452,738 | 2000 | 73 | $349,555 | 2000 | 115 | $244,628 | 2002 |
| 32 | $451,146 | 1994 | 74 | $346,548 | 2000 | 116 | $241,691 | 2002 |
| 33 | $446,296 | 2000 | 75 | $337,788 | 1983 | 117 | $240,391 | 1996 |
| 34 | $443,610 | 2001 | 76 | $335,778 | 1997 | 118 | $239,976 | 1995 |
| 35 | $439,575 | 2001 | 77 | $324,908 | 2000 | 119 | $237,414 | 2000 |
| 36 | $438,961 | 1993 | 78 | $323,876 | 2000 | 120 | $236,784 | 1995 |
| 37 | $434,495 | 1983 | 79 | $310,397 | 2001 | 121 | $228,170 | 1999 |
| 38 | $434,210 | 2002 | 80 | $307,475 | 1990 | 122 | $227,284 | 2001 |
| 39 | $433,432 | 1999 | 81 | $307,078 | 1995 | 123 | $224,238 | 2002 |
| 40 | $429,926 | 1996 | 82 | $302,253 | 1986 | 124 | $223,942 | 2000 |
| 41 | $429,029 | 2001 | 83 | $301,956 | 2001 | 125 | $222,457 | 1998 |
| 42 | $428,061 | 2000 | 84 | $299,704 | 2000 | 126 | $219,604 | 2002 |
| | | | | | | 127 | $217,242 | 1995 |

| | No. Of Stores | Combined Annual Gross Retail Sales | Average Annual Gross Retail Sales |
|---|---|---|---|
| Top 25% | 42 | $22,753,183 | $541,742 |
| Middle 50% | 85 | $26,607,139 | $313,025 |
| Lower 25% | 42 | $7,259,643 | $172,849 |
| All Stores | 169 | $56,619,964 | $335,029 |

## EXPLANATORY NOTES

1.      The information provided above is based on reports of Gross Retail Sales (as defined in the Franchise Agreement) provided by all 169 franchised ROCKY MOUNTAIN CHOCOLATE FACTORY Stores that had been open for at least 12 months as of the end of our most recent fiscal year, February 28, 2003. This information is for the 12 months prior to that date. We have listed the individual Gross Retail Sales for only the top 127 or 75% of the 169 Stores. We included actual gross sales for only the top 75% of franchised Stores because we believe that these results, considered together with the overall average and the average of the lower 25% of franchised Stores, are representative of the results of the franchised Stores overall. The Gross Retail Sales for Stores that we own are not included in this information, but we have included information on any satellite or temporary Stores operated by Franchisees.

2.      Of the 42 Stores included in the top 25%, 16 met or exceeded the average Gross Retail Sales of $541,742. Of the 85 Stores in the middle 50%, 36 met or exceeded the average Gross Retail Sales of $313,025. Of the 42 Stores in the lower 25%, 25 met or exceeded the average Gross Retail Sales of $172,849. Of the 169 Stores, 76 met or exceeded the average Gross Retail Sales of $335,029.

3.      Differences in Gross Retail Sales may be attributable to differences in the mix of Factory Candy, Items and Store Candy offered for sale at each Store, which is subject, in part, to the Franchisee's discretion. Other factors that may affect the results among Stores include geographic and demographic characteristics, the type of mall or other location, length of time the Store has been open and the managerial or entrepreneurial abilities of the franchisee and its managers.

4.      The above information was prepared from royalty reports provided by each individual franchisee. A franchisee pays us a royalty based on sales. We know of no instance, and have no reason to believe, that any franchisee would overstate its level of sales receipts in its royalty report, however, these results have not been audited and we have not independently verified these results.

5.      We do not have access to nor knowledge of the expenses or costs incurred by each of the 169 franchised Stores. The above Gross Retail Sales figures may not necessarily be predictive of any given Store's profitability.

6.      This information represents aggregate results of sales reported to us and should not be considered the actual or probable sales, which will be achieved by any individual franchisee. We do not represent that any prospective franchisee can expect to attain these results. A franchisee's results are likely to be lower in its first year of business. We recommend that the prospective franchisee make his or her own independent investigation to determine whether or not a franchise may be profitable. We further recommend that prospective franchisees consult with professional advisors before executing any agreement.

(CA 6/1/03)                              27

7.    Actual results may vary from franchise to franchise and depend on a variety of internal and external factors, many of which neither we nor any prospective franchisee can estimate, such as competition, economic climate, demographics, changing consumer demands and tastes, etc. A franchisee's ability to achieve any level of gross sales or net income will depend on these factors and others, including the franchisee's level of expertise, none of which are within our control. Accordingly, we cannot, and do not, estimate the results of any particular franchise.

Substantiation for this data is available for inspection at our corporate headquarters and will be provided upon the reasonable request of a prospective franchisee.

**EXCEPT FOR THE INFORMATION IN THIS ITEM, NO REPRESENTATIONS OR STATEMENTS OF ACTUAL, AVERAGE, PROJECTED, FORECASTED OR POTENTIAL SALES, COSTS, INCOME OR PROFITS ARE MADE TO FRANCHISEES BY US. WE DO NOT FURNISH OR MAKE, OR AUTHORIZE OUR SALES PERSONNEL TO FURNISH OR MAKE, ANY ORAL OR WRITTEN INFORMATION CONCERNING THE ACTUAL, AVERAGE, PROJECTED, FORECASTED OR POTENTIAL SALES, COSTS, INCOME OR PROFITS OF A FRANCHISE OR PROSPECTS OR CHANCES OF SUCCESS THAT ANY FRANCHISEE CAN EXPECT OR THAT PRESENT OR PAST FRANCHISEES HAVE HAD, OTHER THAN AS SET FORTH IN THIS ITEM. WE DISCLAIM AND WILL NOT BE BOUND BY ANY UNAUTHORIZED REPRESENTATIONS.**

<u>**ITEM 20**</u>

**LIST OF OUTLETS**

**FRANCHISED
BUSINESS STATUS SUMMARY
FOR FISCAL YEARS 2003/2002/2001[1]**

| State[3] | Transfers | Cancelled or Terminated by RMCF | Not Renewed by RMCF | Reacquired by RMCF | Left the System/ Other | Total from left Columns | Franchisees Operating at Year End |
|---|---|---|---|---|---|---|---|
| Alabama | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/0 | 1/0/0 | 0/1/1 |
| Arizona | 1/0/3 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/0 | 2/0/3 | 7/6/6 |
| Arkansas | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/2 | 0/0/2 | 1/1/1 |
| California | 1/1/3 | 0/0/0 | 0/0/0 | 0/0/0 | 2/0/1 | 3/1/4 | 43/45/39 |
| Colorado | 4/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/0 | 5/0/0 | 30/22/21 |
| Connecticut | 0/2/0 | 0/0/0 | 0/0/0 | 2/0/0 | 0/0/0 | 2/2/0 | 2/2/0 |
| Delaware | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 2/2/1 |
| Florida | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/2/1 | 0/2/1 | 10/8/9 |
| Georgia | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 3/0/0 | 3/0/0 | 3/6/5 |
| Hawaii | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 3/3/4 |
| Idaho | 1/0/1 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/0 | 2/0/1 | 3/4/4 |
| Illinois | 1/1/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/1/0 | 2/2/0 | 10/7/5 |

S00861

| State[1] | Transfers | Cancelled or Terminated by RMCF | Not Renewed by RMCF | Reacquired by RMCF | Left the System/ Other | Total from left Columns | Franchisees Operating at Year End |
|---|---|---|---|---|---|---|---|
| Indiana | 0/1/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/0 | 1/1/0 | 2/3/3 |
| Iowa | 0/1/0 | 0/0/0 | 0/0/0 | 1/0/0 | 0/0/0 | 1/1/0 | 1/1/0 |
| Kansas | 0/0/1 | 0/0/0 | 0/0/0 | 0/0/0 | 1/1/0 | 1/1/1 | 3/3/4 |
| Kentucky | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/2 | 0/0/2 | 1/1/0 |
| Louisiana | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/0 |
| Maryland | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/0 | 1/0/0 | 3/2/2 |
| Massachusetts | 0/1/0 | 0/0/0 | 0/0/0 | 1/0/0 | 1/0/0 | 2/1/0 | 1/1/0 |
| Michigan | 1/1/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/0 | 2/1/0 | 6/5/3 |
| Minnesota | 0/1/0 | 0/0/0 | 0/0/0 | 0/4/0 | 0/0/0 | 0/1/0 | 4/4/1 |
| Mississippi | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/2/2 |
| Missouri | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/1/0 | 1/1/0 | 3/5/6 |
| Montana | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/1/1 | 0/1/1 | 0/0/2 |
| Nebraska | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 2/1/1 |
| Nevada | 0/0/1 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/1 | 2/2/2 |
| New Hampshire | 0/1/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/1/0 | 2/2/1 |
| New Jersey | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 2/2/2 |
| New Mexico | 0/2/1 | 0/0/0 | 0/0/0 | 0/0/0 | 1/2/0 | 1/4/1 | 5/6/6 |
| New York | 0/1/1 | 0/0/0 | 0/0/0 | 0/0/0 | 2/0/0 | 2/1/1 | 3/5/4 |
| North Carolina | 0/1/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/1/0 | 0/2/0 | 2/1/1 |
| Ohio | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 4/3/2 |
| Oregon | 0/1/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/1/0 | 1/2/0 | 7/8/7 |
| Pennsylvania | 1/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/1 | 2/0/1 | 2/3/5 |
| South Carolina | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/0 | 1/0/0 | 2/3/3 |
| Tennessee | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/1 | 0/0/1 | 4/4/3 |
| Texas | 1/1/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/2/1 | 1/3/1 | 10/10/9 |
| Utah | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/0 | 1/0/0 | 5/5/5 |
| Virginia | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 2/2/2 |
| Washington | 0/0/1 | 0/0/0 | 0/0/0 | 0/0/0 | 1/1/0 | 1/1/1 | 7/5/6 |
| West Virginia | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/1/1 |
| Wisconsin | 0/1/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/1 | 1/1/1 | 0/1/0 |
| Wyoming | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/1 | 0/0/1 | 0/0/0 |
| Canada | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/0/2 | 1/0/2 | 25/23/27 |
| Guam | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 1/1/1 |

(CA 6/1/03)

29

S00862

| State[3] | Transfers | Cancelled or Terminated by RMCF | Not Renewed by RMCF | Reacquired by RMCF | Left the System/ Other | Total from left Columns | Franchisees Operating at Year End |
|---|---|---|---|---|---|---|---|
| Abu Dhabi, UAE | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 0/0/0 | 2/2/1 |
| | | | | | | | |
| TOTALS | 11/17/12 | 0/0/0 | 0/0/0 | 4/0/0 | 26/13/14 | 41/30/26 | 230/224/208 |

(1)   All numbers are as of February 28 or 29 for each year.

