Nov-21-06  09:08pm  From-ROCKY MTN CHOCOLATE FACTORY        +19702595895      T-772  P.002  F-591

RMCF-SDMS-000421

## COMMERCIAL LEASE

This Commercial Lease ("Lease") is made effective as of September __, 2003, between S.D. Bridgeworks LLC, a Delaware limited liability company ("Landlord"), and _____ Inc., a California corporation ("Tenant"), who agree as follows:

### LEASE OF PREMISES

Landlord leases to Tenant and Tenant leases from Landlord, upon the provisions and conditions set forth herein, those certain premises depicted on Exhibit "B" attached hereto and incorporated herein by this reference ("Premises"), which Premises are located in that certain commercial/retail project known as Bridgeworks ("Center") located at 5th Avenue between "K" Street and Harbor Drive in San Diego, California 92101, and as generally shown on Exhibit "A" attached hereto.

### BASIC LEASE PROVISIONS

The following are the Basic Lease Provisions of this Lease. Other paragraphs of this Lease explain and define the Basic Lease Provisions in more detail and are to be read in conjunction herewith. In the event of any conflict between the Basic Lease Provisions and the other paragraphs of this Lease, the balance of the Lease shall control.

1. CENTER: Bridgeworks, San Diego, California.

2. PREMISES:  The Premises consist of approximately 1,983 square feet of "Rentable Area" in the northern portion of Suite B, as shown on Exhibit "B" attached hereto. The Premises are located in the 200 block of Fifth Avenue (street address to be provided by the City of San Diego).

3. TERM:  Forty (40) months, plus any partial month at the commencement of the Term. Tenant has one (1) five-year option and one (1) two-year option to renew pursuant to paragraph 2.3.

4. COMMENCEMENT DATE:  The earlier of (i) the date which is sixty (60) days after the Premises are delivered by Landlord to Tenant, or (ii) the date the Premises open for business.

5. BASIC MONTHLY RENT:  For the initial Term of the Lease: $4,957.50 per month for months 1 through 12 of the initial Term plus any partial month at the commencement of the Term; $6,444.75 per month for months 13 through 24 of the initial Term; $7,932.00 per month for months 25 through 36 of the initial Term; and $8,427.75 per month for months 37 through 40 of the initial Term. The Basic Monthly Rent during the Option Periods shall be as set forth in paragraph 3.1.

*Increases good*



PLAINTIFF'S
EXHIBIT
62
O6·CV·1212

6.   <u>TENANT'S PRO RATA SHARE OF CENTER RETAIL COMPONENT</u>: 8.55%.

7.   <u>PERCENTAGE RENT PERCENTAGE</u>: 6%.

8.   <u>SECURITY DEPOSIT</u>:  $9,200.00, which shall be increased during the Option Periods (to the extent applicable) so that the security deposit remains equal to the Basic Monthly Rent then in effect.

9.   <u>PREPAID RENT</u>: $4,957.50.

10.  <u>BROKER(S)</u>:  Landlord's and Tenant's broker is Burnham Real Estate Services, Inc.  Brokerage commissions will be payable pursuant to a separate agreement between Landlord and the broker.

11.  <u>ADDRESSES</u>:

Landlord:                          Tenant:

S.D. Bridgeworks LLC            _____ Inc.
Attn: Mr. Jeremy Cohen          Mr. Thomas Andersen and
835 Fifth Avenue, Suite 401     Mr. Kenneth Pecus
San Diego, CA  92101

12.  <u>PERMITTED USES</u>: The operation of a confectionary manufacturer and retail operator of a premier line of chocolate candies and other confectionary products, including the sale of ice cream.  The trade and advertising name for the business that shall operate upon the Premises shall be "Rocky Mountain Chocolate Factory."  The trade and advertising name may be changed, subject to Landlord consent as provided herein.

13.  <u>MINIMUM BUSINESS HOURS</u>:  Tenant shall remain open to the general public and shall continuously and fully stock, staff, operate and merchandise the Premises during the following minimum business hours:

Days:                          Hours:

Monday through Thursday        11:00 a.m. to 8:00 p.m.
Friday and Saturday            11:00 a.m. to 10:00 p.m.
Sunday                         12:00 p.m. to 6:00 p.m.

RMCF-SDMS-000422

C:\WINDOWS\TEMP\Lease-Rocky Mountain Chocolate 02.doc

<u>Holidays Tenant May Be Closed for Business:</u>

Tenant may be closed for up to five (5) Holidays each calendar year, including, without limitation, the following:

Christmas Day<br>
Thanksgiving Day<br>
Easter Day<br>
New Years Day

14.    <u>PARKING</u>:  Subject to the provisions and conditions of paragraph 7.7 of this Lease, Tenant and its invitees and licensees shall have the nonexclusive right to use parking spaces in the parking garage in the Center.  Tenant additionally has the right, pursuant to paragraph 7.7 of this Lease, to lease one (1) non-exclusive parking space in the parking garage in the Center.

15.    <u>GUARANTY</u>:  The obligations of Tenant under this Lease shall be jointly and severally guaranteed by Thomas Andersen and Kenneth Pecus, pursuant to a Guaranty of Lease in the form of <u>Exhibit "C"</u> attached hereto and incorporated herein by this reference.

<u>ARTICLE 1</u>

<u>PREMISES</u>

1.1    <u>Boundaries of Premises.</u>  Upon and subject to the provisions and conditions of this Lease, the boundary of the Premises shall extend to the unfinished surface of all floors and the underside of the structure forming the ceiling of the Premises. For purposes of Tenant's obligations under this Lease including, particularly, Tenant's obligations under Article 7, Premises shall include the following areas to the extent that they constitute a part of or otherwise exclusively service the Premises: (a) all interior walls, window coverings, floors and floor coverings, and ceilings; (b) all interior and exterior doors and windows; (c) all wiring, outlets, electrical panels, transformers and electrical fixtures serving the Premises; (d) all plumbing and plumbing fixtures and sewer pipes and connections serving the Premises; (e) all air conditioning, heating and ventilation equipment and duct work, directly servicing the Premises; and (f) all of Tenant's personal property, trade fixtures, and permitted alterations on or about or within the Premises.

1.2    <u>Development of Center.</u>  The parties understand and agree that the concept of the Center is undergoing continuing development and that the design and configuration of the Center is subject to change, including without limitation, changes necessitated by applicable building codes or by the requirements of Landlord in connection with the leasing of the Center. Accordingly, no preliminary drawings, plans or specifications, interpretations, depictions or layouts of the Premises and(or) the Center and Center systems shall constitute a basis for restricting Landlord in its determination of the ultimate design and configuration of the Center.

RMCF-SDMS-000423

3

As of the date of execution of this Lease, Exhibit "A" comprises a preliminary outline of the proposed configuration of the Center and Exhibit "B" comprises a preliminary outline of the proposed configuration of the Premises, both of which may be updated from time to time before delivery of the Premises to Tenant. The exact boundary and configuration of the Premises and the Center shall be as constructed. It is understood and agreed by Tenant that any modifications or additions of columns or other structural elements, chase or shaft sizes, if any, or additions of drains, pipes or conduit may be undertaken by Landlord in its reasonable discretion and shall not affect the validity of this Lease in any manner; provided, however, that Landlord shall in good faith endeavor to reasonably minimize any such changes so as to not adversely impact Tenant's practical use and enjoyment of the Premises and Landlord shall not, in any case when so acting, make or otherwise cause the Premises to be made inoperable.

1.3     Rentable Area Defined.     The "Rentable Area" of the Premises shall be as specified in the Basic Lease Provisions, and shall be: (a) the area of the Premises measured from the center line of exterior walls to the center line of demising walls (without deduction for level changes or openings in the floor, or for stairs and stair openings which connect levels within the Premises), and shall include columns, stairs, elevators, displays areas and other interior construction or equipment, and (b) an additional amount equal to 10.5% of the area specified in subparagraph 1.3(a) above to take into account joint receiving, trash, restroom, loading, electrical, mechanical and other areas and rooms serving the Center.

1.4     Layout of Premises.     Prior to Landlord's delivery of the Premises, Landlord shall lay out chalk lines locating the stud bases of the demising walls, as further described in Paragraph 2.2(b). As soon as practical, Landlord shall advise Tenant that the stud bases have been located. Within ten (10) days thereafter, Tenant and Tenant's architect shall review the location of these stud bases and confirm in writing that the locations of the stud bases are properly sited and in conformance with Tenant's working drawings or advise Landlord in writing of such changes in the location of the stud bases as Tenant considers necessary in order to conform the stud base locations with Tenant's working drawings. If Tenant requires changes in the stud base locations, Landlord shall promptly make such changes and Tenant shall thereafter confirm in writing that the locations of the stud bases are properly sited and in conformance with Tenant's working drawings. Tenant's written confirmation that the stud bases are properly sited and in conformance with Tenant's working drawings shall constitute a conclusive determination as to the correct location of the demising walls of the Premises to provide the correct Rentable Area.

RMCF-SDMS-000424

ARTICLE 2

TERM

2.1     Commencement Date.     The term of this Lease ("Term") shall commence on the "Commencement Date" and shall continue for the period described in Item 3 of the Basic Lease Provisions (subject to extension pursuant to subparagraph 2.3 below). On or about the Commencement Date, Landlord shall deliver to Tenant a commencement notice confirming the Commencement Date and the expiration date of the initial Term. Tenant shall execute the

4

commencement notice and deliver the same to Landlord within seven (7) days in order to confirm the Commencement Date.   If Tenant fails to deliver to Landlord the executed commencement notice within said seven (7) day period, then the Commencement Date set forth in the commencement notice shall be binding on Tenant.

2.2    INTENTIONALLY OMITTED.

2.3    Option.  Tenant is hereby granted the right and option to extend the Term of this Lease ("Option"), subject to all the provisions and conditions contained in this Lease, for one (1) additional, successive period of five (5) years and one (1) additional, successive period of two (2) years (individually, "Option Period", and collectively, "Option Periods") following expiration of the initial Term by giving a binding notice of exercise of the option ("Option Notice") to Landlord at least one hundred twenty (120) days, before the expiration of the initial Term or the first Option Period, as the case may be.  If Tenant is, however, in default (as defined herein) on the date of giving the Option Notice, at any time after such exercise but before either of the Option Periods is to commence, or on the date either of the Option Periods is to commence, the applicable Option Period shall not commence, and this Lease shall expire at the end of the initial Term or the first Option Period, as the case may be, unless Landlord, in Landlord's sole discretion, determines that the Option Period shall commence despite such default (which determination shall in no way prevent Landlord from exercising any of the other rights and remedies available to Landlord hereunder).   Each Option Period shall be upon the same provisions and conditions contained in this Lease, except for the payment of Rent during the Option Period, and any reference in the Lease to the "Term" of the Lease shall be deemed to include any Option Period and apply thereto, unless it is expressly provided otherwise.  Tenant shall have no other right to extend this Lease beyond the Option Periods.

2.4    INTENTIONALLY OMITTED

2.5    Conditions to Effectiveness -- Delivery of Premises.  Landlord shall deliver the Premises to Tenant upon the Commencement Date.  If Landlord is unable to deliver the Premises to Tenant within thirty (30) days after the Commencement Date, then either Landlord or Tenant may terminate this Lease upon thirty (30) days prior written notice to the other party.  In the event of any such termination, Landlord shall reimburse Tenant for its actual third party costs associated with Tenant's planning for the Premises; this amount shall be and shall otherwise constitute Landlord's sole liability and responsibility to Tenant in this regard and Landlord shall not be responsible for any other reimbursements for or damages (consequential or otherwise) to Tenant.

2.6    "As Is"/Tenant Improvements.  Landlord shall deliver the Premises to Tenant in "as is" condition, except as specifically set forth herein.  Landlord shall demise the Premises, install electrical outlets in the new demising wall at locations specified by Tenant.  The demising wall shall be ready to receive a base coat of paint.  Landlord shall run conduit from the electrical room of the Project to the Premises.  Landlord shall ensure that HVAC, plumbing and electrical in the Premises are in proper working order.  Tenant shall be obligated to perform all other improvements to the Premises as permitted hereunder, including without limitation, installing a

5

RMCF-SDMS-000425

restroom within the Premises. Tenant shall additionally be obligated upgrade the standard finishes of its franchisor, Rocky Mountain Chocolate Factory, including without limitation, installing a drywall ceiling for at least 75% of the non-storage portion of the Premises and installing an upgraded floor (instead of franchisor's standard tile finish).

2.7    INTENTIONALLY OMITTED.

2.8    Warranty.  Landlord does not make any warranty or representation, express or implied, as to the quality or fitness of the improvements and installations constructed in and for the Center generally, or the Premises, specifically. However, to the extent applicable and as reasonably requested by Tenant, Landlord shall use its commercial best efforts to enforce any warranties for the benefit of Landlord and Tenant that may exist against said general contractor and subcontractors and materialmen.

ARTICLE 3

RENT

3.1    Basic Monthly Rent.  Tenant shall pay to Landlord, as monthly rental ("Basic Monthly Rent"), during the initial Term the amounts set forth in Item 5 of the Basic Lease Provisions. Upon the execution of the Lease, Tenant shall prepay the Basic Monthly Rent of $4,957.50 for the first month of the initial Term. Tenant shall be required to pay its share of Operating Expenses (as hereafter defined) and Percentage Rent during the initial Term and the Option Periods as described below.

The Basic Monthly Rent for the first year of the first Option Period shall be the "Market Rate" value, as defined below, but in no event shall it be less than $8,923.00 per month or greater than $10,906.50 per month. Thereafter, the Basic Monthly Rent for each of the successive years of the first Option Period shall be equal to the previous year's Basic Monthly Rent plus the "CPI Adjustment," as defined below, but in no event shall the successive year's Basic Monthly Rent be less than 3% above the previous year's Basic Monthly Rent or greater than 5% above the previous year's Basic Monthly Rent.

The Basic Monthly Rent for the first year of the second Option Period shall be the "Market Rate" value, as defined below, but in no event shall it be less than $11,898.00 per month. The Basic Monthly Rent for the second year of the second Option Period shall be equal to the previous year's Basic Monthly Rent plus the "CPI Adjustment," as defined below, but in no event shall the second year's (of the second Option Period) Basic Monthly Rent be less than 3% above the first year's (of the second Option Period) Basic Monthly Rent or greater than 5% above the first year's (of the second Option Period) Basic Monthly Rent.

For purposes hereof, the "CPI Adjustment" shall reflect the increase, if any, of the cost of living, calculated in the following manner: Basic Monthly Rent shall be adjusted upward on the first day of the applicable year of the applicable Option Period (each, an "Adjustment Date") for the purpose of reflecting the increase, if any, of the cost of living, in the following manner:

RMCF-SDMS-000426

The base for computing the increase in the Basic Monthly Rent for the second and third years of the first Option Period and the second year of the second Option Period shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for Urban Consumers, Subgroup "All Items" (Base Year 1982/84 = 100) for Los Angeles-Anaheim-Riverside ("Index"), which is published and in effect for the ninetieth day preceding the Commencement Date ("Beginning Index"). The Index published and in effect for the ninetieth day preceding the Adjustment Date ("Comparison Index") shall be used in computing the amount of increase. On the Adjustment Date, the Basic Monthly Rent then in effect shall be increased to equal the product achieved by multiplying the initial Basic Monthly Rent by a fraction, the numerator of which is the Comparison Index and the denominator of which is the Beginning Index. If the Comparison Index declines, then the CPI Adjustment shall be zero (i.e., the CPI Adjustment shall never be negative). If the format of the components of the Index is materially changed, Landlord shall substitute an index which is published by the Bureau of Labor Statistics, or similar agency, which is most nearly equivalent to the Index in effect on the Commencement Date. Landlord shall notify Tenant of the substituted Index, which shall be used to calculate the subsequent increases in Basic Monthly Rent during the applicable years of the Option Periods.

The Basic Monthly Rent and all other amounts payable hereunder shall be paid to Landlord in advance on the first day of each month during the Term, without deduction or offset, in lawful money of the United States of America at the office of Landlord in the Center, or to such place as Landlord may designate in writing.

If the Term commences on other than the first day of a calendar month, then there shall be paid on the Commencement Date a pro rata portion of the Basic Monthly Rent based upon the number of days remaining in such month. In the event the Term ends on a day other than the last day of the month, the last monthly payment of Basic Monthly Rent shall be prorated based upon the number of days in such month prior to and including the last day of the Term.

