You must purchase all of the Factory Candy, ingredients for Store Candy and other Items that you sell at or through your Store from us or a source we designate. If you propose to offer, conduct or utilize any products, services, materials, forms, items or supplies for sale or use in your Store which we have not previously approved as meeting our specifications, you must first notify us in writing requesting our approval. We may, in our sole discretion, and for any reason, withhold our approval. For us to make a determination, you must submit specifications, information, or samples of the proposed products and services. We will advise you within 60 days whether the products or services meet our specifications.

You must purchase all products and services that you require to operate your Store from manufacturers or suppliers we designate. We are the designated supplier of ROCKY MOUNTAIN CHOCOLATE FACTORY branded Factory Candy. First-time franchisees must use one of our designated fixture contractors for the build-out of their Stores and we reserve the right to require experienced franchisees to use a designated contractor as well. If there is no designated supplier for a particular item, you must purchase all products and services from other suppliers who meet all of our specifications and standards. We formulate and modify our specifications and standards based on quality, composition, finish, appearance and service. Suppliers must adequately demonstrate their capacity to supply your needs, in the quantities, at the times and with the reliability requisite to an efficient operation. We may change our standards and specifications, or suppliers who have our authorization, at any time if we give you 30 days written notice in advance.

Our criteria for supplier approval are available to you upon request. We base our approval on quality, vendor reputation, pricing and our opinion about the compatibility of the product with our company image and product line. We may require that samples from a proposed new supplier be delivered to us for testing before we approve the supplier. You must reimburse us for the cost of conducting the test.

We derive revenue from the sale of Factory Candy, Store Candy ingredients, packaging materials, other Items and certain services to you. In the fiscal year ended February 28, 2003, our revenue from purchases from franchisees was $11,854,800 or 61% of our total revenues of $19,461,472. See our financial statements in Item 21. We estimate that the costs of your purchases from designated or approved sources, or according to our standards and specifications will range from 80% to 84% of the total cost of establishing your Store and approximately 38% of the total cost of operating your Store after that time. We are not affiliated with any approved or designated suppliers.

Except as described above, we do not derive income based on any required purchases or leases, except that in an effort to make sources or supplies available to you and to monitor and maintain consistency throughout the system, we may negotiate with approved vendors from whom you can purchase items which meet our specifications. We may collect a fee from approved vendors on the items franchisees purchase from our approved vendors. These vendors may sell you various Items, raw materials for the preparation of Store Candy, such as fudge, brittles and caramel, packaging items such as bags and tins, and other items. We estimate that any purchases by you for which we collect a fee will constitute less than 3% of your total cost of establishing your Store and less than 3% of your total cost of operating your Store.

Except as described above, we do not negotiate purchase arrangements with suppliers for the benefit of franchisees, although we reserve the right to do so in the future. We have no purchasing or distribution cooperatives. We do not give you any material benefits based on your use of designated or approved sources or suppliers.

(CA 6/1/03)     12

# ITEM 9

## FRANCHISEE'S OBLIGATIONS

THIS TABLE LISTS YOUR PRINCIPAL OBLIGATIONS UNDER THE FRANCHISE AGREEMENT. IT WILL HELP YOU FIND MORE DETAILED INFORMATION ABOUT YOUR OBLIGATIONS IN THE FRANCHISE AGREEMENT AND IN OTHER ITEMS OF THIS OFFERING CIRCULAR.

| Obligation | Section in Franchise Agreement | Item in Offering Circular |
|---|---|---|
| (a) Site selection and acquisition/lease | Sections 3.1 and 5.1 | Items 7, 8 and 11 |
| (b) Pre-opening purchases/leases | Sections 5.1, 5.3 and 5.4 | Items 5, 7 and 8 |
| (c) Site development and other pre-opening requirements | Sections 5.2 and 5.5 | Items 7, 8 and 11 |
| (d) Initial and ongoing training | Article 6 | Items 6, 7 and 11 |
| (e) Opening | Section 5.6 | Item 11 |
| (f) Fees | Articles 11 and 12 | Items 5 and 6 |
| (g) Compliance with standards and policies/ Operations Manual | Article 8 and Sections 13.1 and 13.2 | Items 8, 11, 14, 15 and 16 |
| (h) Trademarks and proprietary information | Article 14 and Section 20.3 | Items 13 and 14 |
| (i) Restrictions on products/services offered | Sections 10.1(d) and 13.4 | Items 8 and 16 |
| (j) Warranty and customer service requirements | None | None |
| (k) Territorial development and sales quotas | None | None |
| (l) On-going product/service purchases | Sections 13.5, 13.6 and 13.7 | Items 8 and 16 |
| (m) Maintenance, appearance and remodeling requirements | Sections 10.1(a), (b) and (g) | Item 8 |
| (n) Insurance | Article 21 | Item 7 |
| (o) Advertising | Article 12 | Items 6 and 11 |
| (p) Indemnification | Section 19.3 | None |
| (q) Owner's participation/management/ staffing | Sections 10.1(c) and (h) | Item 15 |
| (r) Records and reports | Article 15 | Item 6 |
| (s) Inspections/audits | Sections 13.3 and 15.5 | Item 6 |
| (t) Transfer | Article 16 | Item 17 |
| (u) Renewal | Sections 17.2, 17.3 and 17.4 | Item 17 |
| (v) Post-termination obligations | Section 18.4 | Item 17 |
| (w) Non-competition covenants | Article 20 | Item 17 |