(2)   The numbers in the "Total" column may exceed the number of Stores affected because several events may have affected the same Store. For example, the same Store may have had multiple owners.

(3)   In April, 1998, we signed a Master Franchise Agreement for the country of Taiwan, but as of our most recent fiscal year end, no Stores were open there. In November 1999, we signed a Master Franchise Agreement for the Gulf Cooperation Council States and Stores opened in the United Arab Emirates in May 2000 and October 2001.

## STATUS OF COMPANY OWNED STORES
### FOR FISCAL YEARS 2003/2002/2001

| STATE | STORES CLOSED DURING YEAR | STORES OPENED DURING YEAR | TOTAL STORES OPERATING AT YEAR END |
|---|---|---|---|
| Alabama | 0/0/*1 | 0/0/0 | 0/0/0 |
| California | 0/0/0 | 0/0/0 | 0/0/0 |
| Colorado | 0/0/*1 | 0/0/0 | 4/4/4 |
| Connecticut | 0/*2/0 | **2/0/0 | 2/0/2 |
| Florida | 0/0/*3 | 0/0/0 | 0/0/0 |
| Georgia | 0/0/*2 | 0/0/0 | 0/0/0 |
| Illinois | 0/0/*1 | 0/0/0 | 0/0/0 |
| Indiana | 0/*1/1 | 0/0/0 | 0/0/1 |
| Iowa | 0/*1/0 | **1/0/0 | 1/0/1 |
| Kentucky | 0/0/0 | 0/0/0 | 0/0/0 |
| Maryland | 0/0/*2 | 0/0/0 | 0/0/0 |
| Massachusetts | 0/*1/0 | **1/0/0 | 1/0/1 |
| Michigan | 0/*1/0 | 0/0/0 | 0/0/1 |
| Minnesota | 0/*1/0 | 0/0/0 | 0/0/1 |
| Missouri | 0/0/0 | 0/0/0 | 0/0/0 |
| Nevada | 0/0/*1 | 0/0/0 | 0/0/0 |

(CA 6/1/03)                                30                                S00863

| STATE | STORES CLOSED DURING YEAR | STORES OPENED DURING YEAR | TOTAL STORES OPERATING AT YEAR END |
|---|---|---|---|
| New Hampshire | 0/*1/0 | 0/0/0 | 0/0/1 |
| New York | 0/*2/1 | 0/**1/0 | 0/0/1 |
| Ohio | 0/0/*2 | 0/0/0 | 0/0/0 |
| Oklahoma | 0/0/0 | 0/0/0 | 0/0/0 |
| Pennsylvania | 0/0/*4 | 0/0/0 | 0/0/0 |
| South Carolina | 0/0/*1 | 0/0/0 | 0/0/0 |
| Virginia | 0/0/0 | 0/0/0 | 0/0/0 |
| Washington | 0/0/0 | 0/0/0 | 0/0/0 |
| Wisconsin | 0/*1/0 | 0/0/0 | 0/0/1 |
| TOTALS | 0/11/20 | 4/1/0 | 8/4/14 |

\* Sold to a franchisee
\*\* Purchased from a franchisee

## PROJECTED OPENINGS
## FOR FISCAL YEAR 2004

| STATE | FRANCHISE AGREEMENTS SIGNED BUT STORE NOT OPENED | PROJECTED FRANCHISED NEW STORES IN FISCAL YEAR 2004 | PROJECTED COMPANY OWNED STORE OPENINGS IN FISCAL YEAR 2004 |
|---|---|---|---|
| Arizona | 1 | 1 | 0 |
| California | 3 | 8 | 0 |
| Colorado | 1 | 2 | 0 |
| Florida | 2 | 2 | 0 |
| Hawaii | 1 | 1 | 0 |
| Iowa | 1 | 1 | 0 |
| Minnesota | 1 | 1 | 0 |
| Missouri | 1 | 2 | 0 |
| New Jersey | 1 | 2 | 0 |
| Nebraska | 1 | 1 | 0 |
| Nevada | 1 | 2 | 0 |
| Pennsylvania | 0 | 2 | 0 |
| Tennessee | 0 | 1 | 0 |
| Texas | 3 | 3 | 0 |
| Washington | 1 | 1 | 0 |
| TOTALS | 18 | 30 | 0 |

(CA 6/1/03)

31

S00864

A list of names of all Franchisees and the addresses and telephone numbers of their Stores are listed as Exhibit C to this Offering Circular. A list of the name and last known home address and telephone number of every Franchisee who has had a franchise terminated, cancelled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the Franchise Agreement during fiscal year 2003 and through the date of this Offering Circular or who has not communicated with us within 10 weeks of the date of this Offering Circular is listed on Exhibit D to this Offering Circular.

## ITEM 21

### FINANCIAL STATEMENTS

Attached to this Offering Circular as Exhibit E are our balance sheets as of February 28, 2003 and February 29, 2002 and the related statements of operations, stockholders' equity and cash flows for each of the years in the three year period ended February 28, 2003.

## ITEM 22

### CONTRACTS

Attached to this Offering Circular are the following franchise-related contracts:

| | |
|---|---|
| Exhibit B | Franchise Agreement |
| Exhibit G | Sublease and Assignment Agreements |
| Exhibit H | Addendum to Franchise Agreement – Satellite Stores |
| Exhibit I | Addendum to Franchise Agreement – Temporary Stores |
| Exhibit J | Addenda to Franchise Agreement – Renewal and Transfer |

## ITEM 23

### RECEIPT

**THE LAST PAGE OF THE OFFERING CIRCULAR (FOLLOWING THE EXHIBITS AND ATTACHMENTS) IS A DOCUMENT ACKNOWLEDGING RECEIPT OF THE OFFERING CIRCULAR BY YOU (ONE COPY FOR YOU AND ONE TO BE SIGNED FOR US).**

S00865

## ADDENDUM TO ITEM 3 OF OFFERING CIRCULAR

NOTICE TO ALL PROSPECTIVE ROCKY MOUNTAIN CHOCOLATE FACTORY FRANCHISEES:

1.    <u>Harbor Finance Partners v. Franklin Crail, et al.,</u> (No. 99CV3494, Denver Dist. Ct.)  On May 26, 1999, one of RMCF's shareholders, individually and on behalf of all other RMCF shareholders similarly situated, filed a class action against RMCF and individual members of RMCF's board of directors, alleging breach of fiduciary duty when the board took certain defensive actions designed to discourage a hostile takeover attempt by Whitman's Candies, Inc.  The complaint asked for compensatory damages, plus interest and costs, in an unspecified amount, and for injunctive relief to enjoin defendants from taking action that would have prevented the public stockholders from maximizing the value of their shares.  The case was moved to the District Court for La Plata County, Colorado.  On December 15, 1999, the court dismissed the case on the grounds that the plaintiffs failed to satisfy the requirements for bringing a derivative action, and the plaintiffs could not bring a direct action.  The plaintiffs did not appeal the dismissal of the case.

2.    <u>American Environmental Safety Institute v. Mars, Incorporated et al.</u>  (No. BC 273433)  On May 8, 2002, a California non-profit corporation filed a law suit against RMCF; Mars, Incorporated; Hershey Foods Corporation; Nestle USA, Inc.; Kraft Foods North America; and See's Candies, Inc. in Superior Court for the County of Los Angeles, California. The Complaint was later amended to add more defendants.  The lawsuit claims that RMCF and the other defendants are aware that their chocolate products contain cadmium and lead in amounts exceeding the permissible levels under California Proposition 65 and that the defendants have failed to properly warn the public of the potentially hazardous effect of these minerals in chocolate.  The complaint demands injunctive relief and money damages including fines exceeding $5,000,000 plus interest, attorney's fees and other legal costs.  On September 28, 2001 the California Attorney General released a statement refusing to prosecute a similar action against chocolate manufacturers on behalf of the State of California and stating that such an action lacked merit.  This action is currently in the discovery phase.

Clyde W. Engle, one of our directors, is or has been a party to each of the following litigation matters. We are describing each of these matters to the best of our ability, after due diligence and our own independent investigation to obtain this information.  Due to Mr. Engle's inability or unwillingness to provide us with any additional information about his litigation matters, however, we cannot be certain that our descriptions are complete, accurate or that we have included each disclosable matter to which Mr. Engle is or has been a party.