3.2     Fair Market Value. The "Market Rate" shall mean the then prevailing monthly market rate for a comparable term commencing on the first day of the applicable Option Period for tenants of comparable size and creditworthiness for comparable space in the vicinity of the Center, taking into account all relevant factors, including without limitation, the size, type, location and improved quality of the Premises (other than those improvements paid for by Tenant, that Tenant has the right to remove from the Premises upon the termination or expiration of this Lease), without discount.

Market Rate shall be determined as follows:

(a)     If Tenant provides Landlord with its binding Option Notice pursuant to Paragraph 2.3 above, then at some point near the one hundred twenty (120) days prior to the commencement of the applicable Option Period (or, at Landlord's election, at an earlier point), Landlord shall calculate and inform Tenant of the Market Rate. If Tenant rejects the Market Rate as calculated by Landlord, Tenant shall inform Landlord of its rejection within ten (10) days after Tenant's receipt of Landlord's calculation, and Landlord and Tenant shall commence

RMCF-SDMS-000427

7

negotiations to agree upon the Market Rate. If Tenant fails to timely reject Landlord's calculation of the Market Rate it will be deemed to have accepted such calculation. If Landlord and Tenant are unable to reach agreement within twenty-one (21) days after Landlord's receipt of Tenant's notice of rejection, then the Market Rate shall be determined in accordance with subparagraph 3.2 (b) below.

(b)    If Landlord and Tenant are unable to reach agreement on the Market Rate within said twenty-one (21) day period, then within seven (7) days, Landlord and Tenant shall each simultaneously submit to the other in a sealed envelope its respective good faith estimate of the Market Rate. If the higher of such estimates is not more than one hundred five percent (105%) of the lower, then the Market Rate shall be the average of the two. Otherwise, the dispute shall be resolved by arbitration in accordance with subparagraph 3.2 (c) and (d) below.

(c)    Within seven (7) days after the exchange of estimates, the parties shall select as an arbitrator an independent MAI appraiser with at least five (5) years of experience in appraising space in the metropolitan area in which the Premises are located ("Qualified Appraiser"). If the parties cannot agree on a Qualified Appraiser, then within a second period of seven (7) days, each shall select a Qualified Appraiser and within ten (10) days thereafter the two appointed Qualified Appraisers shall select a third Qualified Appraiser and the third Qualified Appraiser shall be the sole arbitrator. If one party shall fail to select a Qualified Appraiser within the second seven (7) day period, then the Qualified Appraiser chosen by the other party shall be the sole arbitrator.

(d)    Within twenty-one (21) days after submission of the matter to the arbitrator, the arbitrator shall determine the Market Rate by choosing whichever of the estimates submitted to Landlord and Tenant the arbitrator judges to be more accurate. The arbitrator shall notify Landlord and Tenant of its decision, which shall be final and binding. If the arbitrator believes that expert advice would materially assist him, the arbitrator may retain one or more qualified persons to provide expert advice. The fees of the arbitrator and the expenses of the arbitration proceeding, including the fees of any expert witnesses retained by the arbitrator, shall be paid by the party whose estimate is not selected. Each party shall pay the fees of its respective counsel and the fees of any witness called by that party.

3.3    Percentage Rent. Tenant shall pay to Landlord a sum equal to the Percentage set forth in Item 7 of the Basic Lease Provisions of Tenant's "Gross Sales" (as defined below) made from or upon the Premises during each calendar month ("Percentage Rent"). Percentage Rent shall be so computed each calendar month. On or before the 10th day after each such calendar month, Tenant shall pay to Landlord the amount by which the sum computed as a percentage of Tenant's Gross Sales during the preceding calendar month exceeds the Basic Monthly Rent that Tenant paid during such calendar month. Within forty (40) days after the end of each calendar year, Landlord shall compare the total amount of Basic Monthly Rent and Percentage Rent paid during the previous calendar year (including any partial year at the beginning or end of the Term) and determine whether, and to what extent, Tenant on an annual basis has underpaid, overpaid or simply fulfilled its annual obligation to pay Percentage Rent. To the extent that there is a Percentage Rent payment shortfall, then Tenant shall promptly pay the same to Landlord after

RMCF-SDMS-000428

8

written notice therefor. If there is a Percentage Rent payment overage, then Landlord shall credit the same to the payment obligations of Tenant hereunder, with appropriate notice to Tenant.

"Gross Sales" of Tenant means the gross selling price of all merchandise, food, beverages and(or) services sold, leased, licensed, or delivered in or from the Premises by Tenant, its permitted subtenants, licensees, or concessionaires, whether for cash or on credit (whether collected or not), including the gross amount received by reason of orders taken on the Premises although filled elsewhere, and whether made by store personnel or vending machines. Any transaction on an installment basis, including, without limitation, any "lay-away" sale or like transaction, or otherwise involving the extension of credit, shall be treated as a sale for the full price at the time of the transaction, irrespective of the time of payment or when title passes. Gross Sales also shall include any sums that Tenant receives from pay telephones, stamp machines, vending machines, music machines, amusement machines, or public toilet locks.

In addition, the term Gross Sales as used in this Lease shall not include the full retail price of California State Lottery tickets sold from the Premises, but shall include the full amount of compensation and any incentive bonuses paid to and received by Tenant for such sales, as such compensation and bonuses are determined from time to time by the State Lottery Commission and Director under the applicable provisions of the California Government Code and all other applicable California laws.

Gross Sales shall not include, or if included there shall be deducted (but only to the extent they have been included), the following:

    (a)    The selling price of all merchandise, food, beverages and(or) services returned by customers and accepted for full credit.

    (b)    Merchandise, food or beverages returned to sources or transferred to another store or warehouse owned by or affiliated with Tenant.

    (c)    Sales and use taxes, but only if such taxes are added to the selling price, separately stated whenever possible, collected separately from the selling price of merchandise, food, beverages and(or) services, and collected from customers.

    (d)    Sales of fixtures, trade fixtures, or personal property that are not merchandise sold by Tenant in the course of its business.

Tenant shall furnish to Landlord a statement of Tenant's Gross Sales within ten (10) days after the end of each calendar month, and an annual statement of Gross Sales within twenty (20) days after the end of each calendar year. Each statement shall be signed and certified to be correct by Tenant or its authorized representative, and if Tenant is a corporation the statement shall be signed and certified to be correct by an officer of Tenant. Tenant shall keep at the Premises full and accurate books of account, records, cash receipts, and other pertinent data showing its Gross Sales. Tenant shall install and maintain accurate receipt-printing cash registers and shall record on the cash registers every sale and other transaction made from the Premises.

C:\WINDOWS\TEMP\Lease-Rocky Mountain Chocolate 02.doc

RMCF-SDMS-000429

Tenant shall also furnish to Landlord copies of its quarterly California sales and use tax returns at the time each is filed with the state of California. Such books of account, records, cash receipts, and other pertinent data shall be kept for a period of three (3) years after the end of each calendar year. The receipt by Landlord of any statement, or any payment of Percentage Rent for any period, shall not bind Landlord as to the correctness of the statement or the payment. Landlord shall be entitled during the Term and within three (3) years after expiration or termination of the Term to inspect and examine all Tenant's books of account, records, cash receipts, and other pertinent data used to determine Tenant's Gross Sales, by a certified public accountant to be designated by Landlord. The audit shall be limited to the determination of Gross Sales and shall be conducted during usual business hours at the Premises. If the audit shows that there is a deficiency (either an over or under payment) in the payment of any Percentage Rent, the deficiency shall become immediately due and payable. The costs of the audit shall be paid by Landlord unless the audit shows that Tenant understated Gross Sales by more than two percent (2%), in which case Tenant shall pay all Landlord's costs of the audit.

    3.4    <u>Past Due Rent.</u> Any Basic Monthly Rent, Percentage Rent and Tenant's share of Operating Expenses (as hereafter defined) not paid when due shall bear interest from the date due until the date paid at the rate of twelve percent (12%) per annum. As to any other amounts payable by Tenant to Landlord hereunder other than Basic Monthly Rent, Percentage Rent and Tenant's Share of Operating Expenses, any such interest shall not commence to accrue until thirty (30) days after written notice of payment thereof is given by Landlord to Tenant. The payment of such interest shall not excuse or cure any default or modify any obligation of Tenant under this Lease.

    3.5    <u>Late Charge.</u> Tenant acknowledges that the late payment by Tenant to Landlord of Basic Monthly Rent, Percentage Rent or Tenant's share of Operating Expenses (as hereafter defined) as well as any other amounts payable by Tenant to Landlord hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be difficult to ascertain. Such costs may include, without limitation, administrative costs, processing and accounting charges, and late charges which may be imposed on Landlord. Accordingly, if any installment of Basic Monthly Rent, Percentage Rent or Tenant's share of Operating Expenses (as hereafter defined) shall not be received by Landlord within five (5) days after the date that such amount is due and payable or if any other amount payable by Tenant hereunder to Landlord is not paid within thirty (30) days after written notice of payment thereof by Landlord to Tenant, then Tenant shall pay to Landlord, in addition to the interest provided above, a late charge in the amount of ten percent (10%) of the amount due. The parties agree that such late charge represents a fair and reasonable estimate of the cost Landlord will incur by reason of late payment by Tenant. Acceptance of such late charge by Landlord shall not constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of its other rights or remedies hereunder.

    3.6    <u>Security Deposit.</u> Concurrently with Tenant's execution of this Lease, Tenant shall deposit with Landlord the sum specified in Item 8 of the Basic Lease Provisions ("<u>Security Deposit</u>"). The Security Deposit shall be held by Landlord as security for the faithful performance by Tenant of this Lease. If Tenant defaults under this Lease, Landlord may (but

RMCF-SDMS-000430

shall not be required to) use, apply or retain all or any part of the Security Deposit for the payment of any Rent or to compensate Landlord for any other loss or damage which Landlord may suffer thereby. If any portion of the Security Deposit is so used or applied, Tenant shall, within ten (10) days after demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to the full amount thereof. Landlord shall not be required to maintain the Security Deposit separate from its general accounts. If Tenant shall fully perform this Lease, the Security Deposit, or any balance thereof that has not theretofore been applied by Landlord, shall be returned to Tenant, without payment of interest, within ten (10) days after the expiration of the Term and after Tenant has vacated the Premises. In the event of termination of Landlord's interest in this Lease, Landlord shall transfer the Security Deposit to Landlord's successor in interest whereupon Landlord shall be released from all liability for the return or accounting therefor. No trust relationship is created herein between Landlord and Tenant with respect to the Security Deposit.

<u>ARTICLE 4</u>

<u>OPERATING EXPENSES; TENANT TAXES</u>

4.1    <u>Operating Expenses.</u>  With respect to each calendar year during the Term, or any partial calendar year at the commencement or end of the Term, Tenant shall pay, as additional Rent, an amount equal to Tenant's Pro Rata Share of "Operating Expenses" (as defined below) for such calendar year allocable to the retail portion of the Center, prorated for any partial calendar year during the Term. Tenant shall be required to pay to Landlord its share of "Operating Expenses" (as defined below) as of the Commencement Date. "Operating Expenses" include (a) expenses that relate to the entire Center as a whole, (b) expenses that relate only to the building in which the retail and hotel terrace wing components of the Center are located, and (c) expenses that relate only to the retail component of the Center of which the Premises are a part and which do not solely relate to the hotel, hotel terrace wing and garage components of the Center. As to the Center-wide Operating Expenses, the same shall be allocated among the components of the Center and the respective owners thereof, as follows:

| Use Component | Sharing Percentage |
|---|---|
| Retail | 20% |
| Hotel/Garage | 80% |

As to the Operating Expenses that relate only to the building in which the retail and hotel terrace wing portions of the Center are located and which do not solely relate to the hotel terrace wing portion of the Center, the same shall be allocated between said components of the Center and the respective owners thereof, as follows (unless the nature of the subject expense, as reasonably determined by Landlord, dictates otherwise):

| Use Component | Sharing Percentage |
|---|---|

11

RMCF-SDMS-000431

| Retail | 40% |
|--------|-----|
| Hotel Terrace Wing | 60% |

Operating Expenses that relate wholly to the retail portion of the Center, shall be solely allocated thereto.

4.2    Definition of Operating Expenses.  The term "Operating Expenses", allocated as set forth in paragraph 4.1 above, shall include (except as specifically set forth below), all expenses arising incident to the operation, repair and maintenance of the Center and "Common Facilities" (as defined below), including, without limitation: (a) the cost of condenser water, domestic water, electricity, gas, sewer service, and all other utilities, the cost of operation of the mechanical, elevator, heating, ventilation, air conditioning and other systems, and the cost of supplies and equipment and maintenance and service contracts in connection therewith; (b) the cost of repairs, replacements, general maintenance, and cleaning , including the cost of janitorial and other service agreements and trash removal; (c) the cost of such fire, extended coverage, boiler, sprinkler, apparatus, public liability, property damage, rent, earthquake and other insurance as Landlord (and(or) the secured lender for the Center) deems it appropriate to carry with respect to the Center or any of Landlord's personal property used in the operation of the Center, including, without limitation, the payment of any deductible amounts under such insurance policies; (d) wages, salaries and other labor costs of all on-site employees, including taxes, insurance, retirement, medical and other employee benefits, (but excluding leasing commissions) to the extent incurred in connection with the management, operation, maintenance and repair of the Center; (e) fees, charges and other costs, including property management fees, attorneys' fees (except to the extent such attorneys' fees are incurred in connection with the negotiation of a particular tenant's lease or the resolution of a conflict with a particular tenant), accounting fees and consulting fees, of all independent contractors engaged by Landlord, and all such fees and administrative cost reasonably charged by Landlord if Landlord performs management services in connection with the Center; (f) the cost of supplying, replacing and cleaning employee uniforms; (g) the rental value of Landlord's or the property manager's offices in the Center, to the extent utilized for the management or operation of the Center;  (h) the cost (including loan fees) of any post-construction capital improvements made to the Center as a labor-saving measure or to effect other economies in the operation or maintenance of the Center, and the cost (including loan fees) of any post-construction capital improvements made to the Center after the date of this Lease that are required under any governmental law, regulation or requirement, such cost(s) to be amortized over such reasonable period as Landlord shall determine, together with interest on the unamortized balance at the rate paid by Landlord on funds borrowed for the purpose of constructing such capital improvements; (i) the cost of all supplies, materials, equipment and tools to the extent used in the management, operation and maintenance of the Center, including any rental fees thereon; (j) all costs and fees for licenses, inspections or permits that Landlord may be required to obtain; (k) the cost of exterior and interior landscaping; (l) expenses incurred for maintenance of artwork, streetscaping and similar enhancements of the Center and the immediately surrounding environs which in Landlord's reasonable good faith judgment will benefit the Center or tend to increase the level of commerce in the Center; (m) costs associated with repair and maintenance of the sidewalk, hallways,

RMCF-SDMS-000432

12

stairways and ingress and egress areas, including, without limitation, lighting, resurfacing, painting, restriping and trash removal; (n) costs of music program equipment and maintenance and replacement of any such equipment used to supply music to the Center; (o) costs of security guards and security system; (p) costs associated with seasonal decorations and entertainment; (q) Real Estate Taxes (as herein defined); (r) special assessments, including business improvement district fees and assessments; (s) the costs associated with the repair, maintenance and upkeep of the public park areas adjacent to the Center; and (t) "Master Association" (as herein defined) assessments.