(CA 6/1/03)  13

| Obligation | Section in Franchise Agreement | Item in Offering Circular |
|---|---|---|
| (x) Dispute Resolution | Article 22 | Item 17 |

## ITEM 10

## FINANCING

If a landlord refuses to allow you to sign a lease and instead requires us to sign or guaranty the lease for your Franchised Location, we may sign it, in our discretion. If we become liable under the lease for your Franchised Location, we will either sublease the Franchised Location to you or assign it to you on the same terms and conditions contained in the landlord's lease agreement. Our Sublease Agreement and Assignment and Assumption of Lease are <u>Exhibit G</u> to this Offering Circular. We do not receive any payments when we sign or guaranty a lease for your Franchised Location.

During fiscal year 2004, we may offer some limited financing for build-out expenses to a few of our highly experienced franchisees. Except as stated above, neither we nor any agent or affiliate currently offer, directly or indirectly, any financing to you, nor do we guarantee any lease or other obligations for you. We cannot estimate whether you can obtain financing for any part or all of your investment and, if so, the terms of the financing, which depend on your creditworthiness and other characteristics. We do not have any past or present practice or intention to sell, assign or discount to any third party, any note, contract or other instrument signed by you.

## ITEM 11

## FRANCHISOR'S OBLIGATIONS

Except as listed below, we need not provide any assistance to you.

**Pre-Opening Assistance**.

Before you open your Store, we (or our designee) will:

1. Provide you with written guidelines for the Franchised Location, but you must have an approved location as of the date you sign the Franchise Agreement. We base our approval of a proposed Franchised Location on information you submit and information we gather in a form sufficient to assess the location. (Section 7.1(b), Franchise Agreement.)

2. Provide you with advice regarding the required conversion, design and decoration of the ROCKY MOUNTAIN CHOCOLATE FACTORY Store premises, plus specifications concerning signs, decor and equipment. (Section 7.1(c), Franchise Agreement.)

3. Provide you with advice regarding the selection of suppliers of equipment, supplies and materials used and Factory Candy, Store Candy and Items offered for sale through your ROCKY MOUNTAIN CHOCOLATE FACTORY Store. Depending on the size and configuration of your Store, we will determine your initial purchase of Factory Candy inventory. We provide you with a list of approved suppliers, if any, of equipment, supplies, materials, ingredients for Store Candy and Items, and,

(CA 6/1/03)  14

if available, a description of any national or central purchase and supply agreements that approved suppliers offer for the benefit of ROCKY MOUNTAIN CHOCOLATE FACTORY franchisees. (Section 7.1(d), Franchise Agreement.)

      4.    Train you in Durango, Colorado or at another location we designate. (Section 7.1(a), Franchise Agreement.)

      5.    Loan you one copy of an Operations Manual, covering the operating and marketing techniques of the Store and all updates and revisions. (Section 8.1, Franchise Agreement.)

      6.    Provide up to five days of opening assistance, beginning approximately two days before you open a new ROCKY MOUNTAIN CHOCOLATE FACTORY Store, or we provide up to two days of opening assistance if you purchase a Store that was already operating. (Section 7.1(f), Franchise Agreement.)

**Continuing Assistance**.

    During the operation of your Store, we will:

      1.    If you request, provide consultation by telephone regarding the continued operation and management of your ROCKY MOUNTAIN CHOCOLATE FACTORY Store and advice regarding retail services, product quality control, inventory issues, customer relations and similar advice. (Section 9.1(a), Franchise Agreement.)

      2.    Give you access to advertising and promotional materials as we may develop, the cost of which we may pass on to you at our option. (Section 9.1(b), Franchise Agreement.)

      3.    Provide you with on-going updates of information and programs regarding the candy industry, the ROCKY MOUNTAIN CHOCOLATE FACTORY concept and related Licensed Methods, including information about special or new products we develop and make available to our franchisees. (Section 9.1(c), Franchise Agreement.)

      4.    Train replacement or additional General Managers during the term of the Franchise Agreement. We may charge a tuition or fee, commensurate with our other current published prices, for training and payable in advance. You must pay all travel and living expenses for your personnel during the training program. The availability of the training programs depends on space considerations and prior commitments to new ROCKY MOUNTAIN CHOCOLATE FACTORY franchisees. (Section 9.1(d), Franchise Agreement.)

      5.    Make our employees or designated agents available to you for advice and assistance regarding the on-going operation of the Store. If you request additional assistance and we agree to provide it, we may charge you for all travel, lodging, living expenses, telephone charges and other identifiable expenses associated with the assistance, plus a fee based on the salary of each employee and the time spent by each employee on your behalf. (Section 9.2, Franchise Agreement.)