3.    <u>Shapo v. Engle, et al.</u> (No. 98 C 7909, N.D. Ill.)  On February 23, 1999, the Director of Insurance of the state of Illinois, in his capacity as liquidator ("Liquidator") of Coronet Insurance Company, Crown Casualty Company and National Assurance Indemnity Company (the "Insurance Companies"), filed a Second Amended Complaint against 14 entities and 14 individuals (the "Defendants"), two of whom, Lee Mortenson and Clyde Engle, are directors of RMCF.  Mr. Engle has served as president of the Insurance Companies since 1986, though Mr. Mortenson served as President of Coronet Insurance Company during the period 1994 to 1996.  The Complaint alleges illegal transfers of more than $70 million out of the Insurance Companies between 1985 and 1996, to support personal and business interests of the Defendants, rendering the Insurance Companies unable to pay claims made by their policyholders and ultimately resulting in the liquidation of the Insurance Companies.  The complaint alleges RICO claims and seeks treble damages.  On November 10, 1999, the court denied Mr. Engle's motion to dismiss, but dismissed the Liquidator's claim for declaratory relief against Mr. Mortenson and the other Defendants, except Mr. Engle.  On February 11, 2000, the court granted a motion to intervene filed by Springs-Illinois, Inc., a wholly-owned subsidiary of the Insurance Companies.  The Court also allowed the Liquidator to amend his complaint to add allegations regarding transactions involving Springs-Illinois, Inc. On June 30, 2000, the Court denied the Liquidator's motion to amend its complaint to add a fraud claim against the Bank of Lincolnwood ("BOL").  Mr. Engle is the Chairman of BOL's

Board of Directors and the majority shareholder of BOL's parent company. On February 28, 2001, the judge granted the plaintiffs' motion to compel the defendants to disclose certain financial information and required Mr. Engle to produce documents relating to transactions entered into between him and certain companies. On May 24, 2001, a magistrate judge granted the Liquidator's follow-up motion to compel further discovery and ordered the defendants to pay the Liquidator's costs and attorneys' fees in bringing the motion. To the best of our knowledge, discovery is ongoing as of the date of this Offering Circular.

4.    Robert A. Lee, et al. v. Clyde Wm. Engle, et al. (C.A. No. 13323); and Richard N. Frank v. Clyde Wm. Engle, et al. (C.A. No. 13284). On December 8, 1993, the plaintiffs in the first action filed a complaint in the Court of Chancery of Delaware, New Castle, to initiate a shareholders' derivative suit and class action against Clyde Engle, in his capacity as the Chairman of the Board and Chief Executive Officer of Sunstates Corporation ("Sunstates"), naming the other directors and executive officers of Sunstates, and naming Sunstates as a nominal defendant (the "Frank Action"). The plaintiffs in the second action also filed a complaint in the Court of Chancery to initiate a shareholders' derivative suit against Mr. Engle and the other directors and executive officers of Sunstates on behalf of Sunstates (the "Lee Action"). The Frank Action alleges breaches of fiduciary duty, waste of corporate assets, failure to pay dividends on cumulative preferred stock, and a violation of the duty of disclosure with regard to a proxy statement. The Lee Action seeks injunctive, declaratory, and monetary relief. The Lee Action alleges waste and breach of fiduciary duty, requesting declaratory and monetary relief. The Frank Action and the Lee Action were consolidated into one action, C.A. No. 13323, and also consolidated with other actions involving Sunstates, into a single action for discovery purposes, known as In Re Sunstates Corporation Shareholder Litigation (C.A. No. 13284). On May 2, 2001, the court granted Sunstate's partial summary judgment motion dismissing plaintiff's claim that Sunstate, through its subsidiaries, improperly repurchased Sunstate's preferred and common stock. To the best of our knowledge, as of the date of this Offering Circular, this litigation is ongoing.

5.    Securities and Exchange Commission v. Clyde W. Engle (No. 93-CV-2077). On October 7, 1993, the Securities and Exchange Commission filed a complaint in the United States District Court for the District of Columbia against Clyde Engle, who is currently a director of RMCF. The complaint alleged violations of Section 16(a) of the Securities Exchange Act of 1934, Rules 16a-2 and 16a-3 and the requirements of Forms 3, 4 and 5 promulgated thereunder, and asked for payment of civil penalties of $75,000. On October 13, 1993, Mr. Engle entered into a consent judgment with the SEC, which was entered by the Court on October 13, 1993, in which he (1) neither admitted nor denied the allegations of the complaint; (2) consented to entry of the final judgment; (3) agreed to pay a civil penalty of $75,000; and (4) waived any right of appeal.

6.    Saks and Company d/b/a Saks Fifth Avenue v. Siobhan O'Meara and Clyde Engle. (No. 97 C 829, ND Ill., Feb. 11, 1998). On February 6, 1997, Saks and Company ("Saks") filed a complaint against Siobhan O'Meara and Clyde Engle, as husband and wife, for recovery of amounts due on a Saks Fifth Avenue charge account in the amount of $116,503 plus finance charges and court costs. Plaintiff alleged that Mr. Engle was liable on this account solely by operation of the Illinois Family Expense Act. Mr. Engle counterclaimed against Saks claiming some of the charges on the account were for business expenses and for libel, alleging that Saks submitted false information to one or more credit services. The court granted Saks' motion for summary judgment against Ms. O'Meara but denied Saks' motion for summary judgment against Mr. Engle. On February 25, 1998, the court dismissed the case with leave to reinstate on or before April 13, 1998 and stated that if the case was not reinstated by that date, the dismissal would be with prejudice. To the best of RMCF's knowledge, the case was not reinstated and the claims between Saks and Mr. Engle were most likely settled, however, there is no public record of the terms of any settlement agreement, so RMCF does not know whether or how much Mr. Engle may have paid to settle this case.

(6/1/03)

S00867

ADDENDUM TO THE
ROCKY MOUNTAIN CHOCOLATE FACTORY
OFFERING CIRCULAR FOR THE STATE OF CALIFORNIA

THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE OFFERING CIRCULAR.

1.    The following paragraphs are added to the end of Item 17:

The California Business and Professions Code Sections 20000 through 20043 provide rights to the franchisee concerning termination or nonrenewal of a franchise. If the Franchise Agreement contains a provision that is inconsistent with the law, the law will control.

Neither the Franchisor, any person or franchise broker in Item 2 of the Offering Circular is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 78a *et seq.*, suspending or expelling such persons from membership in such association or exchange.

The Franchise Agreement contains a liquidated damages clause. Under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.

The Franchise Agreement contains a covenant not to compete which extends beyond the termination of the Franchise. This provision may not be enforceable under California law.

You must sign a general release if you renew or transfer your franchise. California Corporations Code §31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code §§31000 through 31516). Business and Professions Code §20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code §§20000 through 20043).

Section 31125 of the Franchise Investment Law requires us to give to you a disclosure document approved by the Commissioner of Corporations before we ask you to consider a material modification of your Franchise Agreement.

The Franchise Agreement requires application of the laws of the State of Colorado. This provision may not be enforceable under California law.

(CA 6/1/03)

**LIST OF STATE AGENCIES/AGENTS FOR SERVICE OF PROCESS**

S00869

# LIST OF STATE AGENCIES

**California**

Department of Corporations
320 West 4th Street, Suite 750
Los Angeles, CA 90013-2344
(213) 576-7505
(866) 275-2677

1515 K Street, Suite 200
Sacramento, CA 95814-4052
(916) 445-7205
(866) 275-2677

1350 Front Street
San Diego, CA 92101
(619) 525-4044
(866) 275-2677

1390 Market Street
San Francisco, CA 94102
(415) 557-3787
(866) 275-2677

**Florida**

Department of Agriculture and
 Consumer Services
Division of Consumer Services
227 N. Bronough Street
City Centre Building, 7th Floor
Tallahassee, FL 32301
(904) 922-2770

**Hawaii**

Department of Commerce and
 Consumer Affairs
1010 Richards Street
Honolulu, HI 96813
(808) 548-2021

**Illinois**

Office of Attorney General
Franchise Division
500 South Second Street
Springfield, IL 62706
(217) 782-4465

**Indiana**

Indiana Secretary of State
Securities Division
302 West Washington Street
Room E-111
Indianapolis, IN 46204
(317) 232-6681

**Maryland**

Office of Attorney General
Maryland Division of Securities
200 St. Paul Place
Baltimore, MD 21202-2020
(410) 576-6360

**Michigan**

Michigan Department of Attorney
 General
Consumer Protection Division
Antitrust and Franchise Unit
670 Law Building
Lansing, MI 48913
(517) 373-7117

**Minnesota**

Minnesota Department of Commerce
Registration and Licensing
 Division
85 7th Place East, Suite 500
St. Paul, MN 55101
(612) 296-6328

**Nebraska**

Department of Banking and Finance
1200 N Street, Suite 311
P.O. Box 95006
Lincoln, NE 68509
(402) 471-3445

**New York**

New York State Department of Law
Bureau of Investor Protection and
 Securities
120 Broadway, 23rd Floor
New York, NY 10271
(212) 416-8211

**North Dakota**

Office of Securities Commissioner
600 East Boulevard, 5th Floor
Bismarck, ND 58505
(701) 328-2910

**Oregon**

Department of Insurance and Finance
Corporate Securities Section
Labor and Industries Building
Salem, OR 97310
(503) 378-4387

**Rhode Island**

Department of Business Regulation
Division of Securities
233 Richmond Street, Suite 232
Providence, RI 02903
(401) 222-3048

**South Dakota**

South Dakota Department of
 Commerce
 and Consumer Regulation
Division of Securities
c/o 118 West Capitol
Pierre, SD 57501
(605) 773-4013

**Texas**

Secretary of State
Statutory Document Section
P.O. Box 13563
Austin, TX 78711
(512) 475-1769

**Virginia**

State Corporation Commission
Division of Securities and
 Retail Franchising
1300 E. Main Street, 1st Floor
Richmond, VA 23219
(804) 371-9672

**Washington**

Securities Administrator
Department of Financial Institutions
Securities Division
P.O. Box 9033
Olympia, WA 98507-9033
(360) 902-8760

**Wisconsin**

Department of Financial Institutions
Division of Securities
345 W. Washington Avenue, 4th Floor
Madison, WI 53703
(608) 261-9555

## LIST OF AGENTS FOR SERVICE OF PROCESS

**California**

California Commissioner of
 Corporations
California Dept. of Corporations
320 West 4th Street, Suite 750
Los Angeles, California 90013-2344
(213) 576-7505
(866) 275-2677