Operating Expenses shall expressly exclude the following costs:

(i)    Initial construction costs for the Center; however, Operating Expenses may include costs incurred by Landlord for alterations to the Center and any other expenditures which are considered capital expenditures under generally accepted accounting principles, with Landlord amortizing such costs and including them, yearly, as part of Operating Expenses;

(ii)    Costs of depreciation and amortization, except Landlord shall have the right to amortize capital costs and include them, yearly, as Operating Expenses;

(iii)    Costs of repairs or other work occasioned by fire, windstorm or other casualty or by act of eminent domain, provided, Landlord shall have the right to amortize such costs and include them, yearly, as part of Operating Expenses;

(iv)    Costs of services or other benefits which are not provided to Tenant but which are provided to other tenants of the Center;

(v)    Costs (including permit, license and inspection costs) incurred in renovating or otherwise improving, altering or building out rentable space for other tenants or vacant rentable space;

(vi)    Costs of utilities or services sold to Tenant or others for which Landlord received reimbursement;

(vii)    Marketing costs, including leasing commissions, attorneys' fees in connection with the negotiation and preparation of letters, deal memos, letters of intent, leases, subleases and/or assignments, space planning costs, and other costs and expenses incurred in connection with lease, sublease and/or assignment negotiations and transactions with present or prospective tenants or other occupants of the Center, including attorneys' fees and other costs and expenditures incurred in connection with disputes with present or prospective tenants or other occupants of the Center;

(viii)    Costs incurred due to the violation by Landlord of the terms and conditions of any lease of space in the Center;

RMCF-SDMS-000433

13

(ix)    Costs of overhead or profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for services in or in connection with the Center to the extent the same exceeds the cost of such services which could be obtained from bona fide, qualified third parties on a competitive basis;

(x)    Costs of interest on debt or amortization on any mortgages, rent and other charges, costs and expenses payable under any mortgage or ground or underlying lease, if any;

(xi)    Costs of any compensation and employee benefits paid to clerks, attendants or other persons in a commercial concession operated by Landlord;

(xii)    Costs of rentals and other related expenses incurred in leasing HVAC, elevators or other equipment ordinarily considered to be of a capital nature, except equipment which is not affixed to the Center;

(xiii)    Costs of electrical power for which a tenant directly contracts with and pays a local public service company;

(xiv)    Any costs expressly excluded from Operating Expenses elsewhere in this Lease or already covered by another provision of this Lease (i.e. no double billing);

(xv)    Tax penalties incurred as a result of Landlord's failure to make payments or file returns when due;

(xvi)    Costs arising from Landlord's political contributions;

(xvii)    Charitable contributions made by Landlord, except when so made in the name of the Center;

(xviii)    Wages and salaries paid to executives and officers of Landlord;

(xix)    Maintenance and repair of capital items not a part of the Center, except such offsite items as may be reasonably necessary for the operation and use of the Center, which costs may then be amortized and included, yearly, as Operating Expenses;

(xx)    The cost of installing, operating and maintaining any specialty services, such as a broadcasting and/or telecommunication facility, a helipad, or a data processing facility in the Center;

(xxi)    Costs arising from the intentional misconduct of Landlord;

(xxii)    Payments for rented equipment, the cost of which equipment would constitute a capital expenditure if the equipment were purchased, but solely to the extent that the rental payments are inflated to provide Landlord with a favorable "buyout" provision;

14

RMCF-SDMS-000434

(xxiii)  Any expenses for repairs or maintenance which are covered by warranties, guarantees and service contracts (excluding any mandatory deductible) to the extent collected and paid to Landlord;

(xxiv)  Legal expenses arising out of the enforcement of the provisions of any leases and other occupancy agreements affecting the Center, including, without limitation, this Lease;

(xxv)  Increases in premiums for insurance required to be carried by Landlord pursuant to this Lease, which such increase is caused by use of the Center by Landlord or any other tenant of Landlord which is hazardous on account of fire or otherwise;

(xxvi)  Any costs, fines or penalties incurred due to violations by Landlord of any governmental rule or authority relating to the operation of the Center; provided, however, that any such costs, fines or penalties incurred by Landlord for the best interests of the Center, but not any particular lessee, or arising by reason of changes in applicable laws, ordinances or regulations that affect the Center after Landlord completes construction of the same shall not be so excluded;

(xxvii)  Management fees to the extent they exceed similar costs incurred in comparable first-class retail projects;

(xxviii)  Costs incurred in the removal of asbestos or other hazardous materials or substances considered to be detrimental to the health or the environment of occupants of the Center, provided the same existed as part of the structure of the Center, other than lessee constructed spaces, as of the Commencement Date.

Operating Expenses for any period in which the Center is not at least ninety-five percent (95%) occupied shall be adjusted according to Landlord's reasonable estimate to reflect the Operating Expenses which would be payable if the Center were ninety-five percent (95%) occupied. Landlord hereby reserves the right to include in the calculation of Operating Expenses for any given Lease Year any and all of the above-enumerated costs and expenses, regardless of whether any of such costs and expenses have or have not been included in the calculation of Operating Expenses during any previous Lease Year(s).

"Real Estate Taxes" shall mean all general real property taxes and general and special assessments, transit charges, fees or assessments, housing fund assessments, payments in lieu of taxes, and any tax, fee or excise levied or assessed: (i) on the Center, any portion thereof, or Landlord's interest therein or Landlord's personal property to the extent used in the operation of the Center (excluding the parking facilities, or the share allocable thereof); (ii) on the use or occupancy of the Center or any portion thereof, including any tax or levy made against Rent or gross receipts from the Center (excluding the parking facilities, or the share allocable thereof); (iii) in connection with the business of renting space in the Center (excluding the parking facilities, or the share allocable thereof); or (iv) as a result of the transfer of any interest in the Center or any portion thereof, that are now or hereafter levied or assessed by the United States of

15

RMCF-SDMS-000435

America, the State of California, or any political subdivision, public corporation, district or other political or public entity (excluding the parking facilities, or the share allocable thereof). Real Estate Taxes shall also include any other tax, fee or other excise, however described, that may be levied or assessed as a substitute for, or as an addition to, in whole or in part, any other Real Estate Taxes. Real Estate Taxes shall not include income, franchise, inheritance, estate, gift, documentary transfer or capital stock taxes, unless, due to a change in the method of taxation, any of such taxes is levied or assessed against Landlord as a substitute for, or as an addition to, in whole or in part, any other tax, assessment or charge that would otherwise constitute a Real Estate Tax, but only as if the Center were the only property of Landlord and the income therefrom were the only income of Landlord. Real Estate Taxes shall expressly exclude any interest, charge, fine or late charge or other penalty for late or nonpayment of taxes caused by Landlord.

4.3    Expense Statements.    Landlord shall provide to Tenant a written reasonable estimate of Operating Expenses approximately ten (10) days prior to the commencement of the Term and each calendar year during the Term (which amount may be re-estimated from time to time, as determined by Landlord, but no more often than once each calendar year). With respect to each such calendar year, Tenant shall pay to Landlord, monthly in advance, one-twelfth (1/12th) of Tenant's Pro Rata Share of the Operating Expenses for that calendar year. Similarly, for any partial calendar year at the commencement of the end of the Term, Tenant shall pay monthly its pro rata share of the Operating Expenses for the partial calendar year. If for any reason Landlord is unable to provide to Tenant the estimate of Operating Expenses at least thirty (30) days prior to the commencement of any calendar year during the Term, then Tenant shall continue to pay monthly the same amount of additional rent for Operating Expenses as was applicable previously until thirty (30) days after receipt of such estimate; but such delay shall not be a waiver of any such additional amount which Tenant is otherwise obligated to pay for such preceding months during the new calendar year, all of which shall be paid within thirty (30) days after receipt of the estimate.

4.4    Year-End Adjustments.    Within ninety (90) days after the end of each calendar year, Landlord shall provide Tenant with a written compilation showing in reasonable detail the actual Operating Expenses incurred by Landlord for such year with a written statement of Tenant's Pro Rata Share thereof. Landlord and Tenant shall within thirty (30) days thereafter make any payment or credit necessary to adjust Tenant's previous actual payments on account of the estimated Operating Expenses covered by such annual statement to the amount shown as due from Tenant on such statement.

4.5    Taxes on Rental.    In addition to Tenant's proportionate share of Operating Expenses, Tenant shall pay to the appropriate agency any and all sales, excise and other taxes (not including, however, Landlord's income taxes) levied, imposed or assessed by the state in which the Center is situated or any political subdivision thereof or other taxing authority upon any Rent payable hereunder. Tenant shall also be solely responsible for and pay within the time provided by law all taxes imposed on its inventory, furniture, trade fixtures, apparatus, leasehold improvements (installed by or on behalf of Tenant), equipment and any other of Tenant's personal or other property.

16

RMCF-SDMS-000436

# ARTICLE 5

## UTILITIES AND CONSTRUCTION PHASES

5.1    Utilities and Services.

(a)    Landlord will provide the utility connections necessary to enable Tenant to obtain for the Premises water, electricity, telephone and sanitary sewer service stubbed to the boundary of the Premises or at such other location in the Center as may be provided by Landlord. Landlord shall have no obligation whatsoever to install additional utility connections or facilities, or alter or modify any utility connections or facilities existing as of the date of delivery of the Premises. Utilities shall be separately metered for the Premises and Tenant shall pay the cost of installation of the utilities meter to the Premises. Tenant shall not at any time overburden or exceed the capacity of the mains, feeders, ducts, conduits, or other facilities by which such utilities are supplied to, distributed in or serve the Premises. If Tenant desires to install any equipment which shall require additional utility facilities or utility facilities of a greater capacity than the facilities provided by Landlord, such installation shall be at Tenant's sole cost and expense and shall be subject to Landlord's prior written approval of Tenant's plans and specifications therefore. Tenant shall pay for all utilities used by Tenant.

(b)    Landlord shall not be responsible for providing any meters or other devices for the measurement of utilities supplied to the Premises. Tenant shall be solely responsible for and shall promptly pay, as and when the same become due and payable, all charges and deposits for water, sewer, electricity, gas, telephone, heating, ventilating and air conditioning and any other utilities used or consumed in the Premises, whether separately metered or included as a part of Operating Expenses.

(c)    Landlord shall not be liable to Tenant in damages or otherwise if any utility shall become unavailable from any public utility company, public authority or any other person or entity supplying or distributing such utility or for any interruption in any utility service (including, without limitation, any heating, ventilation or air conditioning) caused by the making of any necessary repairs or improvements or by any cause beyond Landlord's reasonable control, and the same shall not constitute a termination of this Lease or an eviction of Tenant. The parties acknowledge that Tenant shall be responsible for its own utility systems for the Premises, including Tenant's servicing of its own HVAC system. Tenant shall be responsible for maintaining all such systems in a manner wholly consistent with the prevailing commercial standards for high-quality, professional utility servicing, including, particularly, HVAC servicing on a regular scheduled basis. Landlord shall not be responsible for the maintenance, repair, replacement, operation or use of such systems; provided, however, Landlord shall be responsible for installing an HVAC system for the Premises as part of the Landlord's Work.

(d)    Landlord, at its sole discretion, reserves and shall at all times, have the right to alter the utilities serving the Center, and Tenant agrees to execute and deliver to Landlord without delay such documentation as may be required to effect such alteration.

17

RMCF-SDMS-000437

C:\WINDOWS\TEMP\Lease-Rocky Mountain Chocolate 02.doc

5.2    Excess Usage.  Without the prior written consent of Landlord, Tenant shall not use any apparatus or device in the Premises that shall in any way increase the amount of water or other utility service furnished or supplied to the Premises in excess of the amount normal or reasonable for the use of the Premises permitted under this Lease.  Landlord shall furnish to the Premises utilities and services in excess of those to be furnished pursuant to paragraph 5.1(a) only upon Tenant's prior written request and at Tenant's sole cost and expense.  Tenant shall pay for all such excess utilities and services furnished to or consumed in the Premises.  If Tenant requires, uses or consumes excess water or other utility service, Landlord may install a special meter(s) and thereby measure Tenant's consumption of water or other utility service.  Tenant shall pay in advance to Landlord, in addition to the cost of such utility service, the cost of any such meter, its installation and any related costs, and Landlord shall keep any such meter and such installation equipment in good working order and repair, at Tenant's cost and expense. Tenant shall pay for the amount of the utility consumed as shown on such meter(s) and sewer charges thereon, if any, at the rates charged by the public utility company furnishing such utilities, plus any additional reasonable expense incurred in providing such utility service, including without limitation, materials and equipment required for maintenance of the central facility for the heating and cooling of water, all reasonable labor charges, overhead and all reasonable expenses incurred in keeping account of the amount of the utility so consumed. Tenant shall make no connection to any utility supply system of the Center without Landlord's prior written consent.

5.3    Construction Phases.  Tenant acknowledges that it is aware that construction work may take place from time to time upon various portions of the Center.  Such construction work may consist of additions, replacements, repairs, and(or) tenant improvement work, as well as the possible erection of additional improvements upon the Center.  Notwithstanding any temporary diminution in Tenant's use and enjoyment of the Premises and the Common Facilities, Landlord hereby reserves the right to undertake or allow others to undertake any such construction work, none of which shall entitle Tenant to any rebate or reduction in rent, or subject Landlord to liability of any type relating thereto.  In acting, as so provided, however, Landlord shall not materially, adversely restrict access to (including parking access) or visibility to or from the exterior storefront of the Premises and Landlord shall make every commercially reasonable effort to not have its actions in this regard materially interfere with the business activities of Tenant.

ARTICLE 6

ACCEPTANCE OF PREMISES

6.1    No Representation or Warranty.  Tenant acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty with respect to the suitability or fitness of the Premises or the applicable zoning regulations for the conduct of Tenant's business or for any other purpose, nor Tenant's ability to obtain a business license or any other permit to operate its business on the Premises.

6.2    "As-Is".  Subject to the provisions of Paragraph 2.6 hereof, it is agreed that by taking possession of the Premises as a tenant, Tenant formally accepts the Premises "as is" and

18

RMCF-SDMS-000438

acknowledges that the Premises are in the condition called for hereunder. No representation or warranty is made or shall be deemed made by Landlord concerning the nature, quality, timeliness or suitability for Tenant's business of Landlord's Work, the Center or the Premises, and Tenant shall have no rights against Landlord by reason of such matters or any claimed deficiencies therein except as set forth herein.

## ARTICLE 7

## MAINTENANCE, ALTERATIONS AND COMMON FACILITIES

7.1    <u>Tenant to Maintain.</u>  Tenant shall, at its sole expense, keep the Premises in good repair and tenantable condition during the Term. In so doing, Tenant shall be solely responsible for providing its own janitorial services to the Premises and operating and repairing the heating, ventilation and air conditioning system(s) serving the Premises.  Tenant shall maintain the heating and air conditioning units servicing the Premises in a first class manner utilizing its own internal maintenance personnel and shall, as requested by Landlord, provide periodic written inspection reports describing the condition of the same.  Any costs and expenses incurred in connection with the maintenance obligations of Tenant described herein shall be in addition to Tenant's share of Operating Expenses.

7.2    <u>Alterations.</u>

(a)    Except as may be otherwise provided in this Lease, Tenant shall not make or permit to be made any alterations, additions, improvements, changes, or redecoration (collectively, "<u>Alterations</u>") to or on the Premises or any part thereof without the prior written consent of Landlord, which consent shall be in writing and shall not be unreasonably withheld. Nonstructural changes with a cost, in each instance, of $25,000.00 or less, may be made without Landlord's prior written approval and are not included within the definition of Alterations.

(b)    Tenant shall, prior to making any Alterations on or to the Premises cause the preparation of complete plans, working drawings, and specifications for the construction of the Alterations (collectively, "<u>Alteration Plans</u>").  The Alteration Plans shall be prepared at Tenant's sole cost and expense by an architect approved in writing by Landlord, which approval shall not be unreasonably withheld.  Tenant shall submit the Alteration Plans to Landlord for Landlord's approval, which approval shall be in writing and shall not be unreasonably withheld. Tenant shall reimburse Landlord for all third party costs incurred by Landlord in reviewing the Alteration Plans; provided, however, that Landlord shall provide Tenant with advance notice of such anticipated costs and Tenant, in response thereto, shall have the right to withdraw the Alteration Plans.

(c)    No demolition work or construction work relative to Alterations which require Landlord's approval shall be commenced or carried on prior to Landlord's approval of the Alteration Plans.

RMCF-SDMS-000439

19

(d)     Tenant shall, promptly after receiving Landlord's approval of the Alteration Plans, apply to all appropriate governmental authorities for such licensees, permits and other administrative approvals as may be necessary to demolish and(or) remove existing improvements, to relocate fixtures within the Premises and to construct Alterations in accordance with the Alteration Plans. All such licenses, permits and approvals shall be obtained at Tenant's sole cost and expense. Landlord shall have the right to approve Tenant's general contractor for the Tenant Improvements, which approval shall be in writing and may be withheld in Landlord's sole discretion.

(e)     Once Tenant commences construction of any Alterations then Tenant shall thereafter diligently prosecute the same to completion. Tenant shall notify Landlord of its intention to commence construction of the Alterations, at least twenty (20) days, but not more than sixty (60) days, before the commencement of any such work or the delivery of any materials related thereto. Tenant shall provide Landlord at that time, if so requested by Landlord, with evidence of the availability of sufficient funds to complete the Alterations.

(f)     As a condition to Tenant's right to commence construction of Alterations, Tenant shall furnish Landlord with appropriate certificates of insurance (naming Landlord as an additional insured) showing that Landlord is protected by adequate amounts of builders risk insurance equal to the cost of so constructing the Alterations, liability insurance and workers compensation insurance (all of which insurance shall otherwise comply with the requirements specified in this Lease). Landlord shall have the right to enter upon the Premises and post and maintain thereon any notices of non-responsibility provided for under applicable law.