**Marketing and Promotion.**

    You must pay a Marketing and Promotion Fee of 1% of your monthly Gross Retail Sales. You must pay the Marketing and Promotion Fee with the payment of the monthly Royalty, within 15 days after the end of each calendar month, based on the amount of Gross Retail Sales in the previous month. We deposit the Marketing and Promotion Fee in a bank, commercial account or savings account

(CA 6/1/03)          15

("**Marketing Fund**"). We contribute 1% of the monthly Gross Retail Sales of our Stores to the Marketing Fund. If you request it in writing, we send you an annual unaudited financial statement for the Marketing Fund that indicates how we spent the Marketing Fund. Because we do not have the Fund audited, audited financial statements are not available to franchisees.

We administer the Marketing Fund in our sole discretion. We use the Marketing Fund to create, produce and place point of purchase advertising, in-store signs and in-store promotions. In the future, we may use the Marketing Fund for commercial advertising, agency costs and commissions, to create and produce video, audio, and written advertisements, to administer multi-regional advertising programs, including direct mail and other media advertising and to employ advertising agencies and in-house staff assistance, to support public relations, market research and other advertising and marketing activities. We do not solicit franchisees with the Fund's money.

We may reimburse ourselves from the Marketing Fund for administrative costs, salaries and overhead expenses related to the administration of the Marketing Fund and its marketing programs, including conducting market research, preparing material, collecting and accounting for Marketing Fund contributions. In any fiscal year we may spend an amount greater or less than the aggregate contribution of all ROCKY MOUNTAIN CHOCOLATE FACTORY Stores to the Marketing Fund in that year. The Marketing Fund may borrow from us or other lenders to cover deficits or cause the Marketing Fund to invest any surplus for future use. Any amounts that remain in the Marketing Fund at the end of each year accrue and we apply them toward the next year's expenses. We do not guarantee that advertising expenditures from the Marketing Fund benefit you or any other franchisee directly or on a pro rata basis. We assume no other direct or indirect liability or obligation to you for collecting amounts due to any advertising account or for maintaining, directing or administering any advertising account.

We have used in-house personnel and outside ad agencies in the past to create point-of-purchase advertising and promotions.

You may create your own advertising and promotional materials; however, all of your materials must be in media, of a type and in a format as we approve, must be conducted in a dignified manner and must conform to the standards and requirements we specify. This also applies to all advertising on the Internet. You may not use any advertising or promotional plans or materials, including advertising on the Internet, until you receive our written approval. We approve or disapprove of your proposed advertising within 14 days of the date we receive it.

In fiscal year 2003, we spent 70% of the Fund's proceeds on national marketing, 26% on new products and packaging development and 17% on local store marketing materials. These percentages total 113% because RMCF contributed 13% more than the franchisees contributed to the Fund during fiscal year 2003.

**Local Advertising.**

We may require you to spend up to 1% of Gross Retail Sales each month on local advertising in addition to the 1% Marketing and Promotion Fee. If we require it, you must give us an accounting of the amounts you spent on local advertising within 30 days following the end of each calendar quarter. If we require you to spend money on local advertising, all company-owned Stores would spend money for local advertising on an equal percentage basis with all franchised Stores. You may purchase local advertising separately through local marketing and media sources within a geographical area. Local advertising is your responsibility. We must approve all final advertising and promotional materials before publication.

(CA 6/1/03)    16

**Regional Advertising.**

We reserve the right to designate geographic areas to establish regional advertising associations ("Associations"). If your Store is within the territory of an existing Association when your Store opens, you must become a member of the Association. If we establish an Association during the term of the Franchise Agreement, you must become a member within 30 days after we establish the Association. If you fail to participate in the Association or pay any Association dues, you breach the Franchise Agreement. We must approve all final advertising and promotion materials before publication. At the request of the Association, you would contribute up to 50% of your 1% Marketing and Promotion Fee described in this Item 11, as would all other franchises in the Association. These funds would be available for specific programs selected by the majority of the Association members and which we have approved in advance. If we form an Association, you will be bound by the decisions of the majority of the members of the Association with respect to expenditures, assessments and dues, to the extent we approve them. Each Association could require its members to make additional minimum contributions to the Association monthly up to the full amount of your Marketing and Promotion Fee. We would approve all advertising materials before they were used by an Association or furnished to its members. The Association would be required to prepare unaudited annual financial statements and send them to you if you request them. An Association would be comprised of franchisees. We can form, change and dissolve Associations. Each Association would operate under written documents which franchisees could view. Either we or the Association could create the Association's advertising, but advertising created by the Association would be required to have our written approval before use. We also reserve the right to establish advertising cooperatives in particular regions to enable the cooperative to self-administer a regional advertising program. If we establish a cooperative, you must participate in it.

See Items 6, 8 and 9 of this Offering Circular for more discussion of advertising.

**Operations Manual.**

Exhibit F to this Offering Circular are the tables of contents of our Operations Manual. The total number of pages in our Operations Manual as of the date of this Offering Circular is 250.