**Hawaii**

Director of Commerce and
 Consumer Affairs
1010 Richards Street
P.O. Box 40
Honolulu, Hawaii 96810
(808) 586-2744

**Illinois**

Illinois Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-1090

**Indiana**

Indiana Secretary of State
201 State House
200 West Washington Street
Indianapolis, Indiana 46204
(317) 232-6531

**Maryland**

Maryland Securities Commissioner
200 St. Paul Place
Baltimore, Maryland 21202-2020
(410) 576-6360

**Michigan**

Michigan Department of
 Commerce,
Corporations and Securities Bureau
6546 Mercantile Way
Lansing, Michigan 48910
(517) 334-6212

**Minnesota**

Minnesota Commissioner of
 Commerce
Department of Commerce
85 7th Place East, Suite 500
St. Paul, Minnesota 55101
(612) 296-4026

**New York**

Secretary of State of the State of
 New York
41 State Street
Albany, New York 12231
(518) 473-2492

**North Dakota**

North Dakota Securities
 Commissioner
State Capitol
Bismarck, North Dakota 58505
(701) 328-2910

**Oregon**

Director of Oregon Department of
 Insurance and Finance
700 Summer Street, N.E.
Suite 120
Salem, Oregon 97310
(503) 378-4387

**Rhode Island**

Director of Rhode Island
 Department of Business Regulation
233 Richmond Street, Suite 232
Providence, Rhode Island 02903-4232
(401) 222-3048

**South Dakota**

Director of South Dakota Division of
 Securities
118 West Capitol Avenue
Pierre, South Dakota 57501
(605) 773-4823

**Virginia**

Clerk of the State Corporation
 Commission
1300 East Main Street, 1st Floor
Richmond, Virginia 23219
(804) 371-9672

**Washington**

Securities Administrator
Washington State Department of
 Financial Institutions
P.O. Box 9033
Olympia, Washington 98507-9033
(360) 902-8760

**Wisconsin**

Wisconsin Commissioner of
 Securities
345 W. Washington Ave., 4th Floor
Box 1768
Madison, Wisconsin 53703
(608) 261-9555

S00871

EXHIBIT B

# FRANCHISE AGREEMENT

EXHIBIT C

LIST OF FRANCHISEES

**LIST OF FRANCHISEES**
As of February 28, 2003

## Arizona

Chuck and Sandy Craig, 3240 Gateway Blvd, Suite 206, Prescott, AZ 86303-, (928) 778-9644
Blake and Jennifer Rolley, 276 North Highway 89A, Suite F, Sedona, AZ 86336-, (928) 282-3383
Michael" Moose" and Katrina Watson, 2700 Woodlands Village Blvd., Ste 320, Flagstaff, AZ 86001-, (928) 779-3538
Ron and Mari Griffin, 7014 Camelback Road, Suite 2200, Scottsdale, AZ 85251-, (480) 970-1707
Lon and Ruth Briggs, 21001 N. Tatum Blvd., Suite 36-1230, Phoenix, AZ 85050-, (480) 342-9993
Lon and Ruth Briggs, 4250 Antham Way, Suite 485, Phoenix, AZ 85027-, (623) 465-9716
Thomas and Yvonne Mannion, 5000 Arizona Mills Circle #454, Tempe, AZ 85282-, (480) 756-7366

## Arkansas

Dave and Jeanie Lovejoy, 5 Spring St., Eureka Springs, AR 72632-, (479) 253-6597

## California

Kara and Chad Felberg, 4480 Camino de la Plaza, Ste B, San Ysidro, CA 92173-, (619) 690-6024
Jerry and Cynthia Haws, 13000 Folsom Blvd., Suite 809, Folsom, CA 95630-, (916) 985-4832
Dan Terzian, 1751 Hwy. 237, Anderson, CA 96007-, (530) 365-5185 — 530-223 3297 —
Gordon and Stephanie Kusayanagi, 8155-6 Arroyo Circle, Gilroy, CA 95020-, (408) 842-4666
Robert and Bobbie McFall, 24303 Town Center Dr., Suite 130, Valencia, CA 91355-, (661) 291-1133
Craig and Kim Turner, 740 Ventura Blvd., Ste. 506, Camarillo, CA 93010-, (805) 445-1150
Hal and Vicki Heinemann, 1655 Copenhagen Dr., Solvang, CA 93463-, (805) 688-8823
Hal and Vicki Heinemann, 333 Five Cities Dr., Pismo Beach, CA 93449-, (805) 773-2149
Ryan and Rachael Sproles, 1815 Hawthorne Blvd., #210, Redondo Beach, CA 90278-, (310) 214-1585
Tony and Sheila Lukas, 2200 Petaluma Blvd. N., #410, Petaluma, CA 94952-, (707) 778-2120
James and Diane Gorman, 17600 Collier Ave., Suite H-180, Lake Elsinore, CA 92530-, (909) 245-1396
Steve and Maxine Daniel, 419 Shoreline Village Dr., Suite F, Long Beach, CA 90802-, (562) 436-5901
Jerry and Cynthia Haws, 1039 2nd Street, Sacramento, CA 95814-, (916) 448-8801
Ann Adams and Mike Van Etten, 2060 Lake Tahoe Blvd., South Lake Tahoe, CA 96150-, (530) 544-8288
Scott and Colleen Jones, 200 E. Via Rancho Pkwy., Suite 483, Escondido, CA 92025-, (760) 747-7991
Terri Vollmer, 65 Jefferson, San Francisco, CA 94133-, (415) 982-0611
Dan and Teri Honsowetz, 1413 Horizon Drive, Tulare, CA 93274-, (559) 687-1081
Will and Ginny Glaser, 20 City Blvd. West Blg A, Orange, CA 92868-, (714) 385-1777
Mike and Carol Madvig, 927 Broxton Avenue, Westwood, CA 90024-, (310) 824-5601
Bobby and Monina deJesus, 330 S. Hope St., Los Angeles, CA 90071-, (213) 687-0351
Robert and Sondra Brakeville, 152 N. Glassel St., Suite D, Orange, CA 92866-, (714) 771-6800
Jeannie Passmore, 131 Nut Tree Road, Suite D, Vacaville, CA 95687-, (707) 453-1041
Bruce and Neva Jessel, 28200 Hwy. 189, Suite C-200, Lake Arrowhead, CA 92352-, (909) 337-4909
Janice Smithwick and Billie Jo Lopez, 6081 Center Dr., #111, Los Angeles, CA 90045-, (310) 337-7822
Gordon and Stephanie Kusayanagi, 647 Cannery Row, Monterey, CA 93940-, (831) 372-1065
Gordon and Stephanie Kusayanagi, 681 Leavesley Rd., Space 300, Gilroy, CA 95020-, (408) 842-8666
Dennis and Ivonne Aragon, 1219 Napa Town Center, Napa, CA 94559-, (707) 253-1985
Jim and Celeste Kelber, One Mills Circle, Ste. 809, Ontario, CA 91764-, (909) 980-9248
Gi Deog (Douglas) Gweon, 30622 Santa Margarita Pkwy, #104, Rancho Santa Margarita, CA 92688-, (949) 589-2565
Rollie and Patti Buckallew, 5001 Willows Rd., Suite 301, Alpine, CA 91901-, (619) 659-8104
Mitch and Cheryl Cooney, 848 Higuera St., San Luis Obispo, CA 93401-3601, (805) 541-2221 ←
Steve and Maxine Daniel, 5213 E. 2nd., Long Beach, CA 90803-, (562) 434-1617

S00920

David Stroud, 1139 Prospect Street, La Jolla, CA 92037-, (858) 454-0077
Steve and Maxine Daniel, 200 Main St., Suite 106, Huntington Beach, CA 92648-, (714) 969-0795
Steve and Maxine Daniel, 308 Manhattan Beach Blvd., Manhattan Beach, CA 90266-, (310) 372-9950
Scott and Colleen Jones, 3485 Del Mar Heights Rd., Suite A-1, San Diego, CA 92130-, (858) 720-1951
Tom and Susan Addis, 46043 Old Mammoth Road, Mammoth Lakes, CA 93546-, (760) 934-6269
Jack and Karen Taylor, 5630 Paseo Del Norte, Space 119, Carlsbad, CA 92009-, (760) 804-3775
Al and Minoo Hendizadeh, 71 Fortune Drive, Suite 814, Irvine, CA 92618-, (949) 450-0999
Scott Bowen, 7774 N. Blackstone Ave., Fresno, CA 93720-, (559)-437-0400
Janice Smithwick and Billie Jo Lopez, 4325 Glencoe Ave. C#5, Marina del Rey, CA 90292-,
    (310) 301-4321
Walter and Carol Ast, 1106 Pine Street, Paso Robles, CA 93446-, (805) 226-7598
Harold and Jeanne Brown, 248 South Coast Highway, Laguna Beach, CA 92651-, (949) 497-3799