(g)     Tenant shall insure that the Alterations shall be performed in accordance with all applicable local governmental rules, regulations, codes and statutes including particularly all applicable building codes and all applicable environmental laws.

(h)     Tenant shall undertake and complete the Alterations in a manner which will not unreasonably interfere with the business of the other tenants and will not unreasonably interfere with vehicle traffic, parking, and customer access to the other premises within the Center.

(i)     Tenant shall pay, when due, all claims for labor or materials furnished to or for Tenant for use in constructing the Alterations. Tenant shall not permit any mechanic's or materialmen's liens to be levied against the Premises arising out of Alterations. Should any mechanic's or other lien be filed against the Premises, Center, or any party thereof by reason of Tenant's acts or omissions or because of a claim against Tenant arising out of the Alterations, Tenant shall cause the same to be cancelled and discharged of record by bond or otherwise within ten (10) business days after notice by Landlord.

(j)     Tenant shall indemnify, defend and hold Landlord, the Premises and the Center harmless from and against any and all actions, claims, losses, demands, liabilities, costs, damages, liens for labor, services and materials, or expenses, including attorneys fees, relating to or arising out of the Alterations; provided the foregoing indemnity shall not include or otherwise

20

RMCF-SDMS-000440

cover actions, claims, losses, demands, liabilities, costs, damages, liens for labor, services and materials, or expenses, including attorneys' fees, relating to or arising out of the gross negligence or intentional misconduct of Landlord. Tenant hereby waives all right under, and benefit of, paragraphs 1941 and 1942 of the California Civil Code.

7.3    <u>Landlord's Right to Repair.</u>    If at any time Tenant fails to make any repair required to the Premises, then Landlord shall have the right, if it so elects and only after reasonable prior written notice to Tenant during which notice period Tenant shall have the opportunity to cure, to make such repair and to immediately charge the cost of the same, together with a fifteen percent (15%) overhead and administrative cost, to Tenant as Rent. Landlord shall not be required to give such prior written notice in the case of an emergency where public safety and (or) injury to people or property is at issue. Any costs so charged to Tenant shall be paid to Landlord in full within thirty (30) days.

7.4    <u>Common Facilities.</u>    The term "<u>Common Facilities</u>" shall mean, for purposes of this Lease, all areas and facilities other than the Premises or any other area designated for the exclusive use of any other lessee which are located within the exterior boundary line of the Center that are provided and designated by the Landlord, from time to time, for the general non-exclusive use of Landlord, Tenant, other lessees of the Center, and their respective employees, guests, invitees, and licensees. The Common Facilities shall include, but not be limited to, loading and unloading areas, trash areas, roadways, sidewalks, walkways, driveways, landscaped areas, elevators and lobbies. The Common Facilities shall specifically exclude those portions of the Center that are identified on <u>Exhibit "A"</u> as the hotel and the parking garage.

7.5    <u>Right to Use Common Facilities.</u>    Landlord hereby grants to Tenant, for the benefit of Tenant and its employees, guests, licensees, and invitees during the Term, the non-exclusive right to use, in common with others entitled to such use, the Common Facilities, subject to any rights reserved by Landlord under this Lease.

7.6    <u>Control of Common Facilities.</u>

(a)    The Common Facilities shall at all times be subject to the exclusive control and management of Landlord who shall cause the same to be maintained in a manner commensurate with other mixed-use commercial projects of a similar type in the subject locality. Landlord hereby reserves the right, at any time and from time to time, without liability to Tenant of any kind whatsoever (including, without limitation, liability for loss of business or profits), to make alterations or additions to the Center (excluding the Premises) and the Common Facilities; to change, add to, eliminate or reduce the extent, size, shape, number or configuration of any aspect of the Center (excluding the Premises) or its operations; to close to the general public all or any portion of the Center, to the extent and for the period necessary to avoid any dedication to the public, to effect any repairs or further construction, or in case of invasion, mob, riot, public excitement or other circumstances rendering such action advisable in Landlord's reasonable opinion; to change the arrangement, character, use or location of entrances or passageways, doors and doorways, corridors, elevators, stairs, landscaping, toilets, mechanical, plumbing, electrical or other operating systems or any other portions of the Common Facilities or other parts of the

21

RMCF-SDMS-000441

Center (except that within the Premises); to change Common Facilities to rental space and rental space to Common Facilities; to utilize portions of the Common Facilities for entertainment, displays, product shows, art work, the leasing of temporary or permanent kiosks or such other uses as, in Landlord's judgement, tend to attract the public; to add or install energy-saving devices; and to change the name, number or designation by which the Center is commonly known. In acting as so provided, however, Landlord shall not materially, adversely restrict access to (including parking access) or visibility to or from the exterior storefront of the Premises. Landlord shall have the exclusive rights to the airspace above and around, and the subsurface below, the Premises and other portions of the Center. Subject to paragraphs 7.5 and 7.6 Landlord shall have the exclusive right to use all exterior walls, roofs and other portions of the Center, including, without limitation, Common Facilities and the exterior of the Premises, for signs, notices, promotional purposes, and all other purposes Landlord deems necessary or desirable.

(b)      Tenant expressly acknowledges and agrees that Landlord shall have the option, at any time during the Term, to provide outdoor seating for its other tenants and their customers within any part of the Common Facilities; provided however, such outdoor seating shall not be immediately adjacent to or in front of the Premises. Landlord reserves the right to host or otherwise allow within the Center and the Common Facilities, promotional events, including but not limited to, musical entertainment, cocktail parties and other outdoor activities promoting the businesses within the Center. Such events may include banquets, parties and other events provided by the hotel operator in the Center as an adjunct to its banquet and catering business. Landlord shall have the right to obtain a temporary liquor license to sell alcoholic beverages at these promotions.

(c)      Nothing contained herein shall be deemed to create any liability upon Landlord to provide or ensure the safety and security of the Common Facilities or to protect Tenant or its invitees, licensees or employees from any risk whatsoever, including bodily injury or death or property damage or destruction.

Landlord may, but shall have no obligation to, from time to time, employ one or more persons or entities to patrol or provide security for the Common Facilities. Notwithstanding any such activity, Tenant shall have the sole responsibility of providing security for the Premises and the persons and property therein. Under no circumstances shall Landlord be liable to Tenant or to any other person by reason of any theft, burglary, robbery, assault, trespass, unauthorized entry, vandalism or any other act of any third person occurring in or about the Premises.

7.7    Parking.  Subject to the provisions and conditions hereof, Tenant shall have the right to use in common with other tenants or occupants of the Center and such other persons or groups as Landlord may specify, the parking garage of the Center. In that regard, Tenant shall have the right to lease from Landlord, on a month to month basis during the Term, one (1) unassigned parking space. The rent payable for the unassigned parking space shall be the prevailing market rate for the same charged by Landlord from time to time, which amount shall be payable monthly in addition to the Basic Monthly Rent. Tenant acknowledges and agrees that: (a) its use of the parking garage shall be subject to such rules and regulations as Landlord

RMCF-SDMS-000442

22

may promulgate from time to time, as herein provided; (b) the parking garage contains a limited number of parking spaces, which, may not be sufficient, at any time and from time to time, to service the needs of all tenants and occupants of the Center and their invitees and licensees; (c) Landlord shall have the right to designate within the parking garage areas that are exclusively for the use of the hotel portion of the Center and its guests and for the tenants in the retail portion of the Center; neither Tenant nor its invitees, licensees or employees will park in these exclusive areas; (d) Landlord shall have the right to charge fees for the use of the parking garage and to establish a validated parking system, and(or) to lease or grant a concession for the parking garage to an operator who may charge fees thereafter; all revenues from such parking operations shall belong to Landlord; (e) Landlord, or said operator, may from time to time establish and maintain a valet parking arrangement at market rates, to which Tenant and its customers may be subject; and (f) Tenant shall not allow any of its employees to park in the parking garage; Tenant shall provide Landlord, from time to time, with an updated list of the license plate numbers for vehicles owned or used by their employees within ten (10) days after the Commencement Date and shall thereafter notify Landlord of any changes in such information within ten (10) days after such changes occur. If Tenant or its employees fail to comply with the restrictions set forth in this paragraph, then, without limiting any other remedy which Landlord may pursue in the event of Tenant's default, Landlord, after giving notice to Tenant, shall have the right to charge Tenant, as additional rent, the sum of $50.00 per day per car parking in violation of the provisions of this paragraph; this amount shall increase ten percent (10%) per year for each year of the Term after the first year thereof. Tenant shall notify its employees in writing of the provisions of this paragraph.

7.8    Valet Parking.  Landlord may elect to provide and(or) otherwise contract for Center-wide valet parking on such basis as Landlord deems appropriate.

## ARTICLE 8

### USE AND CONDUCT OF THE PREMISES

8.1    Permitted Use.  Tenant shall use and occupy the Premises solely for the permitted uses set forth in Item 12 of the Basic Lease Provisions, and for absolutely no other. During the Term, Landlord shall not grant the right to any other tenant in the Center to operate a business that sells chocolate and confections as its primary business.

8.2    Conduct of Business.

(a)    Tenant shall not do or permit anything to be done in or about the Premises which will, in any way, obstruct or interfere with the rights of other tenants or occupants of the Center, or injure them, or allow the Premises to be used for any immoral or unlawful purpose, nor shall Tenant cause, maintain, or permit any nuisance or waste in, on, or about the Premises.

(b)    Tenant shall not use the Premises or permit anything to be done in or about the Premises which shall conflict with any law, statute, ordinance, or governmental rule or regulation, the requirements of the Certificate of Occupancy for the Center or with the

23

RMCF-SDMS-000443

requirements of any covenant, condition or restriction affecting the Center (collectively, "Regulations"), including, without limitation, compliance with all Regulations relating to the Americans with Disabilities Act or any similar law. Tenant shall, at its sole cost and expense, promptly comply with all Regulations in force or which may hereafter be in force, and with the requirements of any fire insurance underwriters or other similar body affecting the use and occupancy of the Premises. The judgment of any court of competent jurisdiction or the admission of Tenant in any action against Tenant, whether Landlord is a party thereto or not, that Tenant has violated any Regulation shall be conclusive of that fact as between Landlord and Tenant.

(c)     Tenant shall not do or permit anything to be done in or about the Premises or any other area of the Center, nor bring or keep anything therein which will in any way increase the existing rate of or affect any insurance, including but not limited to fire, extended coverage, vandalism, malicious mischief, flood, liability insurance coverage, upon the Center or any of its contents, or cause a cancellation of any insurance policy covering the Center or any part thereof or any of its contents. Tenant agrees that if any such activity by Tenant causes an increase in any or all insurance premium rates, it will pay such increase in premiums to Landlord within thirty (30) days after receipt by Tenant from Landlord of a bill setting forth the amount of such increase. In the event any of the Tenant's activities shall cause cancellation of any insurance policy covering the Premises, Tenant shall immediately cease to conduct such activity. Tenant shall not conduct or permit to be conducted any sale by auction on or from the Premises.

8.3     Tenant's Duties. In addition to the duties of Tenant as described in paragraph 8.2 above, or elsewhere in this Lease, Tenant agrees, at all times during the Term that:

(a)     At all times the business to be conducted at, through and from the Premises and the kind and quality of merchandise and services to be offered in the conduct thereof shall be first-class in every respect; and the sales methods employed in such business, including, without limitation, adequate stock of merchandise, sales personnel and service personnel, as well as all other elements of merchandising, display and advertising, will be first class in every respect.

(b)     No auction, liquidation, going out of business, fire or bankruptcy sales may be conducted in or from the Premises or advertised by sign or otherwise thereupon.

(c)     The maintenance of an appropriate tenant mix is critical to the success of the Center and that Landlord has entered into this Lease in order to obtain the benefit of the unique attraction associated with Tenant's business. Landlord has entered into this Lease in reliance on Tenant's undertaking to operate the Premises continuously throughout the Term solely for the purpose expressly provided in this Lease as part of a selective, first-class retail development.

(d)     Tenant shall conduct its business in the Premises during the hours specified as "Minimum Business Hours" in the Basic Lease Provisions. Tenant recognizes that Landlord has the right to establish different "Minimum Business Hours" for other tenants of the

RMCF-SDMS-000444

24

Center and to establish extended Minimum Business Hours in connection with any special event, seasonal event or any other promotional or advertising purpose. Tenant will conduct such business in a lawful manner.

(e)     Tenant shall substantially complete any capital or non-capital improvements necessary for its use and operation of the Premises, fully stock the Premises with products and merchandise and hire adequate and qualified personnel so as to be open for business throughout the Term and otherwise during the hours of operation set forth in paragraph 13 of the Basic Lease Provisions and so as to continuously remain open for business throughout the Term. If necessary, Tenant shall develop and maintain a plan of modernization necessary to keep the Premises operating in a first-class and reputable manner and to otherwise satisfy all of its obligations hereunder.

(f)     Tenant shall continuously operate all of the Premises during the entire Term of this Lease with due diligence and efficiency.

(g)     Tenant shall keep the exterior storefront of the Premises electrically lighted during business hours that fall at night or at dusk.

(h)     Tenant shall maintain and clean disposal areas so as to prevent noxious odors, cause all garbage and waste from Tenant's operations and the Premises to be removed at reasonable times and placed in the trash bins located in designated areas. Tenant shall not burn any trash or garbage of any kind in or about the Premises or the Project.

(i)     Tenant agrees that Tenant will not at any time during the Term without first obtaining the Landlord's consent:

    (i)     Change the exterior color of the Premises or any part thereof; or

    (ii)     Cause the sidewalk adjacent to the Premises to be used for any newsstand, cigarstand, sidewalk shop, taxistand, eating area, outside café or seating area, or other business, occupation, or undertaking except as specifically allowed hereunder.

(j)     Tenant shall engage and have upon the Premises a sufficient number of qualified employees in order to allow for the full operation of the Premises to the general public.

(k)     Tenant agrees that Tenant will not at any time during the Term:

    (i)     Use or permit the use of any portion of the Premises as living quarters, sleeping apartments, lodging rooms, or for any unlawful purpose; or

    (ii)     Limit access to the Premises on a membership or wholesale sale basis only.

8.4     _Hazardous Materials._

RMCF-SDMS-000445

C:\WINDOWS\TEMP\Lease-Rocky Mountain Chocolato 02.doc

(a)    Tenant shall not cause or permit the presence, use, generation, release, discharge, storage, disposal or transportation of any "Hazardous Materials" on, under, in, about, to or from, the Premises and(or) the Center; provided that the presence or use of Hazardous Materials: held and used strictly in accordance with (i) all applicable federal, state or local laws, regulations or orders, (ii) guidelines issued by any national or regional board of insurance underwriters, and (iii) prudent standards of practice, shall not be deemed in violation of this provision.

(b)    As used herein, the term "Hazardous Materials" shall mean any hazardous or toxic substances, materials or waste, pollutants or contaminants, as defined, listed or regulated by any federal, state or local law, regulation or order or by common law decision, including, without limitation:    (i) trichloroethylene, tetrachloroethylene, perchloroethylene and other chlorinated solvents; (ii) petroleum products or by products; (iii) asbestos; and (iv) polychlorinated biphenyls.

(c)    Tenant shall exonerate, indemnify, pay and protect, defend (with counsel reasonably approved by Landlord) and save Landlord, and its directors, trustees, beneficiaries, officers, shareholders, partners, lender's, employees, agents, and invitees and other tenants and users of the Center (collectively, the Landlord "Related Parties"), harmless from and against any claims (including, without limitation, third party claims for personal injury or real or personal property damage), actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, taxes, assessments, liabilities (including sums paid in settlements of claims), interest or losses, including reasonable attorneys' fees and expenses (including any such fees and expenses incurred in enforcing this Lease or collecting any sums due hereunder), consultant fees, and expert fees, together with all other costs and expenses of any kind or nature (collectively, the "Costs") that arise directly or indirectly in connection with the presence or release of Hazardous Materials in the Center (including the Premises) or any adjacent areas and (or) the violation of any Hazardous Materials laws, ordinances or regulations by Tenant and (or) Tenant's partners, employees, agents, contractors, invitees or licensees; provided, the foregoing shall not relate to any of the materials and procedures used by Landlord or its contractors and subcontractors incident to the initial construction of the Center.  The indemnification provided in this paragraph shall specifically apply to and include claims or actions brought by or on behalf of employees of Tenant; Tenant hereby expressly waives any immunity to which it may otherwise be entitled under any industrial or worker's compensation laws.  In the event that any of the Landlord Related Parties shall suffer or incur any such Costs, Tenant shall pay to Landlord and (or) such Landlord Related Parties, the total of all such Costs suffered or incurred upon demand therefor.  Without limiting the generality of the foregoing, the indemnification provided herein shall specifically cover Costs including, without limitation, capital, operating and maintenance costs, incurred in connection with any investigation or monitoring of site conditions, any clean-up, containment, remedial, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any non-governmental entity or person because of the presence, suspected presence, release or suspected release of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Center (or any portion thereof), or elsewhere in connection with the transportation of

26

RMCF-SDMS-000446

Hazardous Materials to or from the Center and any claims of third parties for loss or damage due to such Hazardous Materials. This indemnification shall survive the termination of this Lease and shall be binding upon the Tenant and its successors in interest whenever such threat, claim, or cause of action may arise. Tenant expressly waives any defense concerning laches or the statute of limitations, constructive eviction or rent abatement with respect to such claims.