**Site Selection Assistance.**

You must select and acquire the premises for your Store. You must not, without our prior written approval, enter into any contract for the purchase or lease of any premises you intend to use as a Franchised Location for your Store. At our option, we may sign the lease or other acquisition document in our name or jointly with you. If this happens, we may sublease or assign the premises to you on the same terms on which we acquired the right to use the premises. Our Sublease Agreement and Assignment and Assumption of Lease are Exhibit H to this Offering Circular. We consider the following factors when we approve or disapprove your proposed Franchised Location: the coordination of the proposed Franchised Location's address with protected territories previously granted to other franchisees operating under the ROCKY MOUNTAIN CHOCOLATE FACTORY Mark, if any, mall character, quality and location and the nature and location of other competition and potential customers. Approval of a location does not infer or guarantee the success or profitability of a Franchised Location in any manner. There is no contractual limit on the time it takes us to approve or disapprove your proposed site. We typically take 30 days to approve or disapprove of your proposed Franchised Location.

**Schedule For Opening.**

We estimate that the typical length of time between the date you sign the Franchise Agreement and the date your Store opens will be between 90 and 180 days. The factors which may affect this time

(CA 6/1/03)                                    17

**194**

period are your ability to locate a site, secure financing, and obtain a lease, the extent to which you must upgrade or remodel an existing location, the delivery schedule for equipment, inventory and supplies, and completing your training. You must open your Store within 180 days after you sign the Franchise Agreement.

**Integrated Store Information System.**

You must use an integrated store information system ("**System**") in your Store that you must purchase from AIM Software Systems Incorporated ("**AIM**"), located at 656 Santa Rosa, Suite 2A, San Luis Obispo, California 93401, (805) 546-2900. As of the date of this Offering Circular, the System consists of an electronic PC based register (either an NCR 7460 cash register or a Dell 510D PC), FTP Store Communication software, PC/Anywhere, a thermal receipt printer, a scale, and a 56K (minimum) modem. At your option, the System may include credit card authorization software, a credit card scanner, a laser bar code scanner, a bar code printer and a Hewlett Packard Deskjet printer. You must dedicate one phone line to the System. You must contract with an Internet service provider ("**ISP**") to facilitate communication between your System and our data collection server. The System will be delivered to you already configured with proprietary software owned by AIM. AIM will provide all support, updates and maintenance for your System. As of the date of this Offering Circular, AIM charges an annual support fee of between $1,105 and $1,972, depending on the System options you have selected. You must purchase a support agreement with AIM. Most Stores require two cash registers. We may require you to upgrade or update your System. No contractual limitation exists on the frequency or cost of this obligation.

The System provides you with detailed information about your inventory, sales, purchasing, receiving, time and attendance, depending on options selected. The System also permits us to receive information electronically regarding your Store's sales. There is no contractual limit on our right to receive information through the System.

In conjunction with the operation of your System, you must use an IBM-compatible personal computer installed with Windows 98 operating system or higher. You will find it is more convenient to send and receive electronic mail messages and depending on options you select, track information generated by the System on a personal computer.

**Additional Training Information.**

After you sign the Franchise Agreement and before you open your Store, you must complete the initial training program to our satisfaction. We do not charge you for this training for up to three individuals, although you must pay travel, living expenses and wages for you and all employees who attend the training session. The initial training program consists of a total of 7 days of instruction and all training is currently conducted in Durango, Colorado. The training material consists of written, video and audiotaped instruction. The initial training program includes hands-on training in a mock retail store in our training center.

As often as annually, we may require you and/or your General Manager to attend, at your expense, a national, regional or local meeting, seminar or conference that we present for the purpose of discussing a topic such as advertising programs, new operations methods, training, management, sales, or sales promotion, to the extent that we offer any meetings, seminars or conferences.

As of our most recent fiscal year end, we gave the following initial training to franchisees.

(CA 6/1/03)                                    18

| Subject[1] | Hours of Classroom Training[2] | Instructor |
|---|---|---|
| Introduction to Rocky Mountain Chocolate Factory | 1.5 | VP or Director of Franchise Support |
| Customer Service Techniques | 1 | Director of Franchise Support |
| Factory Candy Identification | 1.5 - 2.0 | Director of Franchise Support |
| Chocolate Dipping Technique | 2-3 | Director of Franchise Support |
| Cash Register and Scale Operation | 2 | Director of Franchise Support |
| Cooking | 20 | Director of Franchise Support |
| Design and Construction | 0.5 | Design & Construction |
| Employees (responsibilities, opening and closing dates) | 1 | Director of Franchise Support |
| Employees (hiring, training, scheduling) | 1.5 | Director of Franchise Support |
| Daily Bookkeeping, Month-end Inventory and Other Bookkeeping Methods to Increase Gross Margins | 2 | Director of Franchise Support |
| Our Accounting Policies | 1 | Various Finance Personnel |
| Our Factory Candy Manufacturers and Shipping | 3 (in factory) | Various Factory Department Heads |
| Our Ordering and Shipping Procedures | 1 | Customer Service |
| Authorized and Recommended Outside Suppliers | 1 | Director of Franchise Support |
| Merchandising and Marketing Techniques | 6.5 | Merchandising Manager |
| Our Philosophy, Franchisor/Franchisee Responsibilities | 1 | Various members of Management |
| Integrated Store Information System | 3 | Various IT Personnel |

[1]     For each subject, we hold training classes approximately 6 to 12 times per year. You must attend training after you sign the Franchise Agreement and before you open your Store.