## Colorado

Ted and DeAnn Taylor, 845 Lincoln Ave., Steamboat Springs, CO 80477-, (970) 879-6194
Ted and DeAnn Taylor, 1860 Ski Time Square Dr. Floor 1, Unit E3, Steamboat Springs, CO 80477-,
    (970) 879-5098
Chandler Conrad, 304 Bridge St., Vail, CO 81657-, (970) 476-7623
Hal and Vickie Heinemann, 1 W. Flatiron Circle, #K1-6, Broomfield, CO 80021-, (303) 635-1037
Ron and Kevin Baalman, 2431 W. Colorado Ave., Colorado Springs, CO 80904-, (719) 635-4131
Peter and Paula Edwards, 222 Main St. D. Plaza Pl., Breckenridge, CO 80424-, (970) 453-2094
Rick and Gail Marion, 22010 Highway 6, Space #23, Keystone, CO 80435-, (970) 262-1267
Ron and Kevin Baalman, 750 Citadel Drive E., Space #1016, Colorado Springs, CO 80909-,
    (719) 591-2254
Linda B. Brian, 8900 Pena Blvd. Concourse B-52, Denver, CO 80249-, (303) 342-7860
Dave Blunk, 8501 W. Bowles Ave., Sp. 2B-125, Littleton, CO 80123-, (303) 972-1644
Linda B. Brian, 8900 Pena Blvd. Concourse B-22, Denver, CO 80249-, (303) 342-3472
Ron and Kevin Baalman, 5050 Factory Shops Blvd., Space 810, Castle Rock, CO 80104-, (303) 660-1320
Ronald Black and Wayne Brown, Copper One Lodge, Unit #A4, Copper Mountain, CO 80443-,
    (970) 968-2354
Vincent and Rebecca Tabone, 215 E. Foothills Pkwy, Suite 140, Ft. Collins, CO 80525-, (970) 226-5550
Don and Pat Marsh, 1512 Larimer St., Space #44-R, Denver, CO 80202-, (303) 623-1887
Brian and Sherry Franklin, 2424 Hwy 6 and 50, Space 327, Grand Junction, CO 81505-, (970) 243-3833
Vincent and Rebecca Tabone, 5669 McWhinney Blvd., Loveland, CO 80538-, (970) 593-0106
Linda Brian, 14500 W. Colfax Ave., Suite 536, Lakewood, CO 80401-, (303) 215-1891
Ronald Black and Wayne Brown, 145 Stephens Way, Silverthorne, CO 80498-, (970) 468-9168
Clay and Jo Adams, 517 Big Thompson Ave., Estes Park, CO 80517-, (970) 586-6601
Ron and Kevin Baalman, 1710 Briargate Blvd., Space 185, Colorado Springs, CO 80920-, (719) 590-7623
Nancy Riemer and Kraig Henry, 314 Elk Ave., Crested Butte, CO 81224-, (970) 349-0933
Susy Bonar, 172 N. College Ave., Space A-2, Ft. Collins, CO 80524-, (970) 494-0473
Hal and Vicki Heinemann, 1300 Pearl Street, Boulder, CO 80302-, (303) 444-8455
Rick and Gail Marion, 140 Ida Belle Road, Keystone, CO 80435-, (970) 262-9184

## Delaware

Roberta and Klaus Wuttke, 1510-B Ocean Outlets, Rehoboth Beach, DE 19971-, (302) 227-0422
Roberta and Klaus Wuttke, 135 2nd Street, Lewes, DE 19958-, (302) 645-5528

## Florida

Peter and JoAnn Ehrlich, 10562 Hwy. 98 West, #117, Destin, FL 32541-, (850) 654-9777
Dave and Jeanie Lovejoy, 1854 94th Drive, Space B-180, Vero Beach, FL 32966-, (772) 564-9111
Robert and Diana Greeno, 2700 S. R. 16, Ste. 802A, St. Augustine, FL 32092-, (904) 826-4041
Dean and Lisa Mester, 869 N. Alafaya Trail, #Q-09, Orlando, FL 32828-. (407) 382-8692

2

S00921

Hal and Vicki Heinemann, 5371 Factory Shops Blvd., Ellenton, FL 34222-, (941) 723-6612
Bryan Almon, 8200 Vineland Ave., Suite 1171, Orlando, FL 32821-, (407) 465-1002
Frank Guisto. 10801 Corkscrew Road, Suite 189, Estero, FL 33928-, (941) 949-0455
Hal and Vicki Heinemann, 2223 North West Shore Blvd., #B-225, Tampa, FL 33607-, (813) 351-8008
Diane and Glen Cook, 302 Southgate Plaza, Sarasota, FL 34239-, (941) 906-7570
Bryan Almon, 500 Belz Outlet Blvd., Space #290, St. Augustine, FL 32095-, (904) 827-1545

## Georgia

David Baker, 1000 Tanger Dr., Suite 103, Locust Grove, GA 30248-, (770) 914-0464
Jerry and Janice Hyder, 1001 Market St., Ste. 32A, Dalton, GA 30720-, (706) 275-4488
Jim and Eileen Humphlett, 1 Magnolia Bluff Way, Space 290, Darien, GA 31305-, (912) 437-2968
David Baker, 800 Steven B. Tanger Blvd., Ste. 205, Commerce, GA 30529-, (706) 335-7973
Jerry and Janice Hyder, 455 Bellwood Rd. Suite 76, Calhoun, GA 30701-, (706) 602-0200

## Hawaii

Greg and Cathy Clark, 94-790 Lumiaina St. Suite 110, Waipahu (Oahu), HI 96797-, (808) 676-0772
Greg and Cathy Clark, 650 Iwilei Road, 2nd Floor, Honolulu, HI 96817-, (808) 262-5525
Greg and Cathy Clark, 1 Aloha Towers Drive Space 245, Mailbox 81, Honolulu, HI 96813-,
    (808) 545-4443

## Idaho

Tim and Sharon Phillips, 6854 S. Eisenman Rd., Boise, ID 83705-, (208) 344-7779
Julie Gardner, 460 Sun Valley Road, Ketchum, ID 83340-, (208) 726-3724
Bill and Barbara Miller, 4201 Riverbend Ave., Post Falls, ID 83854-, (208) 773-6710

## Illinois

Chuck and Ann Henle, 207 South Main St., Galena, IL 61036-, (815) 777-3200
Jim and Geri Pstrzoch; Gerald and Barbara Luka, 156 North York Road, Elmhurst, IL 60126-,
    (630) 834-2005
Craig, Tania, Jim & Shirley Sprague, 4700 No. University St., Suite 21, Peoria, IL 61614-, (309) 693-7623
Michael Cerroni, 7200 Harrison Ave., Suite F-28, Rockford, IL 61112-, (815) 332-4671
Pamela and Thomas Lockowitz, 541 Milwaukee Avenue, Libertyville, IL 60048-, (847) 367-6703
Donald and Victoria Wiencek, 512 Orland Square, #E-03, Orland Park, IL 60462-, (708) 349-2063
Norbert and Elaine Tremko, 300 Happ Rd., Northfield, IL 60093-, (847) 446-5001
Bruce and Jean Kuhn, 50-B LaGrange Road, LaGrange, IL 60525-, (708) 352-6487
Andy and Alene Gnyp, 1011 S. Line Rd., Space C-6, Tuscola, IL 61953-, (217) 253-5874
Robin Martin, 22 E. Chicago St., Suite 109, Naperville, IL 60540-, (630) 717-8878

## Indiana

Mark Berry and Mike Self, 28 Monument Circle, Indianapolis, IN 46204-, (317) 687-1322
Andy and Alene Gnyp, 3025 Outlet Dr., Space E85, Edinburgh, IN 46124-, (812) 526-8227

## Kansas

Troy and Stacy Barragree, 2132 North Rock Rd., Suite 112, Wichita, KS 67206-, (316) 630-8200
Troy and Stacy Barragree, 601 S.E. 36th St. #137, Newton, KS 67114-, (316) 282-8599
Dan McDonough, 20377 West 151 St., Olathe, KS 66061-, (913) 397-6100

3

S00922

## Kentucky

Peter and JoAnn Ehrlich, 4049 Summit Plaza, Bldg. 15, Sp. G4, Louisville, KY 40241-, (502) 326-1628

## Louisiana

Tommy Gray, 4436 Veterans Blvd., Suite C-12, Metairie, LA 70006-, (504) 888-7787

## Maryland

Robert and Diana Greeno, 435 Outlet Center Drive, Queenstown, MD 21658-, 410-827-4922
Bob and Diana Greeno, 7000 Arundel Mills Circle, #203, Hanover, MD 21076-, (443) 755-8780
Bob and Diana Greeno and Bob Greeno, Jr., 10300 Little Patuxent Pkwy, #2605, Columbia, MD 21044
    (410) 884-9195

## Michigan

Andy and Alene Gnyp, 14600 Lakeside Circle, Sterling Heights, MI 48313-, (586) 566-7877
Daniel and Amy Hermen, 2121 Celebration Way NE, Suite 350, Grand Rapids, MI 49525-, (616) 361-9323
Rick Jackson and Jim Aman, 8825 Marketplace Drive, Suite 425, Birch Run, MI 48415-, (989) 624-4784
Alan Rosen and Phyllis Indianer, 2800 W. Big Beaver Rd., Space N-124, Troy, MI 48084-1454,
    (248) 816-1454
Alan Rosen and Phyllis Indianer, 6911 Orchard Lake Road, West Bloomfield, MI 48322-, (248) 851-6100
Andy and Alene Gnyp, 4058 Baldwin Road  Space 230, Auburn Hills, MI 48326-, (248) 332-9772

## Minnesota

Michael and Debbie Bolen, 395 S. Lake Ave., Suite 4, Duluth, MN 55802-, (218) 722-1700
Scott and Kristine Kieland, 7455 Currell Blvd., Suite 111, Woodbury, MN 55125-, (651) 209-6340
Stan and Kathleen Evavold, 7888 Main Street North, Sp. 1407, Maple Grove, MN 55369-, (763) 773-7623
Gail Stein, 128 East Broadway, Bloomington, MN 55425-, (952) 858-8826

## Mississippi

Dave and Jeanie Lovejoy, 13118 Highway 61N, #306, Robinsonville, MS 38664-, (662) 357-0110
David Baker, 10770 Factory Shop Blvd., Space 770, Gulfport, MS 39503-, (228) 868-9111

## Missouri

James and Jeanette Modic, 4540 Hwy 54, M7, Osage Beach, MO 65049-, (573) 348-0880
David Baker, 1000 Outlet Center Drive, Suite 16, Warrenton, MO 63383-, (636) 456-2964
David Baker, 2825 S. Glenstone T-8, Springfield, MO 65804-, (417) 882-5665
Bill Marron, 30 W. Pershing, Suite 130, Kansas City, MO 64108-, (816) 421-2571
Bill Marron, 1304 W. Old Hwy. 40, Space E10, Odessa, MO 64076-, (816) 230-1545