(d)        Landlord shall exonerate, indemnify, pay and protect, defend (with counsel reasonably approved by Tenant) and save Tenant, and its directors, trustees, beneficiaries, officers, shareholders, partners, lender's, employees, agents, and invitees and other tenants and users of the Center (collectively, "Tenant Related Parties"), harmless from and against any Costs that arise directly or indirectly in connection with the presence or release of Hazardous Materials in the Center (including the Premises) or any adjacent areas and (or) the violation of any Hazardous Materials laws, ordinances or regulations by Landlord and (or) Landlord's partners, employees, agents, and (or) contractors; provided, the foregoing shall not relate to any of the materials and procedures used by Tenant and the Tenant Related Parties incident to or otherwise as part of Tenant's construction activities upon the Premises and (or) Tenant and the Tenant Related Parties operation and use of the Premises. In the event that any of the Tenant Related Parties shall suffer or incur any such Costs, Landlord shall pay to Tenant and such Tenant Related Parties, the total of all such Costs suffered or incurred upon demand therefor. Without limiting the generality of the foregoing, the indemnification provided herein shall specifically cover Costs including, without limitation, capital, operating and maintenance costs, incurred in connection with any investigation or monitoring of site conditions, any clean-up, containment, remedial, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any non-governmental entity or person because of the presence, suspected presence, release or suspected release of any Hazardous Materials in or into the air, soil, ground water, surface water or improvements at, on, about, under or within the Center (or any portion thereof), or elsewhere in connection with the transportation of Hazardous Materials to or from the Center and any claims of third parties for loss or damage due to such Hazardous Materials. This indemnification shall survive the termination of this Lease and shall be binding upon the Landlord and its successors in interest whenever such threat, claim, or cause of action may arise. Landlord expressly waives any defense concerning laches or the statute of limitations, constructive eviction or rent abatement with respect to such claims.

8.5        Abandonment.    Tenant shall not abandon the Premises at any time during the Term hereof for more than ten (10) days without the consent of Landlord; and if Tenant shall abandon or surrender the Premises, or shall be dispossessed by process of law or otherwise, then any personal property belonging to Tenant and left on the Premises shall be deemed abandoned property and otherwise handled and disposed of as provided herein.

8.6        Load and Equipment Limits.    Tenant shall not place a load upon any floor of the Premises which exceed the load per square foot which such floor was designed to carry, as determined by Landlord or Landlord's structural engineer. The cost of any such determination made by Landlord's structural engineer shall be paid for by Tenant upon demand. Tenant shall

RMCF-SDMS-000447

27

not install business machines or mechanical equipment which cause noise or vibration to such a degree as to be objectionable to Landlord or other Center tenants.

8.7    Notice.    Tenant shall give Landlord prompt notice of any damage to or defective condition in any part or appurtenance of the Center's mechanical, electrical, plumbing, HVAC or other systems serving, located in, or passing through the Premises.

8.8    Personal Property Taxes.    Tenant shall pay before delinquency all taxes, assessments, license fees, and other charges that are levied and assessed against Tenant's personal property installed or located in or on the Premises, and that become payable during the Term. On demand by Landlord, Tenant shall furnish Landlord with satisfactory evidence of these payments.

8.9    Health Matters.    If Tenant's permitted use of the Premises includes the sale or preparation of food, then all of the following provisions shall apply. If Tenant's permitted use of the Premises does not include the sale or preparation of food, the last two sentences of subparagraph (a) and all of subparagraphs (b), (c), and (d) shall not apply.

(a)    Tenant shall, at its own cost, retain a licensed, bonded professional pest and sanitation control service to perform inspections of the Premises not less frequently than once each thirty (30) days for the purpose of eliminating infestation by and controlling the presence of insects, rodents and vermin and shall promptly cause any corrective or extermination work recommended by such service to be performed. Such work shall be performed pursuant to a written contract, and a copy thereof shall be delivered to Landlord by Tenant upon demand. If Tenant fails to perform its obligations under this paragraph 8.9, Landlord may, at its option and after five (5) days written notice to Tenant, cause such inspection to be performed and any necessary corrective or extermination work which is recommended to be done and the cost of such inspection and corrective or extermination work shall be payable upon demand by Tenant to Landlord. In addition, Landlord may elect to provide the services specified in this paragraph to tenants other than those engaged in the sale or preparation of food. In such event, the cost of providing such services shall be charged to the tenants for whom Landlord provides such services.

(b)    Tenant acknowledges that the requirements of governmental authorities having jurisdiction may require that Tenant (i) enlarge the kitchen drain from the Premises to the main sewer line and (ii) install a grease trap in the floor drain of the kitchen of the Premises. Tenant acknowledges and agrees that it shall, if required and as a part of Tenant's Work, enlarge such sewer line and install such grease trap and shall, during the Term of this Lease, clean and maintain such grease trap in such manner as may be required by governmental authorities having jurisdiction.

(c)    Tenant shall store all waste and garbage in a refrigerated or cool and dry location within the Premises and shall dispose of all waste and garbage (including wet garbage and food) only in trash containers located within the Premises or in specific areas designated for that purpose in the Center. Tenant shall not accumulate or permit such materials to accumulate

RMCF-SDMS-000448

28

in hallways, service corridors or other Common Areas. Subject to Paragraph 18.26, Tenant shall, at its own cost and expense, arrange for the removal of all garbage, rubbish and refuse from the Premises. Any waste or garbage, and any food deliveries, stored or accumulated by Tenant outside of the Premises except as permitted by Landlord may be removed immediately by Landlord without notice to Tenant and the cost of such removal, together with Fifty Dollars ($50.00) per occurrence to cover Landlord's administrative cost in providing such service to Tenant, payable by Tenant to Landlord upon demand.

(d)    Tenant shall comply with all governmental rules and regulations applicable to Tenant's operations in the Premises and shall promptly (i) furnish or cause to be furnished to Landlord copies of all reports, notices and citations and other governmental reports, notices and citations issued with respect to the Premises and (ii) cure or otherwise eliminate all deficiencies and violations noted by the governmental authorities and take all required actions to prevent the reoccurrence of such deficiencies and violations.

(e)    Failure of Tenant to perform any obligation pursuant to subparagraphs (a) through (d) above shall be deemed a default pursuant to this Lease entitling Landlord, subject to the notice and cure provisions set forth herein, to exercise all remedies available to Landlord under the Lease.

8.10    Landlord Reservations.  Landlord expressly reserves unto itself, and Tenant has no interest in the area above the ceiling of the Premises, nor any interest in the area below the floor of the Premises; nor any interest whatever in the land beneath the Premises. Landlord makes no warranties or representations as to the present occupants or occupancy level of the Center, or of future occupancy commitments. Tenant waives any duty or obligation, expressed or implied, on the part of Landlord to keep the Center leased or occupied in whole or part or for any specific purpose or use. Notwithstanding the foregoing, Landlord shall have the right to make minor vertical penetrations through the Premises or its exterior walls, at Landlord's expense, for vertical utility connections, provided that such penetrations do not materially affect Tenant's use of the Premises or the public appearance of the Premises.

8.11    Waiver of Claims.  Tenant hereby waives any and all claims and causes of action resulting directly or indirectly from Landlord's exercise of any of its rights, reservations, licenses or easements as provided in this paragraph, including, by way of example but without limitation, claims for business interference, lost profits, damage to or loss of personal property, loss of benefit of the Lease or the Premises, or otherwise resulting from or related to any such change in the Premises or the Center as provided in paragraph 8.10 above.

8.12    Delivery Restrictions.  Tenant shall use its best good faith efforts to request all deliveries, loading, unloading, rubbish removal and other services to the Premises (other than the delivery of small packages and messengered items) be accomplished prior to 10:00 a.m. of each day or at such other times as may be reasonably designated by Landlord; however, to the extent that Tenant cannot abide by such time frames, then Tenant shall not be obligated to do so, so long as any other deliveries are made and otherwise accomplished in a manner reasonably consistent with other businesses of a similar type and location. Landlord reserves the right to

29

RMCF-SDMS-000449

further regulate the activities of Tenant in regard to Tenant's deliveries and servicing of the Premises where in Landlord's reasonable judgement Tenant's activities interfere with the peaceful and useful enjoyment of the Center by other lessees or their invitees and licensees of the operation and use of the Center, including, without limitation, activities associated with the location of delivery vehicles and Tenant agrees to abide by such further non-discriminatory regulations of Landlord. In addition, Tenant shall not use the elevators or the parking garage in the Center for deliveries into or out of the Premises or for moving merchandise. Tenant shall use its best good faith efforts to give Landlord or Landlord's designated representative written notice of anticipated times for deliveries to permit Landlord to coordinate Tenant's deliveries with the deliveries of other lessees of the Center.    In this regard, Tenant shall make every reasonable effort to coordinate its deliveries with the activities of other lessees in the Center. To the extent necessary, in Landlord's reasonable judgement, Landlord shall be entitled to enact and enforce, from time to time, reasonable non-discriminatory rules and regulations which have as their purpose the coordination of deliveries for all lessees in the Center, including Tenant.    At Tenant's expense, Landlord shall install in the vicinity of the loading facilities a "buzzer" or other device selected by Landlord for use by carriers delivering merchandise to Tenant to notify Tenant that a delivery is being made. Tenant shall be solely responsible for (a) informing such carriers of the foregoing delivery procedures and (b) receiving all of its deliveries and verifying the contents of all such deliveries. Tenant shall be permitted to use the Center loading facilities at any time, subject to the nonpreferential rights of other tenants of the Center to use the loading facilities and subject to Landlord's coordination of deliveries, as provided in this paragraph. Tenant shall limit all deliveries to the Premises made in connection with Tenant's moving into the Premises to the following times: (i) after 6:00 p.m. Monday through Friday (except holidays) and (ii) Sundays (except during holiday periods); provided, Tenant may allow deliveries to occur outside said hours provided such action(s) do not violate applicable laws and ordinances, do not interfere with the rights and possession of other lessees in the Center, and do not interfere with Landlord's construction activities upon the Premises.

8.13    Storage, Office Space.    Tenant shall warehouse, store, and(or) stock in the Premises only such goods, wares and merchandise as Tenant intends to offer for sale at retail at, in, from or upon the Premises. This shall not preclude occasional emergency transfers of merchandise to the other stores of Tenant, if any, not located in the Center. Tenant shall use for office, clerical or other non-selling purposes only such space in the Premises as is from time to time reasonably required for Tenant's business in the Premises (but in no event in excess of ten percent (10%) of the total indoor floor area).    Tenant may not display, sell merchandise, allow carts, portable signs, devices or any other objects to be stored or to remain outside the defined exterior walls of the Premises without Landlord's prior written consent.

8.14    Advertising.    Tenant shall fully promote and advertise the Premises.    Tenant, throughout the entire Term of this Lease, shall be solely responsible for all advertising and promotional costs pertaining to the advertising and promotion of its business operated in the Premises and shall not change the advertised name of such business without the prior written consent of Landlord.

RMCF-SDMS-000450

30

8.15    Business Name.   Tenant agrees that the name of its business operated on the Premises shall be as set forth in Paragraph 12 of the Basic Lease Provisions or such other name as approved in advance and in writing by Landlord, which approval shall not be unreasonably withheld.

## ARTICLE 9

## ASSIGNMENT AND SUBLETTING

9.1    Restriction on Transfer.   Tenant shall neither voluntarily nor by operation of law assign, sell, encumber, pledge, or otherwise transfer all or any part of Tenant's leasehold estate under this Lease or Tenant's interest in the Premises, or sublet or otherwise permit any other person (except Tenant's agents and employees) to occupy the Premises or any portion thereof (collectively, "Transfer"), without Landlord's prior written consent, which consent shall not be unreasonably withheld.   Consent by Landlord to one or more Transfers shall not constitute a waiver of Landlord's right to require consent to any future Transfer.   If Tenant is a corporation, unincorporated association, limited liability company or partnership, the transfer, assignment, or hypothecation of any stock or interest in such corporation, association, limited liability company or partnership in the aggregate in excess of 25% of all outstanding stock or interests, or liquidation thereof, shall be deemed a Transfer within the meaning and provisions of this paragraph. Tenant shall reimburse Landlord for Landlord's reasonable costs and attorneys' fees incurred in conjunction with the processing and documentation of any required consent to a Transfer.

9.2    Considerations for Consent.   Landlord consent under this paragraph shall be based upon a reasonable determination by Landlord that the same type, class, nature, and quality of business, services, management, and financial soundness of ownership exist after the proposed Transfer and, provided further, each and every covenant, condition, and obligation imposed upon Tenant by this Lease, each and every right, remedy, and benefit afforded Landlord by this Lease, and the underlying purpose of this Lease is not thereby in any manner materially, adversely impaired or diminished.   The reasonable determination by Landlord as to whether consent will be granted in any specific instance may be based on, among other things, the following factors:

(a)    whether the assignee, sublessee or transferee will use the Premises only for the uses permitted herein;

(b)    the extent to which the transferee will affect the ability of the business operated at the Premises to compete with other similar properties, and to maintain the same or greater percentage rent generally attained by Tenant;

(c)    the financial stability and capacity, and the management experience and capabilities, of the transferee;

(d)    the business reputation of the transferee;

31

RMCF-SDMS-000451

(e)      the quality of the business operations of the transferee and the manner in which such business effectively mixes and compliments other businesses in the Center; and

(f)      the business experience of the proposed transferee.

This list of factors is not intended to be exclusive; however, failure to satisfy Landlord relative to any one or more of these criteria shall be deemed reasonable grounds for withholding consent.   Landlord may additionally rely on any other reasonable basis for judgment as may apply from time to time.

9.3      Transfer Information.   If Tenant desires at any time to accomplish a Transfer, it shall first notify Landlord of its desire to do so and shall submit in writing to Landlord:

(a)      the name and legal composition of the proposed transferee;

(b)      the provisions and conditions of the proposed Transfer; and, if requested, all documents relating to the proposed Transfer, including, without limitation, any purchase contracts, assignment agreements, or escrow instructions relating thereto; and,

(c)      such reasonable business and financial information as Landlord may request concerning the proposed transferee, including, without limitation, a listing of all other leases under which the proposed transferee is a tenant, and any other real estate references as Landlord deems appropriate.

In addition to the information required above, in the event of a proposed Transfer, Tenant shall pay to Landlord a nonrefundable $5,000.00 Transfer fee, and shall also be responsible for any attorneys' fees and costs incurred by Landlord in connection with such Transfer, not to exceed $2,500.00 in each instance in the case of a Transfer not contested or otherwise objected to by Landlord.

9.4      Landlord's Option.   At any time within 15 days after Landlord's receipt of the information specified in paragraph 9.3. above, Landlord, by written notice to Tenant, shall elect to do any of the following:

(a)      Landlord may consent to the proposed Transfer subject to any reasonable conditions on such Transfer, which reasonable conditions may include, without limitation: (i) that the proposed transferee assume Tenant's obligations under the Lease (without, however, releasing Tenant therefrom); (ii) in the case of a proposed sublease, that the subtenant agree that Landlord shall have the right to enforce any and all of the terms of the sublease directly against such subtenant, and that in the event the Lease is terminated prior to the expiration of the sublease, that at the election of Landlord, the sublease shall not terminate and the subtenant will attorn to the Landlord; and (iii) that the terms of the Lease be modified to assure that Landlord will receive, in Landlord's reasonable judgment, at least substantially the same percentage rent and other economic benefits as the Landlord would have received had the Tenant remained in business at the Premises under the Lease and the proposed Transfer had not taken place.  In no

RMCF-SDMS-000452

32

event will Tenant be released from its obligations hereunder upon any Transfer, unless Landlord expressly agrees thereto in writing.