[2]     If you wish, you may work in a company-owned Store at your expense to gain experience interacting directly with actual customers. If you live near a company-owned Store, you may spend up to three days in that Store; otherwise you may travel to one of our company-owned Stores at your expense for one day. In addition, many experienced franchisees allow new franchisees to work in their Stores at no charge after the new franchisee has completed the initial training program.

## ITEM 12

## TERRITORY

You will operate your Store at a specific location that is referred to as the "**Franchised Location**" in the Franchise Agreement. You may not relocate your Franchised Location without our prior written approval. If you have operated your Store for at least 12 months and you desire to change its Franchised

(CA 6/1/03)                                         19

Location, you may send us a written request explaining your reasons and proposing an alternative location. If we approve an alternative location in writing, you must pay us a Design Fee of $2,500 (see Item 6), sign our then current form of Franchise Agreement, you may not change the owners or your percentage ownership interests from that of the prior location and you must complete the move and open your new Franchised Location within 12 months from the date the Store at the prior Franchised Location closes.

We must approve a Franchised Location before you sign a Franchise Agreement. The designation of your Franchised Location does not grant you the exclusive right to any particular market or customers. You may advertise your Store anywhere, as long as you receive our prior approval of all advertising. Other ROCKY MOUNTAIN CHOCOLATE FACTORY franchisees have the same rights to advertise. See Item 11 for more discussion of advertising.

We may establish other related franchises or company-owned Stores that sell or lease similar products or services under a different name or trademark. We retain the rights, among others: (1) to use, and to license others to use, the Marks and Licensed Methods for the operation of Stores, including Kiosk Stores, Satellite Stores and Temporary Stores, at any location other than at the Franchised Location; (2) to use the Marks and Licensed Methods to identify services and products, promotional and marketing efforts or related items, and to identify products and services similar to those which you will sell, but made available through alternative channels of distribution other than through traditional Stores, at any location other than at the Franchised Location, including, but not limited to, through Satellite Stores, Temporary Stores, Kiosk Stores, by way of mail order, (including electronic mail order), the Internet, catalog, television, retail store display or through the wholesale sale of its products to unrelated retail outlets or to candy distributors or outlets located in stadiums, arenas, airports, turnpike rest stops or supermarkets; and (3) to use and license the use of other proprietary marks or methods in connection with the sale of products and services similar to those which you will sell or in connection with the operation of retail stores selling gourmet chocolates or other premium confectionery products, at any location other than at the Franchised Location, which stores are the same as, or similar to, or different from a traditional Store, a Kiosk Store or a Satellite Store or a Temporary Store, on any terms and conditions as we deem advisable, and without granting you any rights in them.

Your continuation of the right to operate the Store during the term of the Franchise Agreement does not depend on achievement of any certain sales volume, market penetration or similar contingency. Although in some instances, we grant a franchisee a right of first refusal on a neighboring or extended territory, you have no option, right of first refusal or similar contractual right to acquire additional Stores within a territory or in areas contiguous to your Store(s).

## ITEM 13

## TRADEMARKS

We grant you the right to use the Marks, including the trademark and service mark ROCKY MOUNTAIN CHOCOLATE FACTORY, ROCKY MOUNTAIN CHOCOLATE FACTORY and design and other trademarks, service marks and commercial symbols which we may authorize. We have registered the following principal trademarks on the Principal Register of the United States Patent and Trademark Office:

(CA 6/1/03)   20

| Mark | Registration No. | Date of Registration |
|---|---|---|
| Rocky Mountain Chocolate Factory | Reg. No. 1,552,146 | August 15, 1989 |
| Rocky Mountain Chocolate Factory and design | Reg. No. 1,718,498 | September 22, 1992 |

We have filed all required affidavits and renewals for these Marks. You must follow our rules when you use the Marks. You may not use the phrase, an abbreviation or two or more of the words "ROCKY MOUNTAIN CHOCOLATE FACTORY" in the legal name of your Business Entity.

You must modify or discontinue your use of a Mark if we require you to modify or discontinue it, at your own expense. We do not allow you to use or register any domain names or use the Internet to market or promote your Store, Factory Candy, Store Candy or other Items sold in or through your Store without our prior written consent. See Items 11 and 16.

There are no presently effective determinations of the United States Patent and Trademark Office, the trademark trial and appeal board, the trademark administrator of any state or any court, any pending infringement, opposition or cancellation proceedings or material litigation involving the principal Marks.

No agreements limit our right to use or license the use of the Marks.

We are not contractually obligated by the Franchise Agreement to protect you against claims of infringement or unfair competition related to your use of the Marks, but it is our policy to do so when, in the opinion of our legal counsel, your right to use the Marks requires protection. In this case, we will pay all costs, including attorneys' fees and court costs, associated with any litigation required to defend or protect your authorized use of the Marks. You must cooperate with us in any litigation.

We do not know of any infringing uses that could materially affect your use of the Marks.

## ITEM 14

### PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

No patents or copyrights are material to the franchise.

We consider our Operations Manual and related materials to be proprietary and confidential and we consider them to be our property to be used by you only as described in the Franchise Agreement. You must maintain the confidentiality of our information and adopt reasonable procedures to prevent unauthorized disclosure of these secrets and information.