## Nebraska

Mike and Carol Woodman, 5043 2nd Ave., Suite 31, Kearney, NE 68847-, (308) 238-9133
Ty and Joy Behnke, 3001 S. 144th St., Suite 1053, Omaha, NE 68144-, (402) 691-0391

S00923

## Nevada

Susan O'Leary, 7400 Las Vegas Blvd. South, Space 24, Las Vegas, NV 89123-, (702) 361-7553
Michael Archiletti, 1955 South Casino Dr., Suite 338, Laughlin, NV 89029-, (702) 298-3610

## New Hampshire

Tom and Cynthia Ehmett, 1699 Whte Mountain Hwy, North Conway, NH 03860-1735, (603) 356-4838
Jim Aman, 120 Laconia Road, Suite 200, Tilton, NH 03276-, (603) 286-7663

## New Jersey

Shel Samuelson, 55 Liberty Village, Flemington, NJ 08822-, (908) 806-7572
James and JoCarol Raymond, 651 Kapkowski, Space #2050, Elizabeth, NJ 07201-, (908) 820-9202

## New Mexico

Wendel and Merle Clark, 108 Coronado Center, Albuquerque, NM 87110-, (505) 888-3399
Tracy and Georgann Garrett, 112 South Plaza, Taos, NM 87571-, (505) 758-8855
Enrique Wintergerst, 303 Romero NW, Ste 112, Albuquerque, NM 87104-, (505) 842-8883
Wendel and Merle Clark, 8380 Carillos Rd., #210, Santa Fe, NM 87505-, (505) 473-3900
Wendel and Merle Clark, 10000 Coors, Suite B5, Albuquerque, NM 87114-, (505) 792-0425

## New York

Lyle and Celeste Dynski-Trumble, 655 Route 318, Waterloo, NY 13165-, (315) 539-0614
James and JoCarol Raymond, 2681 Palisades Center Drive, West Nyack, NY 10994-, (845) 353-1550
Michael and Shirley Luongo, 125 Chambers Street, New York, NY 10007-, (212) 349-7553

## North Carolina

Alan and Jeanne Lassiter, 8030 Renaissance Pkwy, Suite 935, Durham, NC 27713-, (919) 361-4322
Andy and Alene Gnyp, 8111 Concord Mills Blvd., Suite 424, Concord, NC 28027-, (704) 979-1044

## Ohio

Ed and Becci Bartolomeo, 9909 Avon Lake Road, #335, Burbank, OH 44214-, (330) 948-9953
Rick Jackson and Jim Aman, 661 Forest Fair Drive, #123, Cincinnati, OH 45240-, (513) 671-3112
Ed and Becci Bartolomeo, 1500 Polaris Pkwy, Suite 2022, Columbus, OH 43240-, (614) 885-0577
Ed and Becci Bartolomeo, 8205 Factory Shops Blvd., Jeffersonville, OH 43128-, (740) 948-9174

## Oregon

Michelle Haage, 450 NW 257th Ave., Space 336, Troutdale, OR 97060-, (503) 665-7237
Jeff Compton and Renee Hallesy, 33 E. Main St., Ashland, OR 97520-, (541) 482-6757
Cynthia Sandusky, 3251 S. W. Hwy., Suite 101, Lincoln City, OR 97367-, (541) 994-6440
Brad and Julie Saxton, 61304 S. Hwy 97, Bend, OR 97702-, (541) 383-1718
Michelle Haage, Charlie & Jeanie O'Neal, 1402 Jantzen Beach Center, Portland, OR 97217-,
    (503) 286-0171
Kevin Hepner, 1001 Arney Road, Suite 409, Woodburn, OR 97071-, (503) 981-0008
Josh and Ken Rushane, 1111 N. Roosevelt, Suite 320, Seaside, OR 97138-, (503) 738-2125

S00924

Carrie Lanig. R. & C. LeBeau, R. & H. Little. 401 Center Street NE, Suite 285, Salem, OR 97301-,
(503) 371-8400

## Pennsylvania

Tony Sarno, 1000 Rt. 611, Suite B-39, Tannersville, PA 18372-, (570) 688-4058
Ed and Becci Bartolomeo, 1911 Leesburg Road, Suite 750, Grove City, PA 16127-, (724) 748-5116

## South Carolina

Michael and Shirley Luongo, 4633 Hwy 501, Space C220, Myrtle Beach, SC 29577-, (843) 236-5744
David Baker, 660 Factory Shops Blvd., Gaffney, SC 29341-, (864) 902-0000
Michael and Shirley Luongo, 1306 Celebrity Circle, 163-B, Myrtle Beach, SC 29577-, (843) 626-3239

## Tennessee

Dave and Jeanie Lovejoy, 150 Peabody Place, Memphis, TN 38103-, (901) 526-5050
Andy and Alene Gnyp, 280 Outlet Village Blvd., Lebanon, TN 37090-, (615) 443-5330
Andy and Alene Gnyp, 1000 Two Mile Parkway M2, Ste 1685, Goodlettsville, TN 37072-, (615) 851-1239
Andy and Alene Gnyp, 348 Opry Mills Drive, Nashville, TN 37214-, (615) 514-1339

## Texas

Marshall Morton, 301 Tanger Dr. , Suite 201, Terrell, TX 75160-, (972) 563-9999
David and Illuminda Ott, 4015 I-35 South, Suite 835, San Marcos, TX 78666-, (512) 392-9780
Lyle Roberts, 2301 Strand, Galveston, TX 77550-, (409) 762-4340
Food Brand, 5000 Katy Mills Circle Suite 515, Katy, TX 77494-, (281) 644-3663 ext. 231
Jim and Susan Manns, 207 Losoya, #102, San Antonio, TX 78205-, (210) 227-2626
Wendel Clark, 6002 Slide Rd., Space B-16, Lubbock, TX 79414-, (806) 784-0589
Sharon and Paul Zaidins, 3000 Grapevine Mills Pkwy, Ste. 258, Grapevine, TX 76051-, (972) 724-6868
Holly Williams Harris, 104 IH 35, NE, Suite 176, Hillsboro, TX 76645-, (254) 582-0246
Scott and Shanna Berry, 11200 Lakeline Mall Drive, Space EU2, Cedar Park, TX 78613-, (512) 401-2422
Robert Hawkins, 4321 IH-35 North, Suite 390, Gainesville, TX 76240-, (940) 665-7311

## Utah

Bill and Shaunna Durante, 250 N.Red Cliff Drive, Space 20, St. George, UT 84770-, (435) 652-4327
Chip and Kathy Pederson, 1385 Lowell Ave., Park City, UT 84060-, (435) 649-2235
Chip and Kathy Pederson, 158 So. Rio Gand St., MB 111, Salt Lake City, UT 84101-, (801) 456-0684
Chip and Kathy Pederson, 602 E. 500 South, Salt Lake City, UT 84102-, (801) 532-8022
Chip and Kathy Pederson, 510 Main Street, Park City, UT 84060-, (435) 649-0997

## Virginia

Michael Deverell, 5715-57 Richmond Road, Williamsburg, VA 23188-, (757) 229-7947
Kevin and Lisa Christensen, 2700 Potomac Mills Circle. #163, Woodbridge, VA 22192-, (703) 491-5800

## Washington

Ken and Sandi Fein, 1401 4th Avenue, Seattle, WA 98101-,
Phil and Laura McCrory, 561 S. Fork Ave. SW, Ste. H, North Bend, WA 98045-, (425) 831-1818
Ken and Sandi Fein, 393 Columbia Center, Kennewick. WA 99336-, (509) 735-7187

S00925

Ken and Cindi Rushane, 444 Fashion Way. Burlington, WA 98233-, (360) 757-2577
Kenneth and Morey Grosse, 636 Front Street, Leavenworth, WA 98826-, (509) 548-6525
Ken and Sandi Fein, 401 NE Northgate Way, Suite 2020, Seattle, WA 98125-, (206) 361-0222
Ken and Sandi Fein, 1419 First Ave., Seattle, WA 98101-, (206) 262-9581

## West Virginia

David Durbin, 1 Snowshoe Drive, Snowshoe, WV 26209-, (304) 572-1289

(6/1/03)

S00926

**EXHIBIT D**

**FRANCHISEES WHO HAVE LEFT THE SYSTEM**

S00927

## FRANCHISEES WHO HAVE LEFT THE SYSTEM
### As of April 30, 2003

### ARIZONA

Carl Novick, 3094 W. Autumn Breeze Dr., Tucson, AZ 85742-  (520) 229-0002

### CALIFORNIA

Peter and Jean Lin, 76 West Arthur, Arcadia, CA 91007-  (626) 447-1572

### GEORGIA

David Baker, 2394 Lake Villas Lane, Duluth, GA 30097 (770) 841-4138 (21 stores closed in Alabama, Connecticut, Georgia, Illinois, Indiana, Iowa, Massachusetts, Mississippi, Missouri, New York, Pennsylvania, South Carolina and Wisconsin)

### NEW MEXICO

Alexis K. Girard and Greer Enterprises, Inc., 532 Camino Militar, Santa Fe, NM 87501-  (505) 983-6504

### OREGON

Michelle Haage, Charlie & Jeanie O'Neal, 1411 NE Greenway, Gresham, OR 97030-  (503) 492-6424

### WASHINGTON

Ken and Sandi Fein, 1731 Beam Road, Granger, WA 98932-  (509) 854-1413

S00928

**EXHIBIT E**

## FINANCIAL STATEMENTS

S00929

**EXHIBIT H**

**ADDENDUM TO FRANCHISE AGREEMENT – SATELLITE STORE**

IN WITNESS WHEREOF, the parties hereto have executed this Conditional Assignment on the day and year first above written.