(b)    Landlord may deny its consent to the proposed Transfer on any reasonable ground.

Landlord shall be under an affirmative obligation to so act within said fifteen (15) day period.

9.5    <u>No Advertising.</u>  In no event shall Tenant display on or about the Premises or the Shopping Center any signs for the purpose of advertising the Premises for assignment, subletting, or other Transfer.

9.6    <u>Void Transfers.</u>  Any Transfer which does not comply with the provisions of this paragraph 9 shall be void and, at the option of Landlord, shall terminate this Lease.

9.7    <u>Restrictions on Prepaid Rent and Security Deposit.</u>  In the event of any assignment or subletting, Tenant shall not collect more than two months rent at any time in advance, and Tenant shall not collect a security deposit in excess of the Basic Monthly Rent then payable by Tenant to Landlord hereunder. Any consideration paid by the assignee or subtenant that exceeds the Basic Monthly Rent then payable by Tenant to Landlord hereunder shall be due, owing and payable from Tenant to Landlord as and when received by Tenant.

9.8    <u>Transfer Premium Payment.</u>

(a)    The parties hereby agree that as a reasonable condition to Landlord's consent to any Transfer, Tenant shall pay to Landlord as received by Tenant fifty percent (50%) of any "Transfer Premium".  The Transfer Premium shall include any and all consideration that Tenant receives from any and all approved transferee(s) under the Lease in excess of the Basic Monthly Rent and Percentage Rent under this Lease.

(b)    Tenant shall allow Landlord to review and audit Tenant's books and records and(or) request a complete statement certified by Tenant's Chief Financial Officer, describing in detail the computation of any Transfer Premium that Tenant has derived or will derive from the Transfer, for the purpose of verifying the Tenant's calculation of the Transfer Premium.  If Landlord finds that the Transfer Premium for any Transfer has been understated, Tenant shall, within twenty (20) days after demand, pay the deficiency and Landlord's costs of that audit.  If Tenant has understated the Transfer Premium by more than ten percent (10%), then Tenant shall immediately pay Landlord the same, together with an additional fee in the amount of ten percent (10%) of the underpayment.

9.9    <u>Arbitration.</u>  The parties agree that binding arbitration shall be the exclusive procedure for resolution of any dispute, controversy or claim arising from, related to, or concerning the provisions of this paragraph 9, including, without limitation, whether such dispute, controversy or claim is arbitrable and whether Landlord may reasonably withhold its consent to a Transfer.  The arbitration shall take place in San Diego, California, shall be

33

RMCF-SDMS-000453

conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time the demand for arbitration is made and, except for the limitation set forth below, shall be governed by California law. If Tenant requests consent to a Transfer, and the Landlord refuses to give its consent or takes other action which is later determined by the arbitrator(s) appointed pursuant to this subparagraph to be unreasonable or unlawful, Tenant's only remedy shall be specific enforcement of the right to Transfer, and in no event shall Landlord be liable to any party for monetary damages in connection with its responses to requests for consent to a Transfer.

9.10    Reasonable Restriction. Tenant acknowledges and agrees that each of the rights of Landlord set forth in this paragraph 9 in the event of a proposed Transfer is a reasonable restriction on transfer for purposes of California Civil Code §1951.4.

9.11    Bankruptcy. If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. paragraph 101 et seq. ("Bankruptcy Code"), any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, and shall be the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other consideration constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

## ARTICLE 10

## NON-LIABILITY AND INDEMNIFICATION

10.1    Tenant's Waiver of Claims. Landlord shall not be liable for any property damage, personal injury, death, or loss (unless due to Landlord's gross negligence or intentional misconduct), economic or otherwise, past, present, or future, of Tenant, its servants, agents, employees, invitees, licensees, or guests, or of trespassers or any other persons or entities, from any cause whatsoever, whether foreseeable or not, arising at any time in, on, about, or in connection with the Premises, the Common Facilities or the Center or any use, occupancy, or enjoyment thereof or any of Tenant's activities; and Tenant waives, releases, and forever discharges Landlord from any claims, demands, actions, causes of action, and rights which Tenant has or may have against Landlord for any such damage, injury, death, or loss. It is the intent of the parties to exculpate Landlord to the fullest extent allowed by law, except as specifically so provided, and this paragraph shall be so interpreted.

10.2    Limitation On Judgement Against Landlord. It is expressly understood and agreed that any money judgment against Landlord resulting from any default or other claim arising under this Lease shall be satisfied only out of Landlord's interest in the Center. No other

34

RMCF-SDMS-000454

real, personal or mixed property of Landlord (the term "Landlord" for purposes of this paragraph only, shall mean any and all members which comprise Landlord), wherever situated, shall be subject to levy on any such judgment obtained against Landlord. If Landlord's interest in the Center is insufficient for the payment of such judgment, Tenant shall not institute any further action, suit, claim or demand in law or in equity against Landlord for or on account of such deficiency. Tenant hereby waives to the fullest extent waiveable under law any right to satisfy said money judgment against Landlord except from Landlord's interest in the Center.

10.3   Negligence of Third Parties. Neither Landlord nor its partners, agents, servants or employees shall be liable to Tenant for any damage by or from any act of negligence of any tenant or other occupant of the Center or by any owner or occupant of adjoining or contiguous property. Tenant agrees to pay for all damage to the Center, the Common Facilities, or the Premises, as well as all damage to tenants or occupants thereof caused by Tenant's misuse or neglect of the Premises, its apparatus or appurtenances, or caused by any licensee, contractor, agent or employee of Tenant.

ARTICLE 11

INSURANCE

11.1   Insurance to be Carried by Tenant. Tenant shall during the Term, at its sole cost and expense, obtain and maintain the following types of insurance:

(a)    Fire and extended coverage insurance, including endorsements for vandalism, malicious mischief, theft, and sprinkler leakage, covering all of Tenant's property, including, but not limited to, furniture, additions, fixtures, and anything in the nature of a leasehold improvement in an amount equal to the full replacement cost of such property without deduction for depreciation. Such insurance shall contain a deductible of not more than $10,000. Landlord shall be a co-loss payee with Tenant for any such insurance. If this Lease is terminated, as provided in paragraph 13.1(b) hereof, then Landlord shall reassign to Tenant so much of such insurance proceeds that relate to furniture, fixtures and equipment that are removable by Tenant from the Premises upon the expiration of the Term. If the foregoing insurance proceeds are to be used by Tenant to rebuild the Premises, then Landlord shall cooperate with Tenant in making the same available for that purpose.

(b)    Public liability insurance, including bodily injury and property damage, personal injury and contractual liability with respect to all claims, demands or actions by any person or entity, in any way arising from, related to, or connected with the conduct and operation of Tenant's business in the Premises or Tenant's use of the Premises. Landlord shall be shown as an "additional insured" on any such policy. Such policies shall be written on a comprehensive basis, with no more than a $10,000 deductible, with coverage limits of not less than $2,000,000. This policy shall include broad form contractual liability coverage. The limits of said insurance shall not, however, be construed to limit the liability of Tenant under this Lease.

RMCF-SDMS-000455

35

(c)     Worker's Compensation insurance coverage as required by law, together with employer's liability insurance coverage.

(d)     Plate glass insurance to the satisfaction of Landlord in amounts sufficient to replace any plate glass in and about the Premises which may be damaged during the Term of this Lease.

(e)     Any other form or forms of insurance as Landlord or its lenders may require from time to time in form, in amounts, and for insurance risks which are customarily and reasonably covered for similar mixed-use commercial projects of a similar type and location.

Each policy evidencing insurance required to be carried by Tenant pursuant to this Article shall contain a provision including Landlord, and any other parties in interest designated by Landlord, as an additional named insured(s).

11.2   Policy Forms and Delivery.  All of Tenant's insurance, as provided herein, shall be procured from responsible insurance companies who are qualified to conduct business in the State of California and have a minimum rating of a VII in Bests Insurance Guide.  Tenant agrees that certificates of such insurance shall be delivered to Landlord as soon as practicable after the placing of the required insurance, but in no event later than ten (10) days prior to the date Tenant takes possession of the Premises.  All policies shall be on an occurrence basis and shall require that at least thirty (30) days' prior written notice to Landlord by the insurer prior to termination, cancellation or material change in such insurance.  The deductible amounts, if any, with respect to all insurance which Tenant is required to maintain hereunder shall not exceed an amount per claim or occurrence which Landlord reasonably deems necessary.  In the event Tenant fails to procure and maintain an insurance required hereunder, Landlord may (but shall not be required to) procure same at Tenant's expense.  All policies shall include a "severability of interest" endorsement with respect to Landlord. All such policies shall be written as primary policies, not contributing with and not in excess of coverage which Landlord may carry.

11.3   Use of Proceeds.  In the event of damage or destruction to the leasehold improvements in the Premises covered by insurance required to be taken out by Tenant pursuant to this Article, Tenant shall use the proceeds of such insurance for the purposes of repairing or restoring such leasehold improvements.  In the event of damage or destruction of the Center entitling the Landlord to terminate this Lease pursuant to Article 13, hereof, then, if the Premises have also been damaged, Tenant will pay to Landlord that portion of its insurance proceeds relating to the leasehold improvements in the Premises that were paid for by Landlord.

11.4   Landlord's Insurance.  Landlord shall procure and maintain in force at all times during the Term of this Lease a policy or policies of comprehensive general liability insurance and fire and extended coverage insurance with respect to the Center and the Common Facilities to the extent of at least ninety percent (90%) of their insurable value or in such other amounts or with such additional supplemental coverage as Landlord or its lender may require.  Tenant shall pay Landlord its share of the above-mentioned insurance as part of the Operating Expenses payable by Tenant to Landlord pursuant to this Lease.

36

RMCF-SDMS-000456

11.5   Subrogation.  Neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party from any loss or damage to any building, structure, or other tangible property, or any resulting loss of income, or losses under worker's compensation laws and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents, or employees of any such loss or damage is covered by insurance benefiting the party suffering such loss or damage. Landlord and Tenant hereby mutually release each other from liability and waive all right to recover against each other or against officers, employees, agents, guests, authorized assignees or subtenants, or representatives of each other for any loss or damage to any person or property caused by or resulting from risks insured against under any insurance policies carried by the parties; provided, however, this paragraph shall be inapplicable if it would have the effect, but only to the extent that it would have the effect, of invalidating any insurance coverage of Landlord or Tenant.  The parties shall, to the extent available, cause each insurance policy obtained by it hereunder to provide a waiver of subrogation.

11.6   Insurance Increases.  Landlord shall have the right, from time to time during the Term, to require Tenant to increase the amount of insurance coverage carried by Tenant pursuant to the provisions of this Lease, so long as the increased insurance coverages are consistent with insurance coverages customarily and reasonably required for Premises of a similar type, use, location and level of improvement in the applicable location.

## ARTICLE 12

## TRANSFER OF LANDLORD'S INTEREST

Notwithstanding any other provisions of this Lease, Landlord may assign, in whole or in part, Landlord's interest in this Lease and may sell, exchange or master lease all or part of the real estate of which the Premises are a part.  In the event of any sale or exchange of the Premises by Landlord and assignment by Landlord of this Lease, Landlord shall be and is hereby entirely released and discharged of all liability under any and all covenants and obligations contained in or derived from this Lease or arising out of any act or omission by Landlord relating to the Premises which occurs after the consummation of such sale, exchange, or assignment; provided, Landlord shall not be deemed to be so released from covenants and obligations owed under this Lease or arising out of any act, occurrence or omission relating to the Center or the Premises which occurred before the consummation of such sale, exchange or assignment.  Upon any such sale, exchange or assignment Landlord shall transfer and convey to its assignee/transferee the balance of any security deposit paid by Tenant and held by Landlord hereunder; thereafter Landlord shall have no further responsibility for the application of said security deposit.

## ARTICLE 13

## DAMAGE OR DESTRUCTION

13.1   Repair or Termination

RMCF-SDMS-000457

C:\WINDOWS\TEMP\Lease-Rocky Mountain Chocolate 02.doc

(a)  If the Premises are damaged by fire or other casualty of the type insured by Landlord the damage shall be repaired by Landlord; provided such repairs can reasonably be made within one hundred fifty (150) days after the commencement of repairs without the payment of overtime or other premiums and that the insurance proceeds are sufficient to pay the costs of such repairs. Landlord shall give written notice to Tenant within thirty (30) days after the occurrence of the damage if Landlord concludes the damages can be so repaired. Basic Monthly Rent shall not be abated while such repairs are being undertaken.

(b)  If such repairs cannot reasonably be made within such one hundred fifty (150) days, or if such repairs will cost more than the available insurance proceeds, Landlord may, at its election, make such repairs within a reasonable time and, in such event, this Lease shall continue in effect and the Basic Monthly Rent shall not be abated. Landlord's election to make such repairs must be evidenced by written notice to Tenant advising Tenant within thirty (30) days after the occurrence of the damage whether or not Landlord will make such repairs. If Landlord does not so elect to make such repairs then either party may, by written notice to the other given within sixty (60) days after the occurrence of the damage, cancel this Lease as of the date of the occurrence of such damage.

(c)  With respect to any damage and repairs, Tenant waives the provisions of paragraph 1932(2) and 1933(4) of the Civil Code of California.

(d)  All proceeds of any insurance maintained by Tenant or Landlord upon the Premises (including insurance on Tenant improvements) shall be used to pay for the repairs to the property covered by said insurance, to the extent that repairs are made pursuant to this Article.

(e)  If the Premises, the Center, or the Common Facilities are damaged, and such damage is of the type insured against under the insurance maintained by Landlord, the cost of repairing said damage up to the amount of the deductible, or any amount in excess of the coverage under said insurance policy, shall be included as a part of Operating Expenses.

(f)  Landlord shall not have any obligation whatsoever to repair, reconstruct, or restore the Premises or any portion of the Center when the damage occurs during the last eighteen (18) months of the Term.

13.2  **Loss of Enjoyment.**  No damages, compensation or claim shall be payable by Landlord to Tenant for any inconvenience, loss of business or annoyance of Tenant arising from any repair or restoration of any portion of the Premises or any other portion of the Center or Common Facilities performed by Landlord or it agents. Landlord shall use its best efforts to effect such repair or restoration promptly and in such manner as not unreasonably to interfere with Tenant's use and occupancy of the Premises.

13.3  **Automatic Termination.**  A total destruction of the Center shall automatically terminate this Lease. For purposes of this subparagraph 13.3, a total destruction shall mean the total or substantial demolition of all or substantially all of the above-foundation improvements in the Center.

RMCF-SDMS-000458

38

## ARTICLE 14

## DEFAULTS AND REMEDIES

14.1   <u>Events of Default</u>.  The occurrence of any of the following shall constitute a material default and breach of this Lease by Tenant:

(a)   Any failure by Tenant to pay Rent as and when due, where such failure continues for five (5) days after written notice thereof by Landlord to Tenant; provided, however, that any such notice shall be in lieu of, and not in addition to, any notice required under paragraph 1161, <u>et seq</u>. of the California Code of Civil Procedure;

(b)   The abandonment (cessation of substantial use and occupancy) of the Premises by Tenant;

(c)   Any failure by Tenant to observe and perform any other provision of this Lease or the Rules and Regulations promulgated by Landlord hereunder where such failure continues for thirty (30) days after written notice thereof by Landlord to Tenant; provided, however, that any such notice shall be in lieu of and not in addition to, any notice required under paragraph 1161, <u>et seq</u>. of the California Code of Civil Procedure.  Notwithstanding the foregoing, Tenant shall not be deemed in default under this paragraph where the subject default is not susceptible of reasonably being cured within said thirty (30) day period, but Tenant has commenced and is diligently pursing such cure within such thirty (30) day period and, in any case, completes such cure within ninety (90) days of such written notice.

(d)   The making by Tenant or Guarantor of any general assignment for the benefit of creditors; the filing by or against Tenant or Guarantor of a petition to have Tenant or Guarantor adjudged a Chapter 7 debtor or to have debts discharged or of a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant or Guarantor, the same is dismissed within sixty (60) days); the appointment of a trustee or receiver to take possession of substantially all of Tenant's or Guarantor's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days; the attachment, execution or other judicial seizure of substantially all of Tenant's or Guarantor's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days.