## ITEM 15

### OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

You (or your managing shareholder or partner) are not required to participate personally in the direct operation of your Store although we strongly urge you to do so. If you (or your managing partner

(CA 6/1/03)　　　　　　　　　　21

or shareholder) do not participate in the day-to-day operation of the Store, you must designate a manager ("**General Manager**") to be responsible for the direct on-premises supervision of the Store at all times during its hours of operation. If you are a Business Entity, we do not require that your General Manager own an equity interest in you. You or, if applicable, the General Manager, must successfully complete our mandatory initial training program. You and your managers must enter into a confidentiality and noncompetition agreement with us (Exhibit VI to Franchise Agreement). We make no recommendations and have no requirements regarding employment or other written agreements between you and your employees.

We may require each of your officers, directors, principal shareholders, partners and/or members to sign an agreement (Exhibit III to Franchise Agreement) personally guaranteeing and agreeing to perform all of your obligations under the Franchise Agreement.

## ITEM 16

### RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must offer for sale through your Store only the Factory Candy, Store Candy and Items that we approve in writing. The authorized vendor list, which is part of our Operations Manual, describes the full line of products identified with the ROCKY MOUNTAIN CHOCOLATE FACTORY System. We may change the types of authorized products and services, and do not limit our right to do so, although we provide you with written notice 30 days before any change becomes effective.

You must devote a minimum of 50% of all retail display space to Factory Candy, or in other words, RMCF-manufactured bulk chocolates and packaged candies. The other edible items we permit you to serve, make and sell through your Store are store-made candies that you prepare from recipes and specifications in the Operations Manual, through the process of molding, cooking and dipping various foods, such as cookies, crackers, pretzels, fresh and dried fruits, dog bones, plain chocolate and other items we approve in writing, in our sole discretion. We refer to these other edible items as "Store Candy" throughout this Offering Circular. All Factory Candy, Store Candy and Items must be sold in containers or bags that we approve.

You must obtain our consent in writing before you operate food carts, participate in food festivals or offer any other type of off-site food services using our Marks and Licensed Methods. See Exhibits H (Satellite Store) and I (Temporary Store) to this Offering Circular.

You must not offer any other type of product or service, or operate or engage in any other type of business or profession, from or through your Franchised Location, including, filling "wholesale orders," which we define in the Franchise Agreement as those orders or sales where the principal purpose of the purchase is for resale, not for consumption, or any sale other than over-the-counter sales at a price other than the price charged to the general public. We permit volume discounted sales made at the Franchised Location to a single purchaser, not for resale, and discounted sales made at the Franchised Location to charitable organizations for fund-raising purposes. You may not offer any Store Candy, Factory Candy or Items for sale on the Internet.

(CA 6/1/03)　　　　　　　　　　　　　　22

# ITEM 17

## RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

This table lists certain important provisions of the Franchise Agreement. You should read these provisions in the Franchise Agreement attached to this Offering Circular.

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| a. | Term of the franchise | Section 17.1 | 10 years |
| b. | Renewal or extension of the term | Section 17.2 | One 10-year term. |
| c. | Requirements for you to renew or extend | Section 17.3 | Pay fee, sign new agreement with addendum attached as <u>Exhibit J</u>. |
| d. | Termination by you | None | N/A |
| e. | Termination by us without cause | None | N/A |
| f. | Termination by us with cause | Sections 18.1 and 18.2 | We can terminate only if you commit any one of several listed violations. |
| g. | "Cause" defined-defaults which can be cured | Sections 18.1 and 18.2 | 15 days for failure to comply with any provision of Franchise Agreement or Operations Manual. |
| h. | "Cause" defined-defaults which cannot be cured | Section 18.1 | Assignment for benefit of creditors, inability to pay debts, bankruptcy,* reorganization, liquidation, dissolution, receivership, certain unreversed judgments, abandonment, material understatement of income, unlawful or deceptive practices, failure to pay fees, etc. to us after 10 days notice. |
| i. | Your obligations on termination/nonrenewal | Section 18.5 | Pay outstanding amounts, de-identify Store, transfer telephone number, no use of our trade secrets or proprietary materials, covenant not to compete, sign general release (see also r). |
| j. | Assignment of contract by us | Section 16.6 | No restriction on our right to assign. |
| k. | "Transfer" by you – definition | Section 16.1 | Includes transfer of at least 25% of stock or assets of Store. |
| l. | Our approval of transfer by you | Section 16.3 | We have the right to approve all transfers, our consent not to be unreasonably withheld. |
| m. | Conditions for our approval of transfer | Section 16.2 | You must have complied with Franchise Agreement and Operations Manual, transferee must qualify, you must pay all amounts due in full, you must pay transfer fee, transferee must sign the then current contract and you must sign a release. |