ASSIGNOR:

_____

By:_____

Name:_____

Its:_____


ASSIGNEE:

ROCKY MOUNTAIN CHOCOLATE
FACTORY, INC.

By:_____

Name: _____

Its: _____


LANDLORD:

_____

By: _____

Name: _____

Its: _____

(6/1/03)

4

S00931

INDEX TO FINANCIAL STATEMENTS

|                                                        | Page |
| ------------------------------------------------------ | ---- |
| Report of Independent Certified Public Accountants     | 1    |
| Statements of Income                                   | 2    |
| Balance Sheets                                         | 3    |
| Statements of Changes in Stockholders' Equity          | 4    |
| Statements of Cash Flows                               | 5    |
| Notes to Financial Statements                          | 6    |

S00932

## Report of Independent Certified Public Accountants

Board of Directors and Stockholders
Rocky Mountain Chocolate Factory, Inc.

We have audited the accompanying balance sheets of Rocky Mountain Chocolate Factory, Inc. as of February 28, 2003 and 2002, and the related statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended February 28, 2003.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Rocky Mountain Chocolate Factory, Inc. as of February 28, 2003 and 2002 and the results of its operations and its cash flows for each of the three years in the period ended February 28, 2003, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the financial statements, the Company adopted Statement of Financial Accounting Standards No. 142, "*Goodwill and Other Intangible Assets*", on March 1 2002.

GRANT THORNTON LLP

Dallas, Texas
April 18, 2003

ROCKY MOUNTAIN CHOCOLATE FACTORY, INC.
STATEMENTS OF INCOME

|  | FOR THE YEARS ENDED FEBRUARY 28, | | |
|  | 2003 | 2002 | 2001 |
| **Revenues** | | | |
| Sales | $15,304,365 | $15,224,065 | $18,982,948 |
| Franchise and royalty fees | 4,157,107 | 4,215,012 | 3,588,889 |
| Total revenues | 19,461,472 | 19,439,077 | 22,571,837 |
| **Costs and Expenses** | | | |
| Cost of sales | 9,996,592 | 9,612,712 | 10,190,091 |
| Franchise costs | 1,245,778 | 1,286,595 | 1,123,506 |
| Sales & marketing | 1,441,111 | 1,293,309 | 1,170,636 |
| General and administrative | 1,967,117 | 2,096,356 | 2,090,579 |
| Retail operating | 832,591 | 875,190 | 3,742,140 |
| Depreciation and amortization | 815,279 | 905,227 | 1,149,590 |
| Provision for loss on accounts and notes- receivable and related foreclosure costs | 1,666,524 | – | – |
| Total costs and expenses | 17,964,992 | 16,069,389 | 19,466,542 |
| **Operating Income** | 1,496,480 | 3,369,688 | 3,105,295 |
| **Other Income (Expense)** | | | |
| Interest expense | (297,344) | (437,339) | (660,620) |
| Interest income | 171,197 | 275,593 | 94,298 |
| Other, net | (126,147) | (161,746) | (566,322) |
| **Income Before Income Taxes** | 1,370,333 | 3,207,942 | 2,538,973 |
| **Income Tax Expense** | 517,985 | 1,212,600 | 982,585 |
| **Net Income** | $   852,348 | $ 1,995,342 | $ 1,556,388 |
| **Basic Earnings per Common Share** | $     .34 | $     .81 | $     .58 |
| **Diluted Earnings per Common Share** | $     .32 | $     .76 | $     .57 |
| **Weighted Average Common Shares Outstanding** | 2,495,417 | 2,473,268 | 2,701,433 |
| **Dilutive Effect of Employee Stock Options** | 209,939 | 163,120 | 7,224 |
| **Weighted Average Common Shares Outstanding, Assuming Dilution** | 2,705,356 | 2,636,388 | 2,708,657 |

The accompanying notes are an integral part of these statements.

S00934

2

ROCKY MOUNTAIN CHOCOLATE FACTORY, INC.
BALANCE SHEETS

| | AS OF FEBRUARY 28 | |
| --- | --- | --- |
| | 2003 | 2002 |
| **Assets** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 1,282,972 | $   165,472 |
| Accounts receivable, less allowance for doubtful accounts of $65,117 and $73,269 | 2,021,391 | 2,724,907 |
| Notes receivable | 288,100 | 561,829 |
| Refundable income taxes | 548,490 | – |
| Inventories | 3,062,135 | 3,127,090 |
| Deferred income taxes | 174,616 | 138,591 |
| Other | 276,002 | 313,943 |
| Total current assets | 7,653,706 | 7,031,832 |
| **Property and Equipment, Net** | 5,618,239 | 5,983,906 |
| **Other Assets** | | |
| Notes receivable, less valuation allowance of $49,446 and $225,689 | 801,309 | 2,353,355 |
| Goodwill, net | 1,039,872 | 797,789 |
| Intangible assets, net | 557,167 | 568,602 |
| Assets held for sale | 373,525 | – |
| Other | 40,428 | 59,907 |
| Total other assets | 2,812,301 | 3,779,653 |
| Total assets | $16,084,246 | $16,795,391 |
| **Liabilities and Stockholders' Equity** | | |
| **Current Liabilities** | | |
| Current maturities of long-term debt | $ 1,218,400 | $ 1,188,300 |
| Accounts payable | 612,770 | 667,419 |
| Accrued salaries and wages | 678,223 | 881,451 |
| Other accrued expenses | 363,192 | 354,912 |
| Total current liabilities | 2,872,585 | 3,092,082 |
| **Long-Term Debt, Less Current Maturities** | 3,072,798 | 4,324,746 |
| **Deferred Gain on Sale of Assets** | 15,657 | 389,302 |
| **Deferred Income Taxes** | 232,215 | 168,464 |
| **Commitments and Contingencies** | – | – |
| **Stockholders' Equity** | | |
| Common stock, $.03 par value; 7,250,000 shares authorized; 2,500,123 and 2,474,640 shares issued and outstanding | 75,004 | 74,239 |
| Additional paid-in capital | 2,721,433 | 2,544,351 |
| Retained earnings | 7,094,554 | 6,242,206 |
| Less notes receivable from officers and directors | – | (39,999) |
| Total stockholders' equity | 9,890,991 | 8,820,797 |
| Total liabilities and stockholders' equity | $16,084,246 | $16,795,391 |

The accompanying notes are an integral part of these statements.

3

S00935

ROCKY MOUNTAIN CHOCOLATE FACTORY, INC.
STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

|  | FOR THE YEARS ENDED FEBRUARY 28, | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
| **Common Stock** | | | |
| Balance at beginning of year | $ 74,239 | $ 76,931 | $ 95,475 |
| Repurchase and retirement of common stock | - | (3,701) | (19,744) |
| Issuance of common stock | 5 | 6 | 480 |
| Exercise of stock options | 760 | 1,003 | 720 |
| Balance at end of year | 75,004 | 74,239 | 76,931 |
| **Notes Receivable From Officers and Directors** | | | |
| Balance at beginning of year | (39,999) | (168,747) | (208,746) |
| Reduction of notes | 39,999 | 128,748 | 39,999 |
| Balance at end of year | - | (39,999) | (168,747) |
| **Additional Paid-In Capital** | | | |
| Balance at beginning of year | 2,544,351 | 2,907,379 | 5,855,884 |
| Repurchase and retirement of common stock | - | (621,840) | (3,060,555) |
| Costs related to stock split | (15,278) | - | - |
| Issuance of common stock | 1,263 | 1,078 | 49,520 |
| Exercise of stock options | 124,504 | 235,247 | 62,530 |
| Tax benefit from employee stock transactions | 66,593 | 22,487 | - |
| Balance at end of year | 2,721,433 | 2,544,351 | 2,907,379 |
| **Retained Earnings** | | | |
| Balance at beginning of year | 6,242,206 | 4,246,864 | 2,690,476 |
| Net income | 852,348 | 1,995,342 | 1,556,388 |
| Balance at end of year | 7,094,554 | 6,242,206 | 4,246,864 |
| **Total Stockholders' Equity** | $9,890,991 | $8,820,797 | $7,062,427 |
| **Common Shares** | | | |
| Balance at beginning of year | 2,474,640 | 2,564,379 | 3,182,505 |
| Repurchase and retirement of common stock | - | (123,355) | (658,126) |
| Issuance of common stock | 150 | 200 | 16,000 |
| Exercise of stock options and other | 25,333 | 33,416 | 24,000 |
| Balance at end of year | 2,500,123 | 2,474,640 | 2,564,379 |

The accompanying notes are an integral part of these statements.