14.2   <u>Landlord's Remedies</u>.

(a)   In the event of any default by Tenant, as defined herein, then, in addition to any other remedies available to Landlord at law or in equity, Landlord shall have the immediate option, but shall not be obligated to do so, to terminate this Lease and all rights of Tenant hereunder.  In the event that Landlord shall elect to so terminate this Lease, then Landlord may recover from Tenant:

RMCF-SDMS-000459

39

(i)    The worth at the time of award of any unpaid Rent which had been earned at the time of such termination; plus

(ii)    The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds that portion of rental loss which Tenant proves could have been reasonably avoided; plus

(iii)    The worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such rental loss which Tenant proves reasonably could be avoided; plus

(iv)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligation under this Lease or which in the ordinary course of things would be likely to result therefrom including, but not limited to, brokerage commissions and the cost of restoring said Premises to the condition required under this Lease; plus

(v)    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

(vi)    As used in (i) and (ii) above, the "worth at the time of award" shall be computed by allowing interest at twelve percent (12%) per annum. As used in (iii) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank at San Francisco at the time of award, plus one (1) percentage point.

(b)    In the event of any such default by Tenant, Landlord shall also have the right, with or without terminating this Lease, to reenter the Premises to remove all persons and property from the Premises. Such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant.

(c)    In the event of the abandonment of the Premises by Tenant or in the event of any default by Tenant, if Landlord does not elect to terminate this Lease as provided in this paragraph, then Landlord may exercise the remedy and shall be entitled to all the rights provided for in California Civil Code Section 1951.4. (Landlord may continue the Lease in effect after Tenant's breach and abandonment and recover Rent as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations).

(d)    Landlord shall not, by any reentry or other act, be deemed to have accepted any surrender by Tenant of the Premises or Tenant's interest therein, or be deemed to have terminated this Lease or Tenant's right to possession of the Premises or the liability of Tenant to pay Rent thereafter to accrue or Tenant's liability for damages under any of the provisions hereof, unless Landlord shall have given Tenant thirty (30) days notice in writing that it has so elected to terminate this Lease.

(e)    All rights, options, and remedies of Landlord contained in this Lease shall be construed and held to be cumulative, and no one of them shall be exclusive of the other, and

40

RMCF-SDMS-000460

Landlord shall have the right to pursue any one or all of such remedies or any other remedy or relief which may be provided by law, whether or not stated in this Lease.

14.3   Landlord's Default.   Landlord shall not be deemed to be in default under this Lease unless and until it has failed to perform such obligation within thirty (30) days after written notice by Tenant to Landlord specifying the manner in which Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed to be in default if Landlord has commenced and is diligently pursuing such cure within such thirty (30) day period and, in any case, completes such cure within ninety (90) days of such written notice.

ARTICLE 15

EMINENT DOMAIN

15.1   General.   If the Premises or any portion thereof are taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power, this Lease shall terminate as to the part so taken as of the date that the condemning authority takes possession of the Premises. If more than twenty-five percent (25%) of the Premises is taken or sold under such threat, either Landlord or Tenant may terminate this Lease as of the date that the condemning authority takes possession by delivery of written notice of such election within sixty (60) days after such party has been notified of the taking or, in the absence thereof, within sixty (60) days after the condemning authority shall have taken possession.

15.2   Continuation of Lease After Condemnation.   If this Lease is not terminated by Landlord or Tenant, it shall remain in full force and effect as to the portion of the Premises remaining; provided, however, that the Basic Monthly Rent and Tenant's share of the Operating Expenses shall be reduced in proportion to the reduction of the rentable area of the Premises. In such event, Landlord shall, at Landlord's expense, restore the Premises to a complete unit of like quality and character, except as to size, as existed prior to the date on which the condemning authority took possession.

15.3   Allocation of Condemnation Award.   All awards for the taking of any part of the Premises or proceeds from the sale made under the threat of the exercise of the power of eminent domain shall be the property of Landlord, whether made as compensation for diminution of value of the leasehold estate, for the taking of the fee, or as severance damage; provided, however, that: (a) Tenant shall be entitled to any award for loss of or damage to Tenant's trade fixtures, and removable personal property which is separately stated within such award; and (b) to the extent provided under law and so long as such awards do not diminish the amounts otherwise allocable to Landlord, Tenant shall be entitled to recover its lost profits and moving expenses.

15.4   Waiver of CCP Section 1265.130.   Each of the parties waives the provisions of California Code of Civil Procedure Section 1265.130 allowing either party to petition the superior court to terminate this Lease in the event of a partial taking of the Premises.

41

RMCF-SDMS-000461

## ARTICLE 16

## SUBORDINATION

This Lease is subject and subordinate to all declarations of restrictions, deeds of trust or other security interests of any kind now covering the Center, including, but not limited to the Disposition and Development Agreement between Landlord and the Redevelopment Agency of the City of San Diego; subject, however, to the qualification that so long as Tenant is not in default under this Lease, its peaceful use and occupancy of the Premises under this Lease shall not be impaired, restricted or terminated by any such mortgagee, beneficiary, secured party or ground lessor. In the event of foreclosure or exercise of any power of sale under any deed of trust superior to this Lease, Tenant shall attorn to the purchaser at any foreclosure sale or sale pursuant to the exercise of any power of sale, and any such purchaser shall similarly attorn to and accept Tenant and this Lease, in which event this Lease shall not terminate and Tenant shall automatically be and become the tenant of the purchaser; provided, however, that no landlord or purchaser at any foreclosure sale or sale pursuant to the exercise of any power of sale or any successor thereto shall be liable for any act or omission of any prior landlord (including Landlord) or be subject to any offsets or defenses which Tenant might have against any prior landlord (including Landlord), or be bound by any Rent which Tenant might have paid in advance to any prior landlord (including Landlord) for a period in excess of one month or by any Security Deposit or other prepaid charge which Tenant might have paid in advance to any prior landlord (including Landlord), or be bound by an agreement or modification of this Lease made after Tenant has written notice of the interest of such party without the prior written consent of such party.

## ARTICLE 17

## SURRENDER OF PREMISES; REMOVAL OF PROPERTY

17.1   Tenant's Removal of Property. Upon the expiration or termination of the Term of this Lease, Tenant shall quit and surrender possession of the Premises to Landlord in as good order, condition and repair as the same are now or hereafter may be improved by Landlord or Tenant, reasonable wear and tear and repairs which are Landlord's obligation excepted, and in a reasonable state of cleanliness. In such event, Tenant shall, without expense to Landlord, remove from the Premises all debris, rubbish, furniture, equipment, business and trade fixtures, free-standing cabinet work, shelving, moveable partitions and other articles of personal property owned by Tenant or installed or placed by Tenant at its expense in the Premises and all similar articles of any other persons claiming under Tenant. Unless otherwise requested to do so by Landlord, however, Tenant shall not remove any additions or improvements to the Premises, such as carpet, interior partition walls and doors, "built-ins", shelves, built-in fixtures, store front improvements, HVAC equipment, bar and booths, lighting fixtures, moldings, restrooms, ceiling treatments, insulation, lighting, utility connections and distributions, vertical ducts, or other similar items, it being understood and agreed that such items are and shall remain the property of

42

RMCF-SDMS-000462

Landlord. Tenant shall also repair, at its expense, all damage to the Premises resulting from such removal.

17.2 <u>Abandoned Property</u>. Whenever Landlord shall reenter the Premises as provided in this Lease, any property of Tenant not removed by Tenant upon the expiration of the Term of this Lease or within five (5) days after a termination by reason of Tenant's default, as provided in this Lease, shall be considered abandoned, and Landlord may remove any or all such items and dispose of the same in any manner or store the same in a public warehouse or elsewhere for the account and at the expense and risk of Tenant, all in accordance with applicable law.

## ARTICLE 18

## <u>MISCELLANEOUS</u>

18.1 <u>Landlord's Inspection and Maintenance</u>. Tenant shall permit Landlord and its agents at all reasonable times to enter the Premises for the purpose of making inspections and repairs to the Premises or inspections, repairs, alterations, additions or improvements to the Center and to take all steps as may be necessary or desirable for the safety, protection, maintenance or preservation of the Premises or the Center or Landlord's interest therein, or as may be necessary or desirable for the operation or improvement of the Center or in order to comply with the laws, orders or requirements of governmental or other authorities, subject to the following qualifications:

(a) Landlord, except in the case of an emergency, shall give Tenant at least five (5) days advance written notice of such entry; and,

(b) Landlord shall make every commercially reasonable effort to not have its actions in this regard materially interfere with the business activities of Tenant.

18.2 <u>Exhibition of Premises</u>. Tenant shall permit Landlord and its agents to enter and pass through the Premises at all reasonable hours to:

(a) Post notices of non-responsibility; and,

(b) Exhibit the Premises to holders of encumbrances and to prospective purchasers, mortgagees or lessees of the Center.

If during the last month of the Term, Tenant shall have removed substantially all of Tenant's property and personnel from the Premises, Landlord may enter the Premises and repair, alter and redecorate the same, without abatement of Rent and without liability to Tenant, and such acts shall have no effect on this Lease.

18.3 <u>Rights Reserved by Landlord.</u> Landlord reserves the following rights, exercisable without liability to Tenant for (i) damage or injury to property, person or business, (ii) causing an

RMCF-SDMS-000463

43

actual or constructive eviction from the Premises, or (iii) disturbing Tenant's use or possession of the Premises:

      (a)    To name the Center and to change the name or street address of the Center;

      (b)    To install and maintain all signs on the exterior and interior of the Center, except for Tenant identity signs. In this regard, Landlord shall not install signs on Tenant's storefront to the Premises, unless specifically required to do so under applicable law;

      (c)    To have pass keys to the Premises and all doors within the Premises, excluding Tenant's vaults and safes;

      (d)    To lease space in the Center to any individual or entity providing the same products and(or) services as Tenant, subject to the provisions of paragraph 8.1 herein;

      (e)    To grant to other lessees the exclusive right to sell goods and(or) services in the Center, so long as such exclusivity does not operate to the exclusion of any service or product previously provided and sold by Tenant.

    18.4    <u>Quiet Enjoyment.</u>  Tenant, upon paying the Rent and performing all of its obligations under this Lease, shall peaceably and quietly enjoy the Premises, subject to the terms of this Lease and to any mortgage, lease, or other agreement to which this Lease may be subordinate.

    18.5    <u>Force Majeure.</u>  Any prevention, delay or stoppage of work to be performed by Landlord or Tenant which is due to strikes, labor disputes, inability to obtain labor, materials, equipment or reasonable substitutes therefor, acts of God, governmental restrictions or regulations or controls, judicial orders, enemy or hostile government actions, civil commotion, fire or other casualty, or other causes beyond the reasonable control of the party obligated to perform hereunder, shall excuse performance of the work by that party for a period equal to the duration of that prevention, delay or stoppage. Nothing in this paragraph, however, shall excuse or delay Tenant's obligation to pay Rent or other charges under this Lease.

    18.6    <u>Signage and Storefront Control.</u>  Tenant shall not have the right to place, construct, or maintain on the glass panes or supports of the show windows of the Premises, the storefront, the doors, or the exterior walls or roof of the building in which the Premises are located or any interior portions of the Premises located within five (5) feet or less from the windows or doors of the Premises, any signs, advertisements, names, insignia, trademarks, descriptive materials, or any other similar items not consistent with the applicable portions of Exhibit "D" attached hereto without Landlord's prior written approval, which approval shall not be unreasonably withheld. Tenant shall be solely responsible for the cost of constructing and maintaining any signs which may be erected by it pursuant to this paragraph, and shall, in all cases, not erect a sign advertisement, names, insignia, trademarks, descriptive materials or any other similar items without first obtaining any and all necessary and required governmental and

RMCF-SDMS-000464

C:\WINDOWS\TEMP\Lease-Rocky Mountain Chocolate 02.doc

administrative permits and approvals. Tenant's signage shall be consistent with the balance of tenants in the Project and Landlord's city approved signage criteria and shall be subject to approval by Landlord and CCDC. Landlord shall have the right to remove any signs or other matter installed in contravention of this paragraph, without being liable to Tenant by reason of such removal, and to charge the cost of removal to Tenant as Rent hereunder, payable within twenty (20) days of written demand by Landlord.

18.7    Corporate Authority.  If Tenant is a corporation, each individual signing this Lease on behalf of Tenant represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of the corporation, and that this Lease is binding on Tenant in accordance with its terms. Tenant shall, at Landlord's request, deliver a certified copy of a resolution of its board of directors authorizing such execution.

18.8    Counterparts.  This Lease may be executed in multiple counterparts, all of which shall constitute one and the same Lease.

18.9    Execution of Lease. No Option.  The submission of this Lease to Tenant shall be for examination purposes only, and does not and shall not constitute a reservation of or option for Tenant to lease, or otherwise create any interest of Tenant in the Premises or any other premises within the Center. Execution of this Lease by Tenant and its return to Landlord shall not be binding on Landlord notwithstanding any time interval, until Landlord has in fact signed and delivered this Lease to Tenant.

18.10    Furnishing of Financial Statements; Tenant's Representations.  In order to induce Landlord to enter into this Lease Tenant agrees that it shall promptly furnish Landlord, from time to time, upon Landlord's written request, with financial statements reflecting Tenant's current financial condition, prepared in accordance with generally accepted accounting principals, consistently applied. If so requested by Landlord, Tenant shall provide Landlord with written backup to support such financial statements. Tenant shall not be required to provide such financial statements more often than twice each calendar year. Tenant represents and warrants that all financial statements, records and information furnished by Tenant to Landlord in connection with this Lease are true, correct and complete in all respects.

18.11    Further Assurances.  The parties agree to promptly sign all documents reasonably requested to give effect to the provisions of this Lease.

18.12    Mortgagee Protection.  Tenant agrees to send by certified or registered mail to any first deed of trust beneficiary of Landlord whose address has been furnished to Tenant, a copy of any notice of default served by Tenant on Landlord. If Landlord fails to cure such default within the time provided for in this Lease, such beneficiary shall have an additional thirty (30) days to cure such default; provided that if such default cannot reasonably be cured within that thirty (30) day period, then such beneficiary shall have such additional time to cure the default as is reasonably necessary under the circumstances.

RMCF-SDMS-000465

45

18.13   Expenses of Legal Action.   If either party incurs any expense, including reasonable attorneys' fees, in connection with any legal action instituted by either party by reason of any dispute under this Lease or any default or alleged default of the other party, the party prevailing in such action shall be entitled to recover its reasonable expenses from the other party.

18.14   Statements.   Tenant and Landlord each agree, at any time from time to time, within ten (10) days of receipt of written request from the other, to execute, acknowledge and deliver to the other a statement in writing certifying: (a) that this Lease is unmodified and in full force and effect or if there have been modifications, that this Lease is in full force and effect as modified and stating the modifications; (b) as to the Commencement Date and expiration date of the Term; (c) as to the dates to which the Rent and other charges hereunder have been paid in advance, if any; (d) as to the amount of the current Basic Monthly Rent; (e) as to the subleases or assignments, if any, applicable to the Lease; (f) whether or not, to the best knowledge of the party giving the statement, that the other party is in default in the performance of any covenant, agreement or condition contained in this Lease, and, if so, specifying each such default of which such party may have knowledge; and, (g) any other information reasonably requested by the other party.   Any such statement delivered pursuant to this paragraph may be relied upon by any prospective purchaser of the Center, or any mortgagee, ground lessor or other encumbrancer thereof, or by an assignee of any such encumbrancer.

18.15   Holding Over.   Any holding over after the expiration or termination of the Term of this Lease shall be construed to be a tenancy from month to month at a Basic Monthly Rent which shall be equal to one hundred fifty percent (150%) of the Basic Monthly Rent payable (without reduction) during the last month of the Term.

18.16   Notices.   All notices, which Landlord or Tenant may be required or may desire to serve on the other shall be in writing and shall be served by personal delivery, by telecopy or by mailing the same by registered or certified mail, postage prepaid, addressed as set forth in the Basic Lease Provisions or addressed to such other address or addresses as either Landlord or Tenant may from time to time designate to the other in writing in accordance with this Article. Any notice so given by telecopy as provided above shall be deemed effectively given when sent. Any notice so given by mail as provided above shall be deemed effectively given seventy-two (72) hours after deposit in the mail as provided above, unless received earlier by the addressee. Any notice served by personal delivery shall be deemed effectively given when delivered at the party's address.