(CA 6/1/03)                          23

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| n. | Our right of first refusal to acquire your business | Section 16.4 | We may match any offer. |
| o. | Our option to purchase your business | Section 18.4 | We may offer to buy your Store or just your Store assets. |
| p. | Your death or disability | Section 16.7 | Transfer must occur within 120 days. |
| q. | Non-competition covenants during the term of the franchise | Section 20.1 | No involvement in competing business. |
| r. | Non-competition covenants after the franchise is terminated or expires | Section 20.2 | No involvement in competing business. |
| s. | Modification of the agreement | Section 22.3 | No modifications generally but Operations Manual may change. |
| t. | Integration/merger clause | Section 22.4 | Only terms of Franchise Agreement are binding (subject to state law). |
| u. | Dispute resolution by arbitration or mediation | None | N/A |
| v. | Choice of forum | Section 22.1 | Litigation in LaPlata County, Colorado (subject to state law). |
| w. | Choice of law | Section 22.1 | Colorado law applies (subject to state law). |

\*   This provision may not be enforceable under federal bankruptcy law. (11 U.S.C.A. Sec. 101 *et seq.*)

These states have statutes which may supersede the Franchise Agreement in your relationship with us, including the areas of termination and renewal of your franchise: ARKANSAS [Stat. Sections 4-72-201 to 4-72-210], CALIFORNIA [Bus. & Prof. Code Sections 20000-20043], CONNECTICUT [Gen. Stat. Ch. 739, Sections 42-133e to 42-133h], DELAWARE [Title 6, Ch. 25, Code Sections 2551-2556], HAWAII [Title 26, Rev. Stat. Section 482E-6], ILLINOIS [ILCS, Ch.815, Sections 705/1-705/44], INDIANA [Code Section 23-2-2.7-1 to 7], IOWA [Title XX, Code Sections 523H.1-523H.17], MARYLAND [MD. CODE ANN., BUS. REG. Sections 14-201 to 14-233 (1998 Repl. Vol. & Supp. 2001)], MICHIGAN [1979 Comp. Laws, Section 445.1527], MINNESOTA [1996 Stat. Section 80C.14], MISSISSIPPI [Code Sections 75-24-51 to 75-24-63], MISSOURI [Rev. Stat. Sections 407.400-407.410, 407.413, 407.420], NEBRASKA [Rev. Stat. Sections 87-401 to 87-410], NEW JERSEY [Rev. Stat. Sections 56:10-1 to 56:10-12], SOUTH DAKOTA [Codif. L. Section 37-5A-51], VIRGINIA [Code Sections 13.1-557-574], WASHINGTON [Rev. Code Sections 19.100.180, 19.100.190], WISCONSIN [Stat. Sections 135.01 - 135.07], DISTRICT OF COLUMBIA [Code Sections 29-1201 to 29-1208], PUERTO RICO [Ann. Laws, Title 10, Ch. 14, Sections 278-278d], VIRGIN ISLANDS [Code Ann., Title 12A, Ch. 2, Subch. III, Sections 130-139]. These and other states may have court decisions which may supersede the Franchise Agreement in your relationship with the Franchisor, including the areas of termination and renewal of your franchise.

SEE ATTACHED ADDENDUM IMMEDIATELY FOLLOWING ITEM 22 OF THIS OFFERING CIRCULAR FOR INFORMATION REGARDING CALIFORNIA LAW.

(CA 6/1/03)                                24

## ITEM 18

### PUBLIC FIGURES

We do not use any public figure to promote our franchise.

## ITEM 19

### EARNINGS CLAIMS

**CAUTION**: WHILE THE ATTACHED FIGURES REPRESENT ACTUAL GROSS SALES OF FRANCHISED STORES DURING OUR MOST RECENT FISCAL YEAR ENDED FEBRUARY 28, 2003, THE FOLLOWING DATA SHOULD NOT BE CONSIDERED AS THE ACTUAL, POTENTIAL OR PROBABLE GROSS SALES THAT WILL BE REALIZED BY YOU OR ANY OTHER FRANCHISEES. WE DO NOT REPRESENT THAT YOU CAN EXPECT TO ATTAIN THESE GROSS SALES LEVELS OR ANY INCOME OR PROFIT THAT COULD RESULT FROM SUCH GROSS SALES. YOUR FINANCIAL RESULTS ARE LIKELY TO DIFFER FROM THE FIGURES PRESENTED. YOU SHOULD CAREFULLY REVIEW THE ATTACHED EXPLANATORY NOTES.

THE EARNINGS FIGURES DO NOT REFLECT THE COSTS OF SALES OR OPERATING EXPENSES THAT MUST BE DEDUCTED FROM THE GROSS REVENUE OR GROSS SALES FIGURES TO OBTAIN YOUR NET INCOME OR PROFIT. THE BEST SOURCE OF COST AND EXPENSE DATA WILL EVENTUALLY BE FROM FRANCHISEES AND FORMER FRANCHISEES.

THIS FINANCIAL INFORMATION IS PREPARED WITHOUT AN AUDIT. PROSPECTIVE FRANCHISEES OR SELLERS OF FRANCHISES SHOULD BE ADVISED THAT NO CERTIFIED PUBLIC ACCOUNTANT HAS AUDITED THESE FIGURES OR EXPRESSED HIS/HER OPINION WITH REGARD TO THE CONTENT OR FORM.