S00936

ROCKY MOUNTAIN CHOCOLATE FACTORY, INC.
STATEMENTS OF CASH FLOWS

| | FOR THE YEARS ENDED FEBRUARY 28, | | |
| --- | --- | --- | --- |
| | 2003 | 2002 | 2001 |
| **Cash Flows From Operating Activities:** | | | |
| Net income | $ 852,348 | $1,995,342 | $ 1,556,388 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 815,279 | 905,227 | 1,149,590 |
| Provision for loss on accounts and notes receivable and related foreclosure costs | 1,754,524 | 162,046 | 125,202 |
| Provision for inventory loss | 37,000 | 162,000 | 268,500 |
| (Gain) loss on sale of assets | 2,209 | (138,824) | (29,875) |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | 342,967 | (887,947) | (308,785) |
| Refundable income taxes | (548,490) | 37,574 | 39,115 |
| Inventories | 91,535 | (603,779) | (116,386) |
| Other assets | 37,941 | (43,229) | (182,929) |
| Accounts payable | (54,649) | (397,791) | 9,300 |
| Income taxes payable | (49,943) | 139,023 | (120,463) |
| Deferred income taxes | 27,726 | 11,794 | 145,281 |
| Accrued liabilities | (334,347) | (75,608) | (8,649) |
| Net cash provided by operating activities | 2,974,100 | 1,265,828 | 2,526,289 |
| **Cash Flows From Investing Activities:** | | | |
| Additions to notes receivable | (1,033,097) | (659,258) | (173,581) |
| Proceeds received on notes receivable | 530,043 | 195,494 | 129,163 |
| Proceeds from sale of assets | 13,940 | 382,018 | 1,495,670 |
| Purchase of other assets | (11,578) | (231,228) | (199,523) |
| Purchase of property and equipment | (285,313) | (724,130) | (466,448) |
| Net cash provided by (used in) investing activities | (786,005) | (1,037,104) | 785,281 |
| **Cash Flows From Financing Activities:** | | | |
| Net change in line of credit | – | (550,000) | 475,000 |
| Proceeds from long-term debt | – | 6,077,827 | 1,232,247 |
| Payments on long-term debt | (1,221,848) | (5,418,921) | (2,082,658) |
| Repayment of loans by director, officers and former officers | 39,999 | 128,748 | 39,999 |
| Costs of stock split | (15,278) | – | – |
| Issuance of common stock | 126,532 | 237,334 | 63,250 |
| Repurchase and redemption of common stock | – | (625,541) | (3,080,299) |
| Net cash used in financing activities | (1,070,595) | (150,553) | (3,352,461) |
| **Net Increase (Decrease) In Cash And Cash Equivalents** | 1,117,500 | 78,171 | (40,891) |
| **Cash And Cash Equivalents At Beginning Of Year** | 165,472 | 87,301 | 128,192 |
| **Cash And Cash Equivalents At End Of Year** | $1,282,972 | $ 165,472 | $ 87,301 |

The accompanying notes are an integral part of these statements.

S00937

NOTE 1 - NATURE OF OPERATIONS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Nature of Operations

Rocky Mountain Chocolate Factory, Inc. is an international franchiser, confectionery manufacturer and retail operator in the United States, Guam, Canada, and the United Arab Emirates. The Company manufactures an extensive line of premium chocolate candies and other confectionery products.  The Company's revenues are currently derived from three principal sources: sales to franchisees and others of chocolates and other confectionery products manufactured by the Company; the collection of initial franchise fees and royalties from franchisees' sales; and sales at Company-owned stores of chocolates and other confectionery products.

Cash Equivalents

Cash equivalents include cash in excess of daily requirements which is invested in various financial instruments having an original maturity of three months or less.

Inventories

Inventories are stated at the lower of cost or market.  Cost is determined using the first-in, first-out method.

Property and Equipment and Other Assets

Property and equipment are recorded at cost.  Depreciation and amortization are computed using the straight-line method based upon the estimated useful life of the asset, which range from five to thirty-nine years.  Leasehold improvements are amortized on the straight-line method over the lives of the respective leases or the service lives of the improvements, whichever is shorter.

The Company reviews its long-lived assets through analysis of estimated fair value, including identifiable intangible assets, whenever events or changes indicate the carrying amount of such assets may not be recoverable.  The Company's policy is to review the recoverability of all assets, at a minimum, on an annual basis.

Amortization of Goodwill

Goodwill has historically been amortized on the straight-line method over ten to twenty-five years.  In June 2001, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards No. 142 (SFAS 142), *Goodwill and Intangible Assets*, which revises the accounting for purchased goodwill and intangible assets. Under SFAS 142, goodwill and intangible assets with indefinite lives will no. longer be amortized, but will be tested for impairment annually, and also in the event of an impairment indicator.  SFAS 142 is effective for fiscal years beginning after December 15, 2001. The Company adopted SFAS 142 on March 1, 2002.

Sales

Sales of products to franchisees and other customers are recognized at the time of shipment. Sales of products at retail stores are recognized at the time of sale.

Shipping Fees

Shipping fees charged to customers by the Company's trucking department are reported as sales.  Shipping costs incurred by the Company's trucking department are reported as cost of sales.

Franchise and Royalty Fees

Franchise fee revenue is recognized upon completion of all significant initial services provided to the franchisee and upon satisfaction of all material conditions of the franchise agreement.  In addition to the initial franchise fee, the Company receives a royalty fee of five percent (5%) and a marketing and promotion fee of one percent (1%) of the Rocky Mountain Chocolate Factory franchised stores' gross sales.
Use of Estimates

S00938

In preparing financial statements in conformity with accounting principles generally accepted in the United States of America, management is required to make estimates and assumptions that affect the reported amounts of assets, liabilities, the disclosure of contingent assets and liabilities, at the date of the financial statements, and revenues and expenses during the reporting period. Actual results could differ from those estimates.

Vulnerability Due to Certain Concentrations

Franchised stores are concentrated (33%) in the factory outlet mall environment. At February 28, 2003, 4 Company-owned stores and 73 franchise stores of 230 total stores are located in this environment. The Company is, therefore, vulnerable to changes in consumer traffic in this market environment.

As of February 28, 2003, the Company had long-term notes receivable of approximately $444,000 due from two franchisees resulting from the Company financing the construction of their new concept stores. The notes are collateralized by the underlying store assets. The Company is, therefore, vulnerable to changes in the cash flow from these locations.

Stock-Based Compensation

Statement of Financial Accounting Standards No. 123 (SFAS 123), "Accounting for Stock-Based Compensation" encourages, but does not require, companies to record compensation cost for stock-based employee compensation plans at fair value. The Company has chosen to continue to account for stock-based compensation using the intrinsic value method prescribed in Accounting Principles Board Opinion No. 25 (APB 25), "Accounting for Stock Issued to Employees" and provides the required pro forma disclosures prescribed by SFAS 123.

The Company has adopted the disclosure-only provisions of SFAS 123. In accordance with those provisions, the Company applies APB 25 and related interpretations in accounting for its stock option plans and, accordingly, does not recognize compensation cost if the exercise price is not less than market. No compensation expense was recognized during the three years ended February 28, 2003. If the Company had elected to recognize compensation cost based on the fair value of the options granted at grant dates as prescribed by SFAS 123, net income and earnings per share would have been reduced to the pro-forma amounts indicated in the table below for the years ending February 28 (in 000's except per share amounts):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net Income - as reported | $   852 | $  1,995 | $  1,556 |
| Net Income - pro forma | 757 | 1,843 | 1,427 |
| Basic Earnings per Share-as reported | .34 | .81 | .58 |
| Diluted Earnings per Share-as reported | .32 | .76 | .57 |
| Basic Earnings per Share-pro forma | .30 | .75 | .53 |
| Diluted Earnings per Share-pro forma | .28 | .71 | .53 |

Advertising and Promotional Expenses

The Company expenses advertising costs as incurred. Total advertising expense amounted to approximately $420,000, $420,000 and $320,000 for the fiscal years ended February 28, 2003, 2002 and 2001, respectively.

Earnings Per Share

Basic earnings per share is computed as net earnings divided by the weighted average number of common shares outstanding during each year. Diluted earnings per share reflects the potential dilution that could occur from common shares issuable through stock options. During 2003, 2002 and 2001, 56,153, 62,495 and 293,333 stock options were excluded from diluted shares as their affect was anti-dilutive.

S00939

7

Fair Value of Financial Instruments

The Company's financial instruments consist of cash and cash equivalents, trade receivables, payables, notes receivable, and debt. The fair value of all instruments approximates the carrying value.

NOTE 2 - INVENTORIES

Inventories consist of the following at February 28:

|  | 2003 | 2002 |
|---|---|---|
| Ingredients and supplies | $ 1,583,631 | $ 1,538,107 |
| Finished candy | 1,478,504 | 1,588,983 |
|  | $ 3,062,135 | $ 3,127,090 |

NOTE 3 - PROPERTY AND EQUIPMENT, NET

Property and equipment consists of the following at February 28:

|  | 2003 | 2002 |
|---|---|---|
| Land | $ 513,618 | $ 513,618 |
| Building | 3,838,936 | 3,772,807 |
| Machinery and equipment | 6,746,190 | 6,512,836 |
| Furniture and fixtures | 658,145 | 592,677 |
| Leasehold improvements | 489,405 | 418,403 |
| Transportation equipment | 180,723 | 188,874 |
|  | 12,427,017 | 11,999,215 |
| Less accumulated depreciation | 6,808,778 | 6,015,309 |
| Property and equipment, net | $ 5,618,239 | $ 5,983,906 |

NOTE 4 - LINE OF CREDIT AND LONG-TERM DEBT

Line of Credit

At February 28, 2003 the Company had a $2.5 million line of credit from a bank, collateralized by substantially all of the Company's assets with the exception of the Company's retail store assets. Draws may be made under the line at 75% of eligible accounts receivable plus 50% of eligible inventories. Interest on borrowings is at prime less 50 basis points (3.75% at February 28, 2003). At February 28, 2003, $2.5 million was available for borrowings under the line of credit, subject to borrowing base limitations. Terms of the line require that the line be rested (that is, that there be no outstanding balance) for a period of 30 consecutive days during the term of the loan. The credit line is subject to renewal in July, 2003.

Long-term debt

Long-term debt consists of the following at February 28:

|  | 2003 | 2002 |
|---|---|---|
| Mortgage note payable in monthly installments of $17,600 through August, 2016 including interest at 6.0% per annum, collateralized by land and factory building. Interest was subject to adjustment every 60 months until maturity in August, 2016 but was adjusted to a floating rate of prime less fifty basis points (currently 3.75%) effective November 15, 2002. | $ 1,947,500 | $ 2,049,494 |
| Notes payable in monthly installments of between $454 and $8,002. Repaid in fiscal 2003. | – | 103,986 |
| Chattel mortgage note payable in monthly installments of $65,500 through August, 2005 including interest at 6.00% per annum, collateralized by substantially all business assets. Interest rate was adjusted to a floating rate of prime less fifty basis points (currently 3.75%) effective November 15, 2002. | 1,822,042 | 2,487,597 |

S00940