18.17   Merchants Association.   Tenant covenants and agrees to become and remain a member in good standing of any Merchants Association now existing or which may hereafter be organized for the Center ("Association"). Tenant agrees to abide by the rules and regulations thereof, to use Tenant's best efforts to develop within the Association an effective promotional and public relations policy, and to join with other tenants in such joint promotional sales campaigns as may be put on by the Association. Tenant further agrees to pay such dues as are established by a majority vote of the members of the Association. In the event Tenant fails to pay when due any amount required under this paragraph said sum shall be collectible by

RMCF-SDMS-000466

- 46 -

Landlord as additional rent. Failure of any other Tenant in the Center to become or remain a member in good standing of the Association shall not in any way release Tenant from its obligations hereunder, such obligations being a separate and independent covenant of this Lease.

18.18  _Rules and Regulations._ Tenant agrees to abide by and comply with the Rules and Regulations attached hereto as Exhibit "D". In the event of any inconsistencies between this Lease and the Rules and Regulations, the language of this Lease shall prevail. Landlord shall have the right from time to time to make non-discriminatory modifications to the Rules and Regulations as Landlord deems appropriate, and Landlord shall give notice to Tenant of the Rules and Regulations as they may exist from time to time. Landlord shall not be liable or responsible to Tenant for the violation by any other tenant or occupant of the Center of any Rules and Regulations. Tenant shall indemnify, defend and save Landlord, its successors and assigns, harmless from and against any and all claims, demands, actions, causes of action, losses, liabilities, damages, rights or expenses, including, without limitation, attorneys' fees and costs, arising directly or indirectly out of or in connection with Tenant's breach of the Rules and Regulations.

18.19  _Governing Laws; Venue._ This Lease shall be governed by and construed in accordance with the laws of the State of California. Sole and proper venue for any action to enforce or interpret the provisions and conditions of this Lease shall be in San Diego, California.

18.20  _Heading and Titles._ The marginal titles to the Articles of this Lease are inserted for convenience of reference only and shall have no effect upon the construction or interpretation of any part hereof.

18.21  _Heirs and Assigns._ Subject to the limitations on assignment, subletting and transfers, this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

18.22  _Time of Essence._ Time is of the essence with respect to the performance of every provision of this Lease.

18.23  _Severability._ If any condition or provision of this Lease shall be held invalid or unenforceable to any extent under any applicable law or by any court of competent jurisdiction, the remainder of this Lease shall not be affected thereby, and each condition and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

18.24  _Triple Net Lease._ This Lease shall be deemed and construed to be a "triple net lease" and, except as herein expressly provided, Landlord shall receive all payments required to be made by Tenant free from all charges, assessments, impositions, expenses, offsets or deductions of any and every kind or nature whatsoever. Except as otherwise specifically required herein, Landlord shall not be required to furnish any services or facilities or to make any repairs, replacements, or alterations of any kind in or on the Premises.

RMCF-SDMS-000467

47

18.25  Radius.  Neither Tenant nor any Person who controls or is controlled by Tenant, or any Person in which Tenant has an interest, shall own, operate or have any interest in any gallery and gift store of any type within a radius of three (3) miles in any direction from the closest boundary of the Center during the Term of this Lease.  As used herein, the word "Person" means any natural person or persons in individual or representative capacities and any entity or entities of any kind whatsoever, including, without limitation, corporations, limited liability companies, partnerships and associations, or any combination of persons and entities; the word "in control" means ownership of 25% or more of any person.  Without limiting Landlord's remedies, and in addition to all other remedies at law or equity otherwise available to Landlord, in the event Tenant should violate this covenant, Landlord may, at its option and for so long as such other business is operating, include the Gross Sales of such other business in the Gross Sales transacted from the Premises for the purpose of computing Percentage Rent due hereunder.  Landlord shall have the right to audit the books and records of Tenant for such other business in the same manner and as provided herein.

18.26  Refuse Collection.  Landlord may, at its sole option, either:  (a) require a uniform system of refuse collection to be followed by some or all tenants/occupants in the Center, in which case Tenant shall comply with all requirements set by Landlord including the color, size and placement of trash collection bins; or (b) arrange for refuse collection services to be rendered by an independent contractor or by Landlord.  Tenant shall pay for such refuse collection either directly to the independent contractor, to Landlord, or as Landlord shall direct.  Landlord shall have the right to require Tenant to join in a common refuse collection system; the failure of Tenant to comply shall be a default hereunder.

18.27  Reciprocal Easement and Operating Agreement.  If the Center is subdivided and Master Association created ("Master Association") with reciprocal easements and other covenants ("REA") to which the Center and(or) the Premises are made subject, the REA may set forth various easements relating to the Project, including the Premises.  The REA may additionally provide for and govern the co-existence of the various component portions of the Project including the hotel, commercial areas and Common Facilities within the Center.  This Lease and Tenant's rights hereunder may be made subject and subordinate to the provisions of the REA and all amendments and modifications thereto.  By executing this Lease, Tenant acknowledges its agreement to abide by and be bound by all of the terms, provisions, and conditions set forth in such an REA after receipt of a copy of the REA.  To the extent of any conflict between the terms, provisions, and conditions of this Lease and the terms, provisions, and conditions of such an REA and all amendments and modifications thereto, the terms, provisions, and conditions of the REA and all amendments and modifications thereto shall control.  If the Master Association is charged with the management of the Center and(or) the Common Facilities of the Project, assessments may be levied by the Master Association.  During the Term, Tenant agrees to pay, as part of the Operating Expenses, its pro rata share of any Master Association assessment levied against the Landlord, the Center, Common Facilities or Premises ("Allocation").  All references in the Lease to the Master Association shall be deemed applicable only in the event the Center becomes subject to the jurisdiction of the described Master Association.  If the Master Association is not formed during the Term, or if the Premises

RMCF-SDMS-000468

48

are not subject to the jurisdiction of such Master Association, notwithstanding the references herein to the Association, Tenant shall not be obligated to pay Master Association assessments.

18.28   Master Association.   The Master Association may be made the entity responsible for management and maintenance of all or a portion of the Center.  The terms, provisions, and conditions upon which such management and maintenance may be undertaken may be set forth a Declaration of Covenants, Conditions and Restrictions, to be recorded in the Official Records of San Diego County, California ("Declaration").  This Lease, as well as Tenant's rights under this Lease, will be subject and subordinate to the terms, provisions, and conditions set forth in any Declaration.  By execution of this Lease, Tenant acknowledges its agreement to abide by and be bound by the terms, provisions, and conditions set forth in the Declaration upon notice thereof and receipt of a copy of the Declaration.  To the extent of any conflict between the terms, provisions, and conditions of this Lease and the terms, provisions, and conditions of the Declaration, the terms, provisions, and conditions of the Declaration shall control.

18.29   No Material Improvement.   Landlord agrees that the REA and Declaration, as recorded by Landlord, shall not materially, adversely impair the rights of Tenant hereunder.

18.30   Brokers.   Landlord shall be solely responsible for the payment of brokerage commissions to the entities specified in Item 10 of the Basic Lease Provisions.  Except for the payment by Landlord of said commissions, Landlord and Tenant each warrant and represent to each other that there are no other commissions or finder's fees payable with respect to the transaction set forth herein.  Landlord and Tenant shall each indemnify, defend and hold the other harmless from all claims, demands, liabilities and expenses (including attorneys' fees and costs) arising out of a claim that the indemnifying parties actions resulted in a claim for a commission or finder's fee with respect to the transaction set forth herein.

18.31   No Light, Air or View Easement.   Any diminution or shutting off of light, air or view by any structure which may be erected on lands adjacent to the Center shall not in any way affect this Lease or impose any liability on Landlord.

18.32   Entire Agreement.   This Lease, along with any Exhibits affixed hereto, supercedes the letter of intent dated August 12, 2003, and all prior agreements and negotiations between Landlord and Tenant, and constitutes the entire and exclusive agreement between Landlord and Tenant relative to the Premises.

18.33   Recording.   Tenant shall not record this Lease.

18.34   Joint and Several Liability.   If there shall be more than one Tenant, then the obligations hereunder imposed upon Tenant shall be joint and several.

18.35   Waiver.   No act or action by Landlord, including the acceptance of rent after its due date, shall be construed as a waiver by Landlord of its right to require the strict and punctual performance of this Lease by Tenant.  A waiver shall only be effective hereunder if the waiver is in writing.

RMCF-SDMS-000469

18.36  <u>Confidentiality.</u>  The provisions of this Lease are strictly confidential.  The parties shall not disclose the provisions of this Lease to any person not a party to this Lease, except for disclosures required by law and disclosures to their respective financial, legal and space planning consultants.

18.37  <u>Exhibits.</u>  Each of the following Exhibits are attached hereto and incorporated herein by this reference.

<u>Exhibit "A"</u> - Center Description

<u>Exhibit "B"</u> - Premises Description

<u>Exhibit "C"</u> – Guaranty of Lease

<u>Exhibit "D"</u> - Rules and Regulations

**LANDLORD:**    S.D. BRIDGEWORKS LLC,
                 a Delaware limited liability company

        By:    Harbor Fifth Associates,
               a California general partnership
               Its:    Managing Member

                By:    S.D. Malkin San Diego Partners, L.P.,
                       a California limited partnership
                Its:   General Partner

                        By:    S.D. Malkin/San Diego, Inc.,
                               a California corporation
                        Its:   Managing General Partner

                                By:    _____

                                       Jeremy Z. Cohen
                                       Vice President and Treasurer

**TENANT:**    _____ INC.,
               a California corporation

        By:    _____
        Name:  _____
        Its:   _____

        By:    _____
        Name:  _____
        Its:   _____

50

RMCF-SDMS-000470

C:\WINDOWS\TEMP\Lease-Rocky Mountain Chocolate 02.doc

RMCF-SDMS-000471

EXHIBIT "A"

DESCRIPTION OF CENTER

RMCF-SDMS-000472

1

EXHIBIT "B"

DESCRIPTION OF PREMISES

RMCF-SDMS-000473

1

EXHIBIT "C"

GUARANTY OF LEASE

RMCF-SDMS-000474

1

# EXHIBIT "D"

## RULES AND REGULATIONS

2

RMCF-SDMS-000475

C:\WINDOWS\TEMP\Lease-Rocky Mountain Chocolate 02.doc

## EXHIBIT "C"

## GUARANTY OF LEASE

1.      For purposes of this Guaranty of Lease ("Guaranty"), the following terms shall be defined as follows:

Landlord:       S.D. Bridgeworks LLC, a Delaware limited liability company

Tenant:         _____, Inc.

Lease:          That certain Commercial Lease dated _____, 2003 ("Lease") between Landlord and Tenant with regard to the premises located in the Bridgeworks project on Fifth Avenue and K Street in downtown San Diego, California.

2.      In consideration of the execution of the Lease, the undersigned, Thomas Andersen and Kenneth Pecus (collectively, "Guarantor"), hereby unconditionally guarantees to Landlord, its successors and assigns, (a) the prompt payment by Tenant of all rent and other sums due under the Lease (during the initial term or any extension thereof), (b) the faithful performance by Tenant of all terms, covenants, and conditions contained in the Lease (during the initial term or any extension thereof), and (c) to indemnify and save harmless Landlord from any and all loss, costs or damages arising out of any failure by Tenant to fully perform under the Lease (during the initial term or any extension thereof) including, without limitation, attorneys' fees and costs. This Guaranty is a continuing guaranty of payment and performance and is not conditioned or contingent upon any attempt to collect from Tenant or upon any other condition or contingency.

3.      Guarantor acknowledges that it has a financial interest in Tenant, and that Landlord's agreement to execute the Lease constitutes good and valuable consideration to Guarantor.

4.      If Guarantor is more than one person, Guarantor's obligations shall be joint and several and are independent of Tenant's obligations. A separate action may be brought against any Guarantor whether the action is brought or prosecuted against any other Guarantor or Tenant, or all, or whether any other Guarantor or Tenant are joined in the action.

5.      Guarantor waives the benefit of any statute of limitations affecting the obligations or liability of Tenant under the Lease and (or) Guarantor's obligations or liability under this Guaranty.

6.      The provisions of the Lease may be changed by agreement between Landlord and Tenant at any time, or by course of conduct, without the consent of and without notice to Guarantor. This Guaranty shall guarantee the payment and

RMCF-SDMS-000476

performance of the Lease as changed or modified from time to time. An assignment of the Lease (as permitted by the Lease) shall not affect this Guaranty.

7.     This Guaranty shall not be affected by Landlord's waiver, failure, or delay to enforce any of its rights.

8.     If Tenant defaults under the Lease, Landlord shall have the right to proceed immediately against Guarantor or Tenant, or both, and Landlord shall have the right to enforce against Guarantor or Tenant, or both, any rights that it has under the Lease, or pursuant to applicable laws. If the Lease terminates and Landlord has any rights it can enforce against Tenant after termination, Landlord shall have the right to enforce those rights against Guarantor without giving prior notice to Tenant or Guarantor, and without making any demand on either of them.

9.     Guarantor waives the right to require Landlord to (a) proceed against Tenant, (b) proceed against or exhaust any security that Landlord may have, or (c) pursue any other remedy within Landlord's power. Guarantor waives any defense which may exist by reason of any disability of Tenant or based on Tenant not being liable for obligations under the Lease for any reason, and waives any other defense based on the termination of Tenant's liability from any cause. Until all of Tenant's obligations to Landlord have been discharged in full, Guarantor shall have no right of subrogation against Tenant. Guarantor waives any and all presentments, demand for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty, and waives all notices of the existence, creation, or incurring of new or additional obligations.

10.     Guarantor hereby expressly waives (a) any right of setoff, counterclaim or deduction against amounts due under this Guaranty; (b) notice of the acceptance of this Guaranty and notice of default of Tenant under the Lease; and (c) the right to interpose all substantive and procedural defenses of the law of guaranty, indemnification and suretyship, except the defenses of prior payment or prior performance.

11.     Without limiting the generality of the foregoing, the liability of Guarantor under this Guaranty shall not be deemed to have been waived, released, discharged, impaired or affected by (a) reason of any waiver or failure to enforce or delay in enforcing any of Tenant's obligations, (b) the granting of any indulgence or extension of time to Tenant, (c) the assignment of the Lease, or the subletting of the Premises by Tenant, with or without Landlord's consent, (d) the expiration of the Term (as the same may be extended), (e) if Tenant holds over beyond the Term of the Lease, (f) any merger or reorganization or the release or discharge of Tenant or any other guarantor in any voluntary or involuntary receivership, bankruptcy, winding-up or other creditors' proceedings, (g) the rejection, disaffirmance or disclaimer of the Lease by any party in any action or proceeding, (h) the release of any collateral held for the obligations of Tenant under the Lease or release of any Guarantor or any other guarantor, (i) any defect or invalidity of the Lease, (j) the transfer by Guarantor of any or all of the capital stock of Tenant and shall continue with respect to the periods prior thereto and thereafter. The liability of the Guarantor shall not be affected by any repossession, re-entry or reletting of

RMCF-SDMS-000477

2

the Premises by Landlord; provided, however, that the net payments received by Landlord after deducting all costs and expenses of repossession and(or) reletting the same (including, without limitation, any attorneys' fees, brokerage fees and any reasonable costs or expenses incurred in redecorating, remodeling, or altering the Premises for reletting), shall be credited from time to time by Landlord to the account of Tenant and Guarantor and Guarantor shall pay any balance owing to Landlord from time to time, immediately upon being given written notice of demand by Landlord in the manner for providing notice set forth in the Lease.

12.    All rights and remedies of Landlord under this Guaranty shall be cumulative and may be exercised singly or concurrently.

13.    If Landlord disposes of its interest in the Lease, "Landlord", as used in this Guaranty, shall mean Landlord's successor or assign.

14.    If Landlord engages legal counsel to enforce Guarantor's obligations under this Guaranty or the Lease or otherwise resorts to legal proceedings, Guarantor shall pay to Landlord all costs incurred, including without limitation attorneys' and expert's costs and fees.

15.    Guarantor's obligations under this Guaranty shall be binding on Guarantor's successors.

16.    This Guaranty shall be governed by and construed in accordance with the laws of the State of California.  Sole and proper venue for any action to enforce or interpret the provisions and conditions of this Guaranty shall be in San Diego, California.

17.    Time is of the essence with respect to the performance of every provision of this Guaranty.

18.    Any capitalized term not specifically defined herein shall have the meaning otherwise ascribed thereto in the Lease.

Dated:_____, 2003    _____

Thomas Andersen


_____

Kenneth Pecus

RMCF-SDMS-000478

3