(CA 6/1/03)                         25

FISCAL YEAR 2003 ACTUAL GROSS SALES FOR TOP 75% OF FRANCHISED STORES
OPEN FOR AT LEAST TWELVE MONTHS

| Store | Sales | Year Opened | Store | Sales | Year Opened | Store | Sales | Year Opened |
|---|---|---|---|---|---|---|---|---|
| 1 | $1,477,109 | 1996 | 43 | $427,985 | 1997 | 85 | $299,472 | 1996 |
| 2 | $678,286 | 1999 | 44 | $411,312 | 2000 | 86 | $298,477 | 1995 |
| 3 | $667,375 | 1998 | 45 | $406,207 | 2001 | 87 | $294,710 | 2001 |
| 4 | $656,053 | 1985 | 46 | $402,044 | 2000 | 88 | $292,353 | 1997 |
| 5 | $620,540 | 1995 | 47 | $401,664 | 2000 | 89 | $291,446 | 2002 |
| 6 | $617,454 | 1999 | 48 | $401,591 | 1998 | 90 | $290,229 | 1999 |
| 7 | $613,192 | 2001 | 49 | $399,988 | 2001 | 91 | $285,106 | 1983 |
| 8 | $608,525 | 2002 | 50 | $399,426 | 1990 | 92 | $283,086 | 1993 |
| 9 | $593,951 | 1997 | 51 | $398,825 | 1992 | 93 | $283,029 | 2001 |
| 10 | $583,302 | 1986 | 52 | $398,301 | 2002 | 94 | $282,662 | 1998 |
| 11 | $583,012 | 1995 | 53 | $395,847 | 1992 | 95 | $280,614 | 2001 |
| 12 | $569,641 | 1994 | 54 | $393,244 | 1997 | 96 | $278,685 | 1997 |
| 13 | $563,212 | 1999 | 55 | $390,506 | 1994 | 97 | $278,012 | 1992 |
| 14 | $550,626 | 2002 | 56 | $388,455 | 1993 | 98 | $274,476 | 1995 |
| 15 | $545,772 | 1997 | 57 | $388,392 | 1993 | 99 | $272,257 | 2000 |
| 16 | $543,504 | 1992 | 58 | $382,861 | 1999 | 100 | $270,427 | 1982 |
| 17 | $537,239 | 2001 | 59 | $382,674 | 1992 | 101 | $270,369 | 1987 |
| 18 | $530,449 | 1995 | 60 | $382,244 | 2000 | 102 | $269,465 | 1982 |
| 19 | $527,800 | 1999 | 61 | $377,977 | 2000 | 103 | $268,439 | 1994 |
| 20 | $518,170 | 1996 | 62 | $376,828 | 1996 | 104 | $267,953 | 1999 |
| 21 | $516,524 | 2000 | 63 | $376,633 | 2000 | 105 | $266,812 | 1999 |
| 22 | $506,553 | 1992 | 64 | $370,142 | 1983 | 106 | $266,270 | 1998 |
| 23 | $500,441 | 1999 | 65 | $368,731 | 2000 | 107 | $264,899 | 1995 |
| 24 | $489,554 | 2002 | 66 | $368,529 | 2000 | 108 | $261,678 | 2000 |
| 25 | $489,046 | 1984 | 67 | $364,587 | 1995 | 109 | $258,120 | 2001 |
| 26 | $487,121 | 2002 | 68 | $364,231 | 1994 | 110 | $257,460 | 2000 |
| 27 | $483,759 | 1991 | 69 | $360,049 | 1999 | 111 | $254,126 | 1999 |
| 28 | $483,444 | 1993 | 70 | $358,692 | 2001 | 112 | $252,798 | 1997 |
| 29 | $480,458 | 1984 | 71 | $357,753 | 1995 | 113 | $251,450 | 2000 |
| 30 | $469,595 | 2001 | 72 | $349,728 | 2001 | 114 | $245,676 | 1984 |
| 31 | $452,738 | 2000 | 73 | $349,555 | 2000 | 115 | $244,628 | 2002 |
| 32 | $451,146 | 1994 | 74 | $346,548 | 2000 | 116 | $241,691 | 2002 |
| 33 | $446,296 | 2000 | 75 | $337,788 | 1983 | 117 | $240,391 | 1996 |
| 34 | $443,610 | 2001 | 76 | $335,778 | 1997 | 118 | $239,976 | 1995 |
| 35 | $439,575 | 2001 | 77 | $324,908 | 2000 | 119 | $237,414 | 2000 |
| 36 | $438,961 | 1993 | 78 | $323,876 | 2000 | 120 | $236,784 | 1995 |
| 37 | $434,495 | 1983 | 79 | $310,397 | 2001 | 121 | $228,170 | 1999 |
| 38 | $434,210 | 2002 | 80 | $307,475 | 1990 | 122 | $227,284 | 2001 |
| 39 | $433,432 | 1999 | 81 | $307,078 | 1995 | 123 | $224,238 | 2002 |
| 40 | $429,926 | 1996 | 82 | $302,253 | 1986 | 124 | $223,942 | 2000 |
| 41 | $429,029 | 2001 | 83 | $301,956 | 2001 | 125 | $222,457 | 1998 |
| 42 | $428,061 | 2000 | 84 | $299,704 | 2000 | 126 | $219,604 | 2002 |
|   |   |   |   |   |   | 127 | $217,242 | 1995 |

(CA 6/1/03)   26